THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, D.C. 20530

KEVIN V. RYAN
United States Attorney
CHARLES M. O'CONNOR
Assistant United States Attorney
Northern District of California
450 Golden Gate Ave., Box 36055
San Francisco, CA 94102

A. KENT MAYO
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 616-6557
kent.mayo@usdoj.gov

Attorneys for Plaintiff United States

        [Additional Counsel identified on signature pages.]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| Plaintiff,  ) | |
| and  ) | |
| ) | NO. C 03-04650 (CRB) |
| STATE OF HAWAII,  ) | |
| MISSISSIPPI COMMISSION ON  ) | |
| ENVIRONMENTAL QUALITY,  ) | |
| STATE OF UTAH,  ) | |
| BAY AREA AIR QUALITY  ) | |
| MANAGEMENT DISTRICT,  ) | |
| Plaintiff-Intervenors,  ) | **CONSENT DECREE** |
| v.  ) | |
| CHEVRON U.S.A. INC.,  ) | |
| Defendant.  ) | |

# TABLE OF CONTENTS

I.      Jurisdiction and Venue (Paragraphs 1-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     Applicability and Binding Effect (Paragraphs 4-8) . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    Objectives (Paragraph 9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     Definitions (Paragraph 10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      Affirmative Relief/Environmental Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A.      NOx Emissions Reductions from FCCU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.      $SO_2$ Emissions Reductions from FCCU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.      PM Emissions Reductions from FCCU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.      CO Emissions Reductions from FCCU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E.      NSPS Applicability of FCCU Regenerators . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

F.      NOx Emissions Reductions from Heaters and Boilers . . . . . . . . . . . . . . . . . . . 41

G.      $SO_2$ Emissions Reductions from and NSPS Applicability to Chevron Heaters
        and Boilers and Other Specified Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

H.      Sulfur Recovery Plants - NSPS Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . 48

I.      Flaring Devices - NSPS Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

J.      Control of Acid Gas Flaring Incidents and Tail Gas Incidents . . . . . . . . . . . . . 57

K.      Control of Hydrocarbon Flaring Incidents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

L.      Benzene Waste NESHAP Program Enhancements . . . . . . . . . . . . . . . . . . . . . . 67

M.      Leak Detection and Repair Program Enhancements . . . . . . . . . . . . . . . . . . . . . 82

N.      Incorporation of Consent Decree Requirements into Federally-
        Enforceable Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

102.    Construction Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

O.      Risk Management Plan for El Segundo Refinery . . . . . . . . . . . . . . . . . . . . . . . . 93

VI.     Emission Credit Generation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

VII.    Modifications to Implementation Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

VIII.   Supplemental Environmental Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

IX.    Reporting and Recordkeeping   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

X.    Civil Penalty   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

XI.    Stipulated Penalties   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

A.    Non-Compliance with Requirements for NOx Emission Reductions
      from FCCU   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

B.    Non-Compliance with Requirements for SO$_2$ Emission Reductions
      from FCCU   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

C.    Non-Compliance with Requirements for PM Emission Reductions
      from FCCU   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

D.    Non-Compliance with Requirements for CO Emission Reductions
      from FCCU   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

E.    Non-Compliance with Requirements for NOx Emission Reductions
      from Heaters/Boilers   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

F.    Non-Compliance with Requirements for SO$_2$ Emission Reductions
      from Heaters/Boilers   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

G.    Non-Compliance with Requirements for NSPS Applicability of
      Sulfur Recovery Plant   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

H.    Non-Compliance with Requirements for NSPS Applicability of
      Flaring Devices   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

I.    Non-Compliance with Requirements for Control of AG Flaring and
      Tail Gas Incidents   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

J.    Non-Compliance with Requirements for Control of HC Flaring Incidents . . . . 117

K.    Non-Compliance with Requirements for Benzene Waste
      NESHAP Enhancements   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

L.    Non-Compliance with Requirements for Leak Detection and
      Repair Enhancements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

M.    Non-Compliance with Requirements for Risk Management Plan
      for El Segundo Refinery   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

173.  Non-Compliance with Requirements Related to Environmentally
      Beneficial Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

174.  Non-Compliance with Requirements for Reporting and Recordkeeping  . . . . . 122

175.  Non-Compliance with Requirements for Payment of Civil Penalties . . . . . . . . 122

176.  Non-Compliance with Requirement to Pay Stipulated Penalties  . . . . . . . . . . 122

177.  Payment of Stipulated Penalties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

178.  Stipulated Penalties Dispute  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

XII.   Interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

XIII.  Right of Entry  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

XIV.  Force Majeure  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

XV.   Retention of Jurisdiction/Dispute Resolution  . . . . . . . . . . . . . . . . . . . . . . . . 127

XVI.  Effect of Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

XVII. General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

XVIII. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

XIX.  Signatories  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

# TABLE OF APPENDICES

Appendix A –   Determining the Optimized Addition Rates for Catalyst Additives at the FCCUs

Appendix B –   List of Heaters and Boilers Greater Than 40 mmBTU Per Hour

Appendix C –   Predictive Emissions Monitoring Systems Requirements

Appendix D –   NSPS Compliance Schedule for Heaters and Boilers

Appendix E –   NSPS Compliance Schedule for Other Identified Equipment

Appendix F –   List of Flaring Devices

Appendix G –   [Omitted]

Appendix H –   Logic Diagram for Paragraphs 60 to 63

Appendix I-   [Omitted]

Appendix J –   Carbon Canister Breakthrough Study Guidelines

Appendix K –   Sustainable Skip Period Program

Appendix L –   Federal Diesel Emissions Reduction SEPs

Appendix M –   Facility- and Community-Specific SEPs

1      WHEREAS, plaintiff, the United States of America ("Plaintiff" or "the United States"),

2   by the authority of the Attorney General of the United States and through its undersigned

3   counsel, acting at the request and on behalf of the United States Environmental Protection

4   Agency ("EPA"), has simultaneously filed a Complaint and lodged this Consent Decree against

5   Chevron U.S.A. Inc. ("Chevron"), for alleged environmental violations at Chevron's petroleum

6   refineries in Richmond, California, El Segundo, California, Pascagoula, Mississippi, Salt Lake

7   City, Utah, and Kapolei, Hawaii (collectively, the "Chevron Refineries");

8      WHEREAS, the United States alleges that Chevron has violated and/or continues to

9   violate the following statutory and regulatory provisions:

10      1)  Prevention of Significant Deterioration ("PSD") requirements found at Part C of

11   Subchapter I of the Clean Air Act (the "Act"), 42 U.S.C. § 7475, and the regulations

12   promulgated thereunder at 40 C.F.R. § 52.21 (the "PSD Rules"); the portions of the applicable

13   state implementation plans ("SIPs") and related rules adopted as required by 40 C.F.R. §§ 51.165

14   and 51.166; and "Plan Requirements for Non-Attainment Areas" at Part D of Subchapter I of the

15   Act, 42 U.S.C. §§ 7502-7503, and the regulations promulgated thereunder at 40 C.F.R. §

16   51.165(a) and (b) and at 40 C.F.R. Part 51, Appendix S, and at 40 C.F.R. § 52.24 ("PSD/NSR

17   Regulations"), for heaters and boilers and fluid catalytic cracking unit catalyst regenerators for

18   NOx, SO$_2$, CO and PM;

19      2)  New Source Performance Standards ("NSPS") found at 40 C.F.R. Part 60, Subparts

20   A and J, under Section 111 of the Act, 42 U.S.C. § 7411 ("Refinery NSPS Regulations"), for

21   sulfur recovery plants, fuel gas combustion devices, and fluid catalytic cracking unit catalyst

22   regenerators;

23      3)  Leak Detection and Repair ("LDAR") requirements promulgated pursuant to

24   Sections 111 and 112 of the Act, and found at 40 C.F.R. Part 60 Subparts VV and GGG; 40

25   C.F.R. Part 61, Subparts J and V; and 40 C.F.R. Part 63, Subparts F, H, and CC ("LDAR

26   Regulations"); and

27      4)  National Emission Standards for Hazardous Air Pollutants ("NESHAP") for

28   Benzene Waste Operations promulgated pursuant to Section 112(e) of the Act, and found at  40

1    C.F.R. Part 61, Subpart FF ("Benzene Waste NESHAP Regulations").

2            WHEREAS, the United States further alleges that Chevron has violated and/or

3    continues to violate the reporting requirements found at Section 103(a) of the Comprehensive

4    Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9603(a),

5    and Section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42

6    U.S.C. § 11004, and the regulations promulgated thereunder;

7            WHEREAS, the United States also specifically alleges that Chevron, at its El Segundo

8    Refinery, has violated the reporting requirements found at Section 103(a) of CERCLA, 42

9    U.S.C. § 9603(a), and Section 304 of EPCRA, 42 U.S.C. § 11004, and the regulations

10   promulgated thereunder, and the Chemical Accident Prevention Provisions promulgated

11   pursuant to Section 112(r) of the Clean Air Act, 42 U.S.C. § 7412(r), and found at 40 C.F.R. Part

12   68;

13           WHEREAS, the United States also specifically alleges that, upon information and

14   belief, Chevron has been and/or continues to be in violation of the SIPs and other state and local

15   rules, regulations and permits adopted or issued by the states in which the Chevron Refineries

16   are located to the extent that such plans, rules, regulations, and permits implement, adopt or

17   incorporate the above-described Federal requirements;

18           WHEREAS, the State of Hawaii, the Mississippi Commission on Environmental

19   Quality, an agency of the State of Mississippi, the State of Utah, and the Bay Area Air Quality

20   Management District ("BAAQMD") (collectively, "Plaintiff-Intervenors"), have sought to

21   intervene in this matter alleging violations of their respective applicable SIP provisions and/or

22   other state and local rules, regulations, and permits incorporating and implementing the

23   foregoing federal requirements;

24           WHEREAS, Chevron denies that it has violated and/or continues to violate the

25   foregoing statutory, regulatory, SIP provisions and other state and local rules, regulations and

26   permits incorporating and implementing the foregoing federal requirements, and maintains that it

27   has been and remains in compliance with all applicable statutes, regulations and permits and is

28   not liable for civil penalties and injunctive relief as alleged in the Complaint;

1     WHEREAS, the United States is engaged in a federal strategy for achieving cooperative

2  agreements with U.S. petroleum refineries to achieve across-the-board reductions in emissions

3  ("Global Settlement Strategy");

4     WHEREAS, Chevron consents to the simultaneous filing of the Complaint and lodging

5  of this Consent Decree against Chevron despite its denial of the allegations in the Complaint to

6  accomplish its objective of cooperatively reconciling the goals of the United States, Chevron and

7  the Plaintiff-Intervenors under the Clean Air Act and the corollary state statutes, and therefore

8  agrees to undertake the installation of air pollution control equipment and enhancements to its air

9  pollution management practices at the Chevron Refineries to reduce air emissions by

10 participating in the Global Settlement Strategy;

11     WHEREAS, by entering into this Consent Decree, Chevron is committed to pro-

12 actively resolving environmental concerns relating to its operations;

13     WHEREAS, the United States and the Plaintiff-Intervenors anticipate that the

14 affirmative relief and environmental projects identified in Sections V and VIII of this Consent

15 Decree will reduce annual emissions from the Chevron Refineries by the following amounts: 1)

16 nitrogen oxide by approximately 3,300 tons per year; 2) sulfur dioxide by approximately 6,300

17 tons per year.

18     WHEREAS, EPA recently issued PSD Rules and PSD/NSR Regulations, see 67 Fed.

19 Reg. 80186-80289 (2002), that identify and address "Pollution Control Projects" and "Clean

20 Units" and the applicability of PSD/NSR permitting requirements to such Projects or Units;

21     WHEREAS, EPA previously issued guidance ("Pollution Control Projects and New

22 Source Review (NSR) Applicability", July 1, 1994) identifying and addressing "Pollution

23 Control Projects" and the applicability of PSD/NSR permitting requirements to such Projects;

24     WHEREAS, EPA agrees that under the recently issued PSD Rules and PSD/NSR

25 Regulations that identify and address "Clean Units", see 67 Fed. Reg. 80186 et seq., units that

26 accept the following emission limits under this Consent Decree may be considered as "Clean

27 Units" with respect to the identified pollutants:

28     For FCCUS:      – 20 ppmvd NOx at 0% O2 on a 365-day rolling average basis

1      – 25 ppmvd SO2 at 0% O2 on a 365-day rolling average basis

2      – 100 ppmvd CO at 0% O2 on a 365-day rolling average basis

3      – 0.5 pounds of PM per 1,000 pounds of coke burned on a 3-hour

4      average basis

5   For Heaters and Boilers: 0.020 lbs/mmBTU NOx

6 Units with higher limits may be considered as "Clean Units" under applicable rules at the

7 discretion of the permitting agency.

8   WHEREAS, EPA agrees that under recently issued PSD Rules and PSD/NSR

9 Regulations that identify and address "Pollution Control Projects", see 67 Fed. Reg. 80186 et

10 seq., and under prior EPA guidance ("Pollution Control Projects and New Source Review (NSR)

11 Applicability," July 1, 1994), the following activities may be considered as "Pollution Control

12 Projects" under such rules, regulations, and guidance, provided that Chevron complies with the

13 requirements for "Pollution Control Projects" under applicable federal, state, and local

14 regulations and policies.

15   For FCCUs:  Activities required to comply with Sections V.A. and B. of this Consent

16   Decree (reduction of NOx and SO2 emissions by use of hardware and/or use of catalyst

17   additives under applicable protocol).

18   For Heaters and Boilers: Activities undertaken to comply with Paragraph 33 of this

19   Consent Decree (reduction of NOx emissions by 2777 tons through the installation of

20   Qualifying Controls (as defined in Paragraph 32)).

21   WHEREAS, Chevron's Hawaii Refinery, located on the Island of Oahu, has no access

22 to an external source or supply of natural gas and generates insufficient refinery fuel gas to

23 operate all process units at the Refinery on refinery fuel gas.

24   WHEREAS, with respect to the provisions of Section V.J. ("Control of Acid Gas

25 Flaring Incidents and Tail Gas Incidents") of this Consent Decree, EPA maintains that "[i]t is the

26 intent of the proposed standard [40 C.F.R. § 60.104] that hydrogen-sulfide-rich gases exiting the

27 amine regenerator [or sour water stripper gases] be directed to an appropriate recovery facility,

28 such as a Claus sulfur plant," see Information for Proposed New Source Performance Standards:

1    <u>Asphalt Concrete Plants, Petroleum Refineries, Storage Vessels, Secondary Lead Smelters and</u>

2    <u>Refineries, Brass or Bronze Ingot Production Plants, Iron and Steel Plants, Sewage Treatment</u>

3    <u>Plants</u>, Vol. 1, Main Text at 28;

4              WHEREAS, EPA further maintains that the failure to direct hydrogen-sulfide-rich gases

5    to an appropriate recovery facility --  and instead to flare such gases under circumstances that are

6    not sudden or infrequent or that are reasonably preventable -- circumvents the purposes and

7    intentions of the standards at 40 C.F.R. Part 60, Subpart J;

8              WHEREAS, EPA recognizes that "Malfunctions," as defined in Paragraph 10.BB. of

9    this Consent Decree and 40 C.F.R. § 60.2, of the "Sulfur Recovery Plants" or of "Upstream

10   Process Units" may result in flaring of "Acid Gas" or "Sour Water Stripper Gas" on occasion, as

11   those terms are defined herein, and that such flaring does not violate 40 C.F.R. § 60.11(d) if the

12   owner or operator, to the extent practicable, maintains and operates such units in a manner

13   consistent with good air pollution control practice for minimizing emissions during these

14   periods;

15             WHEREAS, discussions between the Parties have resulted in the settlement embodied

16   in the Consent Decree;

17             WHEREAS, Chevron has waived any applicable federal, state or local requirements of

18   statutory notice of the alleged violations;

19             WHEREAS, notwithstanding the foregoing reservations, the Parties agree that:

20   (a) settlement of the matters set forth in the Complaint (filed herewith) is in the best interests of

21   the Parties and the public; and (b) entry of the Consent Decree without litigation is the most

22   appropriate means of resolving this matter;

23             WHEREAS, the Parties recognize, and the Court by entering the Consent Decree finds,

24   that the Consent Decree has been negotiated at arms length and in good faith and that the

25   Consent Decree is fair, reasonable, and in the public interest;

26             NOW THEREFORE, with respect to the matters set forth in the Complaint and in

27   Section XVI of this Consent Decree ("Effect of Settlement"), and before the taking of any

28   testimony, without adjudication of any issue of fact or law, and upon the consent and agreement

1   of the Parties to the Consent Decree, it is hereby ORDERED, ADJUDGED and DECREED as

2   follows:

### I.  JURISDICTION AND VENUE

4       1.      This Court has jurisdiction over the subject matter of this action and over the

5   Parties pursuant to 28 U.S.C. §§ 1331, 1345 and 1355.  In addition, this Court has jurisdiction

6   over the subject matter of this action pursuant to Sections 113(b) and 167 of the CAA, 42 U.S.C.

7   §§ 7413(b) and 7477, Sections 325(a), (b), and (c) of EPCRA, 42 U.S.C. § 11045(a), (b), and (c),

8   and Section 109(c) of CERCLA, 42 U.S.C. § 9609(c).  The United States' complaint states a

9   claim upon which relief may be granted for injunctive relief and civil penalties against Chevron

10  under the Clean Air Act, EPCRA, and CERCLA.  Authority to bring this suit is vested in the

11  United States Department of Justice by 28 U.S.C. §§ 516 and 519, Section 305 of the CAA, 42

12  U.S.C. § 7605, Section 325 of EPCRA, 42 U.S.C. § 11045, and Section 109(c) of CERCLA, 42

13  U.S.C. § 9609(c).

14      2.      Venue is proper in the Northern District of California pursuant to Section

15  113(b) of the CAA, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c), and 1395(a).

16  Chevron consents to the personal jurisdiction of this Court, waives any objections to venue in

17  this District, and does not object to the intervention of the Plaintiff-Intervenors in this action.

18      3.      Notice of the commencement of this action has been given to the State of

19  Hawaii, the State of Mississippi, the State of Utah, the California Air Resources Board, the

20  BAAQMD and the South Coast Air Quality Management District in accordance with Section

21  113(a)(1) of the Clean Air Act, 42 U.S.C. § 7413(a)(1), and as required by Section 113(b) of the

22  CAA, 42 U.S.C. § 7413(b).

23

### II.  APPLICABILITY AND BINDING EFFECT

25      4.      The provisions of the Consent Decree shall apply to the Chevron Refineries.

26  The provisions of the Consent Decree shall be binding upon the United States, the Plaintiff-

27  Intervenors, and Chevron and its agents, successors, and assigns.

28      5.      Chevron agrees not to contest the validity of the Consent Decree in any

1   subsequent proceeding to implement or enforce its terms.

2   　　　　　6.　　　　Effective from the Date of Entry of the Consent Decree until its termination,

3   Chevron agrees that the Chevron Refineries are covered by this Consent Decree.  Effective from

4   the Date of Lodging of the Consent Decree, Chevron shall give written notice of the Consent

5   Decree to any successors in interest to any of the Chevron Refineries prior to the transfer of

6   ownership or operation of any portion of any of the Chevron Refineries and shall provide a copy

7   of the Consent Decree to any successor in interest.  Chevron shall notify the United States and

8   the appropriate Plaintiff-Intervenor in accordance with the notice provisions set forth in

9   Paragraph 231 (Notice), of any successor in interest at least thirty (30) days prior to any such

10  transfer.

11  　　　　　7.　　　　Chevron shall condition any transfer, in whole or in part, of ownership of,

12  operation of, or other interest (exclusive of any non-controlling non-operational shareholder

13  interest) in, any of the Chevron Refineries upon the execution by the transferee of a modification

14  to the Consent Decree, which makes the terms and conditions of the Consent Decree that apply

15  to the respective Chevron Refinery applicable to the transferee.  In the event of such transfer,

16  Chevron shall notify the parties listed in Paragraph 231.   By no earlier than thirty days after

17  such notice, Chevron may file a motion to modify the Consent Decree with the Court to make

18  the terms and conditions of the Consent Decree applicable to the transferee.  Chevron shall be

19  released from the obligations and liabilities of this Consent Decree unless the United States

20  opposes the motion and the Court finds that the transferee does not have the financial and

21  technical ability to assume the obligations and liabilities under the Consent Decree.

22  　　　　　8.　　　　Chevron shall be solely responsible for ensuring that performance of the work

23  contemplated under this Consent Decree is undertaken in accordance with the deadlines and

24  requirements contained in this Consent Decree and any attachments hereto.  Chevron shall

25  provide a copy of the applicable provisions of this Consent Decree to each consulting or

26  contracting firm that is retained to perform work required under Sections V.L. or V.M. of this

27  Consent Decree, upon execution of any contract relating to such work.  Copies of the relevant

28  portions of the Consent Decree do not need to be supplied to firms who are retained solely to

1  supply materials or equipment to satisfy requirements under Sections V.L. or V.M. of this

2  Consent Decree.

3  ### III.  OBJECTIVES

4  9.  It is the purpose of the Parties in this Consent Decree to further the objectives

5  of the federal Clean Air Act, the California Health and Safety Code Section 40000 *et seq.* and the

6  California State Implementation Plan, the Hawaii Revised Statutes (1993) (as amended), the

7  Hawaii Department of Health's Air Pollution Control rules, Chapter 11-60.1, Hawaii

8  Administrative Rules and the Hawaii State Implementation Plan, the Mississippi Air and Water

9  Pollution Control Act codified at Miss. Code Ann. § 49-17-1 et seq. (Rev. 1999) and the

10  Mississippi State Implementation Plan, the Utah Code Section 19-2, Utah Administrative Code

11  R307, and the Utah State Implementation Plan.

12

13  ### IV.  DEFINITIONS

14  10.  Unless otherwise defined herein, terms used in the Consent Decree shall have

15  the meaning given to those terms in the Clean Air Act, and the implementing regulations

16  promulgated thereunder.  The following terms used in the Consent Decree shall be defined,

17  solely for purposes of the Consent Decree and the reports and documents submitted pursuant

18  thereto, as follows:

19  A.  "Acid Gas" shall mean any gas that contains hydrogen sulfide and is generated

20  at a refinery by the regeneration of an amine solution.

21  B.  "Acid Gas Flaring" or "AG Flaring" shall mean the combustion of an Acid

22  Gas and/or Sour Water Stripper Gas in an AG Flaring Device.

23  C.  "Acid Gas Flaring Device" or "AG Flaring Device" shall mean any device at

24  the Chevron Refineries that is used for the purpose of combusting Acid Gas and/or Sour Water

25  Stripper Gas, except facilities in which gases are combusted to produce sulfur or sulfuric acid.

26  The AG Flaring Devices currently in service at the Chevron Refineries are identified in

27  Appendix F to the Consent Decree.  To the extent that, during the duration of the Consent

28  Decree, the Chevron Refineries utilize AG Flaring Devices other than those specified in

1  Appendix F for the purpose of combusting Acid Gas and/or Sour Water Stripper Gas, those AG

2  Flaring Devices shall be covered under this Consent Decree.

3       D.     "Acid Gas Flaring Incident" or "AG Flaring Incident" shall mean the

4  continuous or intermittent combustion of Acid Gas and/or Sour Water Stripper Gas that results in

5  the emission of sulfur dioxide equal to, or in excess of, five-hundred (500) pounds in any twenty-

6  four (24) hour period; provided, however, that if five-hundred (500) pounds or more of sulfur

7  dioxide have been emitted in a twenty-four (24) hour period and flaring continues into

8  subsequent, contiguous, non-overlapping twenty-four (24) hour period(s), each period of which

9  results in emissions equal to, or in excess of five-hundred (500) pounds of sulfur dioxide, then

10  only one AG Flaring Incident shall have occurred.  Subsequent, contiguous, non-overlapping

11  periods are measured from the initial commencement of flaring within the AG Flaring Incident.

12       E.     [Omitted]

13       F.     "Calendar quarter" shall mean the three month period ending on March 31st,

14  June 30th, September 30th, and December 31st.

15       G.     "CEMS" shall mean continuous emissions monitoring system.

16       H.     "Chevron" shall mean Chevron U.S.A. Inc. and its operating division Chevron

17  Products Company, and their respective successors and assigns and their respective agents,

18  officers, directors, and employees in their capacities as such.

19       I.     "Chevron Pilot Plant" shall mean Chevron's proprietary facility

20  used to conduct FCCU catalyst evaluation and performance studies.

21       J.     "Chevron Refineries" shall mean the El Segundo Refinery, Richmond

22  Refinery, Pascagoula Refinery, Hawaii Refinery and the Salt Lake City Refinery.

23       K.     "Consent Decree" or "Decree" shall mean this Consent Decree, including any

24  and all appendices attached to the Consent Decree.

25       L.     "CO" shall mean carbon monoxide.

26       M.     [Omitted]

27       N.     "Current Generation Ultra-Low NOx Burners" shall mean those burners that

28  are designed to achieve a NOx emission rate of 0.020 to 0.040 lb/mmBTU HHV when firing

1   natural gas at 3% stack oxygen at full design load without air preheat, even if upon installation

2   actual emissions exceed 0.040 lb/mmBTU HHV.

3       O.      "Date of Entry of the Consent Decree" or "Date of Entry" shall mean the date

4   the Consent Decree is approved or signed by the United States District Court Judge.

5       P.      "Date of Lodging of the Consent Decree" or "Date of Lodging" shall mean the

6   date the Consent Decree is filed for lodging with the Clerk of the Court for the United States

7   District Court for the Northern District of California.

8       Q.      "Day" or "Days" as used herein shall mean a calendar day or days.

9       R.      "El Segundo Refinery" shall mean the refinery owned and operated by

10   Chevron in El Segundo, California.

11      S.      "FCCU" as used herein shall mean a fluidized catalytic cracking unit and its

12   regenerator and associated CO boiler(s) where present.

13      T.      "Flaring Device" shall mean either an AG and/or an HC Flaring Device.

14      U.      "Fuel Oil" shall mean any liquid fossil fuel with sulfur content of greater than

15   0.05% by weight.

16      V.      "Hawaii Refinery" shall mean the refinery owned and operated by Chevron in

17   Kapolei, Hawaii.

18      W.      "Hydrocarbon Flaring" or "HC Flaring" shall mean the combustion of refinery

19   -generated gases, except for Acid Gas and/or Sour Water Stripper Gas and/or Tail Gas, in a

20   Hydrocarbon Flaring Device.

21      X.      "Hydrocarbon Flaring Device" or "HC Flaring Device" shall mean, a flare

22   device used to safely control (through combustion) any excess volume of a refinery generated

23   gas other than Acid Gas and/or Sour Water Stripper Off Gas and/or Tail Gas.  The HC Flaring

24   Devices currently in service at the Chevron Refineries are identified in Appendix F to the

25   Consent Decree.  To the extent that, during the duration of the Consent Decree, the Chevron

26   Refineries utilize HC Flaring Devices other than those specified in Appendix F for the purpose

27   of combusting any excess of a refinery-generated gas other than Acid Gas and/or Sour Water

28   Stripper Gas, those HC Flaring Devices shall be covered under this Consent Decree.

1     Y.      "Hydrocarbon Flaring Incident" or "HC Flaring Incident" shall mean the

2 continuous or intermittent Hydrocarbon Flaring, except for Acid Gas or Sour Water Stripper Gas

3 or Tail Gas, at a Hydrocarbon Flaring Device that results in the emission of sulfur dioxide equal

4 to, or greater than five hundred (500) pounds in a 24-hour period; provided, however, that if

5 five-hundred (500) pounds or more of sulfur dioxide have been emitted in a twenty-four (24)

6 hour period and flaring continues into subsequent, contiguous, non-overlapping twenty-four (24)

7 hour period(s), each period of which results in emissions equal to, or in excess of five-hundred

8 (500) pounds of sulfur dioxide, then only one HC Flaring Incident shall have occurred.

9 Subsequent, contiguous, non-overlapping periods are measured from the initial commencement

10 of Flaring within the HC Flaring Incident.

11     Z.      "Hydrotreater Outage" shall mean the period of time during which the FCCU

12 operation is affected as a result of catalyst change-out operations or shutdowns required by

13 ASME pressure vessel requirements or state boiler codes, or as a result of Malfunction, that

14 prevents the hydrotreater from effectively producing the quantity and quality of feed necessary

15 to achieve established FCCU emission performance.

16     AA.     "Low NOx Combustion Promoter" shall mean a catalyst that is added to a

17 FCCU consistent with Appendix A that minimizes NOx emissions while maintaining its

18 effectiveness as a combustion promotor.

19     BB.     "Malfunction" shall mean, as specified in 40 C.F.R. § 60.2, "any sudden,

20 infrequent, and not reasonably preventable failure of air pollution control equipment, process

21 equipment, or a process to operate in a normal or usual manner.  Failures that are caused in part

22 by poor maintenance or careless operation are not malfunctions."

23     CC.     "Natural Gas Curtailment" shall mean a restriction imposed by a public utility

24 limiting Chevron's ability to obtain or use natural gas.

25     DD.     "Next Generation Ultra-Low NOx Burners" or "Next Generation ULNBs"

26 shall mean those burners new to the market that are designed to achieve a NOx emission rate of

27 less than or equal to 0.020 lb/mmBTU HHV when firing natural gas at 3% stack oxygen at full

28 design load without air preheat, even if upon installation actual emissions exceed 0.020

1    lb/mmBTU HHV.

2         EE.    "NOx" shall mean nitrogen oxides.

3         FF.    "NOx-Reducing Catalyst Additives" shall mean a catalyst additive that is

4    introduced to an FCCU to reduce NOx emissions through reduction or controlled oxidation of

5    intermediates consistent with Appendix A.

6         GG.    "Paragraph" shall mean a portion of this Consent Decree identified by an

7    Arabic numeral.

8         HH.    "PEMS" shall mean predictive emissions monitoring systems developed in

9    accordance with Appendix C to this Consent Decree.

10        II.    "PM" shall mean particulate matter as measured by 40 C.F.R. Part 60,

11   Appendix A Method 5B or 5F.

12        JJ.    "Parties" shall mean the United States, the Plaintiff-Intervenors, and Chevron.

13        KK.    "Pascagoula Petrochemical Plant" shall mean the petrochemical plant operated

14   by Chevron in Pascagoula, Mississippi.

15        LL.    "Pascagoula Refinery" shall mean the refinery owned and operated by

16   Chevron in Pascagoula, Mississippi, which shall include the Pascagoula Petrochemical Plant

17   except as otherwise specifically set forth in this Consent Decree.

18        MM.    "Plaintiff-Intervenors" shall mean the State of Hawaii, the Mississippi

19   Commission on Environmental Quality, an agency of the State of Mississippi, the State of Utah,

20   and the BAAQMD.

21        NN.    "Richmond Refinery" shall mean the refinery owned and operated by Chevron

22   in Richmond, California.

23        OO.    "Root Cause" shall mean the primary cause(s) of an AG Flaring Incident(s),

24   Hydrocarbon Flaring Incident, or a Tail Gas Incident(s) as determined through a process of

25   investigation.

26        PP.    "Salt Lake City Refinery" shall mean the refinery owned and operated by

27   Chevron in Salt Lake City, Utah.

28        QQ.    "Shutdown", as specified in 40 C.F.R. § 60.2, shall mean the cessation of

1    operation of equipment for any purpose.

2        RR.    "Sour Water Stripper Gas" or "SWS Gas" shall mean the gas produced by the

3    process of stripping refinery sour water.

4        SS.    "SO$_2$" shall mean sulfur dioxide.

5        TT.    "SO2- Reducing Catalyst Additives" shall mean a catalyst additive that is

6    introduced to an FCCU to reduce SO$_2$ emissions by reduction and adsorption.

7        UU.    "Startup", as specified in 40 C.F.R. § 60.2, shall mean the setting in operation

8    of equipment for any purpose.

9        VV.    "Sulfur Recovery Plant" or "SRP" shall mean a process unit that recovers

10    sulfur from hydrogen sulfide by a vapor phase catalytic reaction of sulfur dioxide and hydrogen

11    sulfide.

12        WW.    "Sulfur Recovery Unit" or "SRU" shall mean a single component of a Sulfur

13    Recovery Plant, commonly referred to as a Claus train.

14        XX.    "Tail Gas Unit" or "TGU" shall mean a control system utilizing a technology

15    for reducing emissions of sulfur compounds from a Sulfur Recovery Plant.

16        YY.    "Tail Gas Incident" shall mean, for the purpose of this Consent Decree,

17    combustion of Tail Gas that either is:

18        i.    Combusted in a flare and results in 500 pounds or more of SO$_2$ emissions in any

19            24 hour period; or

20        ii.    Combusted in a thermal incinerator and results in excess emissions of 500

21            pounds or more of SO$_2$ emissions in any 24-hour period.  Only those time

22            periods which are in excess of a SO$_2$ concentration of 250 ppm (rolling twelve-

23            hour average) shall be used to determine the amount of excess SO$_2$ emissions

24            from the incinerator, provided, however, that continued combustion of tail gas in

25            an incinerator at the Salt Lake City SRP or at Pascagoula SRU 2/3 that occurs

26            prior to Chevron's acceptance of NSPS J applicability for those units as required

27            by this Consent Decree shall not be a Tail Gas Incident.

28        Chevron shall use good engineering judgment and/or other monitoring data during

1    periods in which the $SO_2$ continuous emission analyzer has exceeded the range of the instrument

2    or is out of service.

3           ZZ.     "Torch Oil" shall mean FCCU feedstock or cycle oils that are combusted in the

4    FCCU regenerator to assist in starting up or restarting the FCCU, hot standby of the FCCU, or to

5    maintain regenerator heat balance in the FCCU.

6           AAA.    "Upstream Process Units" shall mean all amine contactors, amine scrubbers,

7    and sour water strippers at the Chevron Refineries, as well as all process units at the refineries

8    that produce gaseous or aqueous waste streams that are processed at amine contactors, amine

9    scrubbers, or sour water strippers.

10

11                    **V.  AFFIRMATIVE RELIEF/ENVIRONMENTAL PROJECTS**

12   **A.    NOx Emissions Reductions from FCCUs:**  Chevron shall implement a program to

13          reduce NOx emissions from the Fluid Catalytic Cracking Units ("FCCU") at the

14          Chevron Refineries.  Chevron shall incorporate lower NOx emission limits into permits

15          and will demonstrate future compliance with the lower emission limits through the use

16          of CEMS.

17          11.     **Compliance with Specific Emissions Limits (Richmond and El Segundo**

18   **FCCUs)**.

19          a.      Richmond Refinery FCCU:  Beginning upon Date of Entry, Chevron shall

20   comply with a NOx emission limit of 20 ppmvd @ 0% $O_2$ on a 365 day rolling average basis and

21   40 ppmvd @ 0% $O_2$ on a 7 day rolling average basis from the FCCU at its Richmond Refinery.

22          b.      El Segundo Refinery FCCU:  No later than December 31, 2008, Chevron shall

23   comply with a NOx emission limit of 20 ppmvd @ 0% $O_2$ on a 365 day rolling average basis and

24   40 ppmvd @ 0% $O_2$ on a 7 day rolling average basis from the FCCU at its El Segundo Refinery.

25          c.      NOx emissions during periods of Startup, Shutdown, or Malfunction shall not

26   be used in determining compliance with the emission limit of 40 ppmvd @ 0% $O_2$ on a 7 day

27   rolling average basis, provided that during such periods Chevron implements good air pollution

28   control practices to minimize NOx emissions.

12.    **Use of NOx Reducing Catalyst Additives and Low NOx Combustion Promoter to Reduce NOx (Pascagoula, Hawaii and Salt Lake City FCCUs):**  In order to reduce NOx emissions and establish lower FCCU NOx emission limits at the Pascagoula, Hawaii, and Salt Lake City Refinery FCCUs, Chevron shall use NOx Reducing Catalyst Additive and Low NOx Combustion Promoter.  The program to reduce NOx emissions at these FCCUs shall consist of the following steps:  a baseline data collection period for use in developing a model of NOx emissions; a short term trial period to determine which NOx reducing catalyst additive works best in each FCCU; an optimization period to determine optimized addition rates of NOx reducing catalyst additive and low NOx Combustion promoter; and a demonstration period to establish 365-day rolling average and short term (*e.g.*, 24-hour or 7-day rolling average) NOx emission limits.

a.    Program Schedule for Salt Lake City FCCU.  By not later than December 31, 2004, Chevron shall notify EPA whether Chevron will install a FCCU feed hydrotreater at the FCCU at its Salt Lake City Refinery for purposes of complying with Clean Fuels requirements. For each required step in the NOx emissions reduction program set forth in this Paragraph 12, two alternative compliance dates are listed for the Salt Lake City FCCU.  The first date will apply and be enforceable under this Consent Decree only if Chevron notifies EPA that it will not install a FCCU feed hydrotreater.  The second date will apply and be enforceable under this Consent Decree only if Chevron notifies EPA that it will install a FCCU feed hydrotreater.

b.    NOx Baseline Data and NOx Model.  Chevron shall submit to EPA and the appropriate Plaintiff-Intervenor a report of 12 months of baseline data and a report describing a model to predict uncontrolled NOx concentration and mass emission rate by the following dates and for the following baseline time periods for each of the following FCCUs:

| FCCU | Baseline Start | Baseline End | Report |
|------|----------------|--------------|--------|
| Hawaii | December 31, 2005 | December 31, 2006 | February 28, 2007 |
| Pascagoula | June 30, 2004 | June 30, 2005 | August 31, 2005 |

| Salt Lake City | December 31, 2004 | December 31, 2005 | February 28, 2006 |
|---|---|---|---|
| | or | or | or |
| | June 30, 2006 | June 30, 2007 | August 31, 2007 |

The baseline data shall include all data considered in development of the model on a daily average basis, and, at a minimum, the following data on a daily average basis:

 i.  Regenerator flue gas temperature;

 ii.  Coke burn rate in pounds per hour;

 iii.  FCCU feed rate in barrels per day;

 iv.  FCCU feed API gravity;

 v.  FCCU feed sulfur and basic nitrogen content as a weight %, except that if, after 30 days of daily monitoring of the FCCU feed nitrogen content for the Salt Lake City and Hawaii FCCUs, the variability of feed nitrogen content is less than one standard deviation from the mean, Chevron may commence monitoring and recording the feed nitrogen content at the Salt Lake City and Hawaii FCCUs through daily sampling composited on a weekly basis for the remainder of the baseline period;  in addition, after this 30 day period, Chevron may propose, for EPA approval, alternate sulfur and nitrogen data collection requirements;

 vi.  Estimated percentage, and where available, actual percentage of each type of FCCU feed component (i.e. atmospheric gas oil, vacuum gas oil, atmospheric tower bottoms, vacuum tower bottoms, etc.);

 vii.  Estimated percentage, and where available, actual percentage by volume of the FCCU feed that is hydrotreated;

 viii.  CO boiler firing rate and fuel type, if applicable;

 ix.  CO boiler combustion temperature, if applicable;

 x.  Total Catalyst addition rate;

 xi.  NOx and SO2 Reducing Catalyst Additive and addition rates, conventional combustion promoter addition rates, and/or Low NOx Combustion Promoter

1       addition rates; and

2       xii.       Hourly and daily $SO_2$, NOx, CO, and $O_2$ concentrations.

3  Upon request by EPA, Chevron shall submit any additional, available data that EPA determines

4  it needs to evaluate the model.  The report describing the model shall include a description of

5  how the model was developed including which parameters were considered, why parameters

6  were eliminated, efforts and results of model validation, and the statistical methods used to arrive

7  at the equation to predict uncontrolled NOx concentration and mass emission rate.

8       c.       Use of Low-NOx Combustion Promoter:

9       i.       Chevron shall identify, for EPA approval, the Low NOx Combustion Promoter

10              that Chevron proposes to use by the following dates for each of the following

11              FCCUs:

12                      Hawaii           June 30, 2007

13                      Pascagoula       September 30, 2004

14                      Salt Lake City   March 31, 2005   or   September 30, 2006

15              Chevron may conduct studies of Low NOx Combustion Promoter performance

16              at the Chevron Pilot Plant and rely upon these studies as appropriate for

17              purposes of screening and selecting the promoter to be proposed by Chevron

18              for use under this Paragraph 12.  Chevron shall submit the data generated in

19              any such studies to EPA at the time that Chevron proposes its Low NOx

20              Combustion Promoter.

21       ii.      Chevron shall commence and complete a program of minimization of use of

22              conventional Pt-based combustion promoter to that amount necessary to

23              control afterburn and then complete replacement of its use with Low NOx

24              Combustion Promoter.  Chevron shall complete this program in accordance

25              with the protocol set forth in Appendix A by the following dates for each of

26              the following FCCUs:

27                      FCCU              Commence Date        Complete Date

28                      Hawaii            March 31, 2008       September 30, 2008

| | | |
|---|---|---|
| Pascagoula | June 30, 2005 | December 31, 2005 |
| Salt Lake City | December 31, 2005 | June 30, 2006 |
| | or | or |
| | June 30, 2007 | December 31, 2007 |

iii.   By the following dates, Chevron shall submit a report to EPA and the appropriate Plaintiff-Intervenor on the effect of minimization of use of conventional Pt-based combustion promoter and the use of Low NOx combustion promoter for each of the following FCCUs:

| | | | |
|---|---|---|---|
| Hawaii | October 31, 2008 | | |
| Pascagoula | January 31, 2006 | | |
| Salt Lake City | July 31, 2006 | or | January 31, 2008 |

iv.   Chevron may use conventional Pt-based combustion promoter on an intermittent basis during the optimization and demonstration periods, as needed to avoid unsafe operation of the FCCU regenerator and to comply with CO emission limits.  Chevron shall undertake appropriate measures and/or adjust operating parameters with a goal of eliminating such use. Notwithstanding the foregoing, Chevron shall not be required to adjust operating parameters in a way that would limit conversion or processing rates.

v.   Chevron may, upon EPA approval, discontinue use of Low NOx combustion promoter if Chevron demonstrates that it has adjusted other parameters and that such promoter does not adequately control afterburn and/or causes CO emissions to approach or exceed applicable limits.  Notwithstanding the foregoing, Chevron shall not be required to adjust operating parameters in a way that would limit conversion or processing rates.

d.   <u>NOx Reducing Catalyst Additives - Short Term Trials</u>

i.   By the following dates, Chevron shall identify for EPA approval at least two commercially available NOx Reducing Catalyst Additives that Chevron proposes to use for short term trials and submit a protocol to EPA and the

1    appropriate Plaintiff-Intervenor for conducting the trials at each of the

2    following FCCUs:

3                    Hawaii              June 30, 2007

4                    Pascagoula          March 31, 2005

5                    Salt Lake City      March 31, 2005   or   September 30, 2006

6    Chevron may conduct studies of NOx reducing additive performance at the

7    Chevron Pilot Plant and rely upon these studies as appropriate for purposes of

8    screening and selecting the additives to be proposed by Chevron for use in the

9    short term trials under this Paragraph 12.  Chevron shall submit the data

10   generated in any such studies to EPA at the time that Chevron proposes its trial

11   additives.

12   ii.      Chevron shall propose use of at least two NOx reducing additives that are

13            likely to perform the best in each FCCU.  EPA will base its approval or

14            disapproval on its assessment of the performance of the proposed additives in

15            other FCCUs and the similarity of those FCCUs to Chevron's FCCUs, with the

16            objective of trialing NOx reducing additives likely to have the best

17            performance in reducing NOx emissions.  In the event that Chevron submits

18            less than two approved additives, EPA shall identify other approvable

19            additives to Chevron.

20   iii.     Chevron shall trial at least two additives.  Chevron shall commence and

21            complete the trials of the NOx reducing additives by the following dates for

22            each of the following FCCUs:

23                    FCCU            Commence Date              Complete Date

24                    Hawaii          September 30, 2008         March 31, 2009

25                    Pascagoula      December 31, 2005          June 30, 2006

26                    Salt Lake City  June 30, 2006             December 31, 2006

27                                    December 31, 2007          June 30, 2008

28

iv.   Chevron shall submit a report to EPA and the appropriate Plaintiff-Intervenor
that describes the performance of each NOx reducing catalyst additive that was
trialed by the following dates for each of the following FCCUs:

Hawaii           April 30, 2009

Pascagoula       July 31, 2006

Salt Lake City   January 31, 2007   or   July 31, 2008

v.   Chevron shall propose to use the best performing additive as measured by
percentage of NOx emissions reduced and the concentration to which NOx
emissions were reduced in the trials.  EPA will either approve the proposed
additive or approve another additive that was trialed for use in the optimization
study.  Upon request by EPA, Chevron shall submit any additional available
data that EPA determines it needs to evaluate the trials.

e.   NOx Reducing Catalyst Additives - Optimization Study:

i.   By the following dates, Chevron shall submit, for EPA approval, a proposed
protocol consistent with the requirements of Appendix A for optimization
studies to establish the optimized NOx reducing additive and Low NOx
combustion promoter addition rates for each of the following FCCUs:

Hawaii           April 30, 2009

Pascagoula       July 31, 2006

Salt Lake City   January 31, 2007   or   July 31, 2008

The protocol shall include identification of the additive, methods to calculate
effectiveness, cost effectiveness, methods for baseloading, and percent additive
to be used at each increment tested.

ii.   Chevron shall commence and complete the optimization study of the NOx
reducing additive and low NOx Combustion promoter in accordance with the
approved protocol and Appendix A by the following dates for each of the
following FCCUs:

| FCCU | Commence Date | Complete Date |
|------|---------------|---------------|
| Hawaii | June 30, 2009 | December 31, 2009 |
| Pascagoula | September 30, 2006 | March 31, 2007 |
| Salt Lake City | March 31, 2007 | September 30, 2007 |
|  | September 30, 2008 | March 31, 2009 |

iii.    Notwithstanding the foregoing, Chevron will not be required to add increasing increments of catalyst additive beyond an additive rate that results in any of the following:

(a)    The FCCU meets 20 ppmvd NOx @ 0% O2 on a 365-day rolling average, in which case Chevron shall agree to accept a limit of 20 ppmvd NOx @ 0% O2 on a 365-day rolling average basis at the conclusion of the Demonstration Period ;

(b)    Incremental pickup factor <1.8 lb NOx/lb additive

(c)    Total cost of the additive > $10,000/ton NOx removed

(d)    FCCU is operating at 2.0% Weight % NOx reducing catalyst additive

If an additive limits the FCCU's ability to control CO emissions to below 500 ppmvd CO corrected to 0% 02 on a 1-hour basis and cannot be reasonably compensated for by adjusting other parameters, then the additive rate shall be reduced to a level at which the additive no longer causes such effects.

iv.    By the following dates, Chevron shall report to EPA and the appropriate Plaintiff-Intervenor the results of the optimization study and propose optimized addition rates of all catalysts and promoters to be used for the demonstration period for EPA approval for each of the following FCCUs:

| Hawaii | January 31, 2010 |
|--------|------------------|
| Pascagoula | April 30, 2007 |
| Salt Lake City | October 31, 2007  or  April 30, 2009 |

Upon request by EPA, Chevron shall submit any additional available data that EPA determines it needs to evaluate the optimization study.

v.    At any time prior to 180 days after commencement of the demonstration period, Chevron may agree to accept FCCU emission limits of 20 ppmvd NOx @ 0% O2 (365-day rolling average) and 40 ppmvd NOx @ 0% O2 (7-day rolling average) in lieu of completing any remaining obligations of Paragraph 12 and 13.

f.    NOx Reducing Catalyst Additives - Demonstration:

i.    Chevron shall commence and complete demonstration of the EPA approved NOx reducing additive and low NOx Combustion promoter at the EPA approved optimized addition rates by the following dates for each of the following FCCUs:

| FCCU | Commence Date | Complete Date |
|------|---------------|---------------|
| Hawaii | December 31, 2009 | June 30, 2011 |
| Pascagoula | March 31, 2007 | September 30, 2008 |
| Salt Lake City | September 30, 2007 | March 31, 2009 |
| | March 31, 2009 | September 30, 2010 |

ii.    During the demonstration period, Chevron shall add NOx reducing catalyst and operate the FCCUs, CO Boilers (where applicable) and FCCU feed hydrotreaters (where applicable) in a manner that minimizes NOx emissions to the extent practicable and without interfering with conversion or processing rates.

iii.    Chevron has made efforts to improve operation of the Hawaii FCCU to run at lower excess O2 during the 2003 turnaround.  If the NOx emissions established during the baseline period for the Hawaii FCCU are >100 ppmvd @ 0% O2 on a 365-day rolling average at the conclusion of the baseline period, then Chevron shall evaluate further modifications that can be made to the FCCU to reduce NOx emissions, including potential improvement in air distribution, during the turnaround planned for 2008.

g.        NOx Additive Performance Demonstration Report ("NOx Additive Demonstration Report").  Chevron will report the results of the demonstration ("NOx Additive Demonstration Report") to EPA and the appropriate Plaintiff-Intervenor by the following dates for each of the following FCCUs.

| | |
|---|---|
| Hawaii | August 31, 2011 |
| Pascagoula | November 30, 2008 |
| Salt Lake City | May 31, 2009   or   November 30, 2010 |

The NOx Additive Demonstration Report shall include, at a minimum, the NOx and $O_2$ CEMS data recorded during the Demonstration Period and all applicable baseline data on a daily average basis for the Demonstration Period.

**13.        Establishing NOx Emissions Limits (Hawaii, Pascagoula and Salt Lake City FCCUs):**

a.        In each NOx Additive Demonstration Report, Chevron shall propose a short term (*i.e.*, 24-hour or 7-day rolling average) and a long term (365-day rolling average) concentration-based (ppmvd) NOx emission limit as measured at 0% 02.  Chevron may propose alternative emissions limits to be applicable during Hydrotreater Outages or other alternative operating scenarios.  Chevron shall comply with the emission limits it proposes for each FCCU beginning immediately upon submission of the NOx Additive Demonstration Report for that FCCU.  Chevron shall continue to comply with these limits unless and until Chevron is required to comply with the emissions limits set by EPA pursuant to Paragraph 13.b., below.  Upon request by EPA, Chevron shall submit any additional, available data that EPA determines it needs to evaluate the demonstration.

b.        EPA will use the data collected about the FCCU during the baseline period, the Optimization Period, and the Demonstration Period, as well as all other available and relevant information, to establish limits for NOx emissions from the Hawaii, Pascagoula, and Salt Lake City FCCUs.  EPA will establish a short term (*e.g.*, 24-hour or 7-day rolling average) and a 365-day rolling average concentration-based (ppmvd) NOx emission limits corrected to 0% oxygen.  EPA will determine the limits based on: (i) the level of performance during the baseline,

Optimization and Demonstration periods; (ii) a reasonable certainty of compliance; and (iii) any other available and relevant information.  EPA will notify Chevron of its determination of the concentration-based NOx emissions limit and averaging times for each FCCU, including how and whether emissions during Hydrotreater Outages are included in the 365-day rolling average. EPA may establish alternative emissions limits to be applicable during Hydrotreater Outages or other alternative operating scenarios.  Chevron shall immediately (or within ninety (90) days, if EPA's limit is more stringent than the limit proposed by Chevron) operate the FCCU so as to comply with the EPA-established emission limits.

c.       NOx emissions during periods of Startup, Shutdown, or Malfunction shall not be used in determining compliance with the short-term NOx emission limits established pursuant to this Paragraph 13, provided that during such periods Chevron implements good air pollution control practices to minimize NOx emissions.

14.      [Omitted]

15.      **Demonstrating Compliance with FCCU NOx Emission Limits**.  Beginning no later than the dates set forth below for each FCCU, Chevron shall use NOx and O2 CEMS to monitor performance of the FCCU and to report compliance with the terms and conditions of this Consent Decree.

| | |
|---|---|
| El Segundo | Date of Entry |
| Richmond | June 30, 2004 |
| Hawaii | April 10, 2005 |
| Pascagoula | June 30, 2004 |
| Salt Lake City | June 30, 2004 |

The CEMS will be used to demonstrate compliance with the respective NOx emission limits established pursuant to Paragraphs 11 and 13.  Chevron shall make CEMS data available to EPA and the appropriate Plaintiff-Intervenor upon demand as soon as practicable.  Chevron shall install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60

1    Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.

2    With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix

3    F §§ 5.1.1, 5.1.3 and 5.1.4, Chevron must conduct either a Relative Accuracy Audit ("RAA") or a Relative

4    Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years.  Chevron must also

5    conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not

6    performed.  With respect to its Richmond Refinery, Chevron may conduct a Field Accuracy Test ("FAT")

7    as defined in BAAQMD regulations or procedures in lieu of the required RAA or CGA.  With respect to

8    the O2 CEMS required by this Paragraph, in lieu of the audit points specified in 40 C.F.R. Part 60,

9    Appendix F § 5.1.2., Chevron may audit the O2 CEMS at 20-30% and 50-60% of the actual O2 CEMS

10   span value.

11   **B.**      **SO2 Emissions Reductions from FCCUs**.  Chevron shall implement a program to reduce SO$_2$

12            emissions from the Fluid Catalytic Cracking Units ("FCCU") at the Chevron Refineries.

13            Chevron shall incorporate lower SO$_2$ emission limits into permits and will demonstrate future

14            compliance with the lower emission limits through the use of CEMS.

15            16.      **Compliance with Specific SO2 Emission Limits (El Segundo, Hawaii, Pascagoula,**

16   **and Salt Lake City FCCUs).**

17            a.      El Segundo FCCU:

18            i.      Interim SO2 Emission Limit:  By no later than Date of Entry, Chevron shall comply

19                    with an interim SO2 emission limit of 35 ppmvd at 0% O2 on a 365-day rolling

20                    average basis from the FCCU at its El Segundo Refinery.

21            ii.     Final SO2 Emission Limit:  By no later than December 31, 2005, Chevron shall comply

22                    with a final SO2 emission limit of 25 ppmvd @ 0% O$_2$ on a 365 day rolling average

23                    basis and 50 ppmvd @ 0% O$_2$ on a 7 day rolling average basis from the FCCU at its El

24                    Segundo Refinery.  In addition, if Chevron discontinues use of the CO Boiler then

25                    Chevron shall seek further emissions reductions as set forth in Paragraph 19.

26            b.      Hawaii FCCU:     No later than June 30, 2007, Chevron shall comply with an interim

27   SO2 emission limit of 75 ppmvd at 0% O2 on a 365-day rolling average basis from the FCCU at its Hawaii

28   Refinery.

c.    Pascagoula FCCU:

i.    Interim SO2 Emission Limit:    By no later than June 30, 2005, Chevron shall comply with an interim SO2 emission limit of 100 ppmvd at 0% O2 on a 365-day rolling average basis from the FCCU at its Pascagoula Refinery.

ii.   Final SO2 Emission Limit:    By no later than September 30, 2007, Chevron shall comply with a final SO2 emission limit of 25 ppmvd @ 0% $O_2$ on a 365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling average basis from the FCCU at its Pascagoula Refinery.

d.    Salt Lake City FCCU:    With respect to the FCCU at its Salt Lake City Refinery, Chevron shall either:

i.    by no later than December 31, 2008, comply with a final SO2 emission limit of 25 ppmvd @ 0% $O_2$ on a 365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling average basis through feed hydrotreating and SO2 reducing catalyst additives; or

ii.   in the event that feed hydrotreating and SO2 reducing catalyst additives are insufficient to achieve the emissions limits set forth above, then by no later than December 31, 2010, comply with a final SO2 emission limit of 25 ppmvd @ 0% $O_2$ on a 365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling average basis through installation and operation of a wet gas scrubber or an EPA-approved SO2 reducing technology other than feed hydrotreating or catalyst additives.

e.    SO2 emissions during periods of Startup, Shutdown, or Malfunction shall not be used in determining compliance with the emission limit of 50 ppmvd SO2 @ 0% $O_2$ on a 7 day rolling average basis, provided that during such periods Chevron implements good air pollution control practices to minimize SO2 emissions.

17.    **Use of SO2 Reducing Catalyst Additives to Reduce SO2 (Richmond and Hawaii FCCUs):**   In order to reduce SO2 emissions and establish lower FCCU SO2 emission limits at the Richmond and Hawaii Refinery FCCUs, Chevron shall use SO2 reducing catalyst

1   additive.  The program to reduce SO2 emissions at these FCCUs shall consist of the following

2   steps:   a baseline data collection period for use in developing a model of SO2 emissions; a short

3   term trial period to determine which SO2 reducing catalyst additive works best in each FCCU;

4   an optimization period to determine optimized addition rates of SO2 reducing catalyst additive;

5   and a demonstration period to establish 365-day rolling average and 7-day rolling average SO2

6   emission limits.

7              a.         SO2 Baseline Data and SO2 Model.  Chevron shall submit to EPA and the

8   appropriate Plaintiff-Intervenor a report of baseline data and a report describing a model to

9   predict SO2 concentration and mass emission rate by the following dates and for the following

10  baseline time periods for each of the following FCCUs:

11  | FCCU | Baseline Start | Baseline End | Report |
    |---|---|---|---|
    | Hawaii | December 31, 2005 | December 31, 2006 | February 28, 2007 |
    | Richmond | June 30, 2004 | June 1, 2005 | August 31, 2005 |

14  The baseline data shall include all data considered in development of the model on a daily

15  average basis, and, at a minimum, the following data on a daily average basis:

16            i.         Regenerator flue gas temperature;

17            ii.        Coke burn rate in pounds per hour;

18            iii.       FCCU feed rate in barrels per day;

19            iv.        FCCU feed API gravity;

20            v.         FCCU feed sulfur content as a weight %, except that if, after 30 days of daily

21                       monitoring of the FCCU feed sulfur content for the Hawaii FCCU, the

22                       variability of feed sulfur content is less than one standard deviation from the

23                       mean, Chevron may commence monitoring and recording the feed sulfur

24                       content at the Hawaii FCCU through daily sampling composited on a weekly

25                       basis for the remainder of the baseline period; in addition, after this 30 day

26                       period, Chevron may propose, for EPA approval, alternate sulfur data

27                       collection requirements;

28

1     vi.    Estimated percentage, and where available, actual percentage of each type of

2          FCCU feed component (i.e. atmospheric gas oil, vacuum gas oil, atmospheric

3          tower bottoms, vacuum tower bottoms, etc.);

4     vii.    Estimated percentage, and where available, actual percentage by volume of the

5          FCCU feed that is hydrotreated;

6     viii.   CO boiler firing rate and fuel type, if applicable;

7     ix.    CO boiler combustion temperature, if applicable;

8     x.     Total Catalyst addition rate;

9     xi.    NOx and SO2 Reducing Catalyst Additive and addition rates, conventional

10        combustion promoter addition rates, and/or Low NOx Combustion Promoter

11        addition rates; and

12     xii.    Hourly and daily $SO_2$, NOx, CO, and $O_2$ concentrations.

13 Upon request by EPA, Chevron shall submit any additional, available data that EPA determines

14 is needed to evaluate the model.  The report describing the model shall include a description of

15 how the model was developed including which parameters were considered, why parameters

16 were eliminated, efforts and results of model validation, and the statistical methods used to arrive

17 at the equation to predict uncontrolled SO2 concentration and mass emission rate.

18     b.     <u>SO2 Reducing Catalyst Additives - Short Term Trials</u>

19     i.     By the following dates, Chevron shall identify, for EPA approval, at least two

20          commercially available SO2 Reducing Catalyst Additives that Chevron

21          proposes to use for short term trials with a protocol for conducting the trials for

22          each of the following FCCUs:

23             Hawaii        March 31, 2006

24             Richmond     September 30, 2004

25             Chevron may conduct studies of SO2 reducing additive performance

26          at the Chevron Pilot Plant and rely upon these studies as appropriate for

27          purposes of screening and selecting the additives to be proposed by Chevron

28          for use in the short term trials under this Paragraph 17.  Chevron shall submit

the data generated in any such studies to EPA and the appropriate Plaintiff-
Intervenor at the time that Chevron proposes its additives to be trialed.

ii.  Chevron shall propose use of at least two SO2 reducing additives that are
likely to perform the best in each FCCU.  EPA will base its approval or
disapproval on its assessment of the performance of the proposed additives in
other FCCUs and the similarity of those FCCUs to Chevron's FCCUs, with the
objective of trialing SO2 additives likely to have the best performance in
reducing SO2 emissions.  In the event that Chevron submits less than two
approved additives, EPA shall identify other approvable additives to Chevron.

iii. Chevron shall trial at least two additives.  Chevron shall commence and
complete the trials of the SO2 reducing additives by the following dates for
each of the following FCCUs:

| FCCU | Commence Date | Complete Date |
|------|---------------|---------------|
| Hawaii | December 31, 2006 | June 30, 2007 |
| Richmond | June 1, 2005 | December 31, 2005 |

iv.  By the following dates, Chevron shall submit a report to EPA and the
appropriate Plaintiff-Intervenor that describes the performance of each SO2
reducing catalyst additive that was trialed for each of the following FCCUs:

| | |
|------|---------------|
| Hawaii | July 31, 2007 |
| Richmond | January 31, 2006 |

v.  Chevron shall propose to use the best performing additive as measured by
percentage of SO2 emissions reduced and the concentration to which SO2
emissions were reduced in the trials.  EPA will either approve the proposed
additive or approve another additive that was trialed for use in the optimization
study.  Upon request by EPA, Chevron shall submit any additional available
data that EPA determines is needed to evaluate the trials.

c.  SO2 Reducing Catalyst Additives - Optimization Study:

i.  By the following dates, Chevron shall submit, for EPA approval, a proposed

1    protocol consistent with the requirements of Appendix A for optimization

2    studies to establish the optimized SO2 reducing additive for each of the

3    following FCCUs:

4           Hawaii          July 31, 2007

5           Richmond      January 31, 2006

6    The protocol shall include identification of the additive, methods for

7    baseloading, and percent additive to be used at each increment tested.

8  ii.    Chevron shall commence and complete the optimization study of the SO2

9    reducing additive in accordance with the approved protocol and Appendix A

10    by the following dates for each of the following FCCUs:

| FCCU | Commence Date | Complete Date |
|------|---------------|---------------|
| Hawaii | September 30, 2007 | March 31, 2008 |
| Richmond | March 31, 2006 | September 30, 2006 |

14  iii.    Notwithstanding the foregoing, Chevron will not be required to add increasing

15    increments of catalyst additive beyond an additive rate that results in any of the

16    following:

17      (a)    The FCCU meets 25 ppmvd SO2 @ 0% O2 on a 365-day

18          rolling average, in which case Chevron shall agree to accept

19          limits of 25 ppmvd SO2 @ 0% O2 on a 365-day rolling

20          average basis at the conclusion of the Demonstration Period;

21      (b)    Incremental pickup factor < 2.0 lb SO2/lb additive;

22      (c)    FCCU is operating at 10.0 Weight % SO2 reducing catalyst

23          additive.

24    If an additive limits the processing rate or the conversion capability in a

25    manner that cannot be reasonably compensated for by adjustment of other

26    parameters, the additive level shall be reduced to a level at which the additive

27    no longer causes such limits or effects.

28

iv.     By the following dates, Chevron shall report to EPA and the appropriate Plaintiff-Intervenor the results of the optimization study and propose optimized addition rates of all catalysts to be used for the demonstration period for EPA approval for each of the following FCCUs:

    Hawaii          April 30, 2008

    Richmond        October 31, 2006

Upon request by EPA, Chevron shall submit any additional available data that EPA determines is needed to evaluate the optimization study.

v.      At any time prior to 180 days after commencement of the demonstration period, Chevron may agree to accept FCCU emission limits of 25 ppmvd SO2 @ 0% O2 (365-day rolling average) and 50 ppmvd SO2 @ 0% O2 (7-day rolling average) in lieu of completing any remaining obligations of Paragraphs 17 and 18.

d.      <u>SO2 Reducing Catalyst Additives - Demonstration</u>:

i.      Chevron shall commence and complete demonstration of the EPA approved SO2 reducing additive at the EPA approved optimized addition rates by the following dates for each of the following FCCUs:

| FCCU | Commence Date | Complete Date |
|------|---------------|---------------|
| Hawaii | March 31, 2008 | June 30, 2011 |
| Richmond | September 30, 2006 | March 31, 2008 |

ii.     During the demonstration period, Chevron shall add SO2 reducing catalyst and operate the FCCUs, CO Boilers (where applicable) and FCCU feed hydrotreaters (where applicable) in a manner that minimizes SO2 emissions to the extent practicable and without interfering with conversion or processing rates.

e.      <u>SO2 Additive Performance Demonstration Report ("SO2 Additive Demonstration Report")</u>.  Chevron will report the results of the demonstration ("SO2 Additive Demonstration Report") to EPA and the appropriate Plaintiff-Intervenor by the following dates

1   for each of the following FCCUs.

2                   Hawaii                          August 31, 2011

3                   Richmond                        May 31, 2008

4   The SO2 Additive Demonstration Report shall include, at a minimum, the SO2 and $O_2$ CEMS

5   data recorded during the Demonstration Period and all applicable baseline data on a daily

6   average basis for the Demonstration Period.

7           f.          If at any time during the trial, optimization and/or demonstration of SO2

8   additives, Chevron demonstrates that the use of SO2 reducing additive at the Richmond FCCU

9   limits the FCCU's ability to comply with the NOx emissions limits required by this Consent

10  Decree and cannot be reasonably compensated for by adjusting other parameters, then the

11  additive rate shall be reduced to a level at which the additive no longer causes such effects.

12  Chevron may, upon EPA approval, utilize the SO2 reducing additive at an addition rate that does

13  not affect Chevron's ability to comply with the NOx emission limit required by this Consent

14  Decree.

15          18.     **Establishing SO2 Emissions Limits (Hawaii and Richmond FCCUs).**

16          a.          In each SO2 Additive Demonstration Report, Chevron shall propose 7-day

17  rolling average and 365-day rolling average concentration-based (ppmvd) SO2 emission limits

18  as measured at 0% 02.  Chevron may propose alternative emissions limits to be applicable during

19  Hydrotreater Outages or other alternative operating scenarios. Chevron shall comply with the

20  emission limits it proposes for each FCCU beginning immediately upon submission of the SO2

21  Additive Demonstration Report for that FCCU.  Chevron shall continue to comply with these

22  limits unless and until they are required to comply with the emissions limits set by EPA pursuant

23  to Paragraph 18.b, below.  Upon request by EPA, Chevron shall submit any additional, available

24  data that EPA determines is needed to evaluate the demonstration.

25          b.          EPA will use the data collected about the FCCU during the baseline period, the

26  Optimization Period, and the Demonstration Period, as well as all other available and relevant

27  information, to establish limits for SO2 emissions from the Hawaii and Richmond FCCUs.  EPA

28  will establish 7-day rolling average and 365-day rolling average concentration-based (ppmvd)

1  SO2 emission limits corrected to 0% oxygen.  EPA will determine the limits based on: (i) the

2  level of performance during the baseline, Optimization and Demonstration periods; (ii) a

3  reasonable certainty of compliance; and (iii) any other available and relevant information.  EPA

4  will notify Chevron of its determination of the concentration-based SO2 emissions limit and

5  averaging times for each FCCU, including how and whether emissions during Hydrotreater

6  Outages are included in the 365-day rolling average.  EPA may establish alternative emissions

7  limits to be applicable during Hydrotreater Outages or other alternative operating scenarios.

8  Chevron shall immediately (or within ninety (90) days, if EPA's limit is more stringent than the

9  limit proposed by Chevron) operate the FCCU so as to comply with the EPA-established

10  emission limits.

11       19.    **Further SO2 Emission Reductions from El Segundo FCCU.**  If at any time

12  prior to June 30, 2009, Chevron determines that it will discontinue operation of the CO Boiler at

13  the El Segundo Refinery, Chevron will conduct a SO2 Reducing Catalyst Evaluation Program

14  and, if necessary, a SO2 Reducing Catalyst Demonstration Assessment, to further reduce SO2

15  emissions from the El Segundo FCCU.

16       a.    Notice of Decision.  At least 60 days prior to discontinuing operation of the

17  CO Boiler at the El Segundo Refinery, Chevron will notify EPA in writing of its decision.

18  Within 60 days after discontinuing operation of the CO Boiler, Chevron shall identify for EPA

19  approval the SO2 reducing additive it proposes to use during the Demonstration Assessment, if

20  conducted.

21       b.    SO2 Reducing Catalyst Evaluation Program.  Within 180 days of the

22  discontinuation of use of the CO Boiler, Chevron shall complete a SO2 Reducing Catalyst

23  Evaluation Program with the objective of accepting a final emission limit of 25 ppmvd @ 0% $O_2$

24  on a 365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling average basis for

25  the El Segundo FCCU without operation of the CO Boiler.

26       c.    SO2 Reducing Catalyst Demonstration Assessment: Within 210 days after

27  discontinuing operation of the CO Boiler, Chevron shall either:

28       i.    accept  an SO2 limit for the El Segundo FCCU of 25 ppmvd @ 0% $O_2$ on a

365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling average basis;

ii.     initiate an SO2 Reducing Catalyst Demonstration Assessment using an EPA-approved SO2 reducing additive at 10% by weight of total catalyst added for a period of 18 months; or

iii.    apply for EPA approval to add SO2 reducing catalyst additive during the Demonstration Assessment at less than 10% by weight of total catalyst added, but no less than 5% by weight of total catalyst added, under the following conditions:

(a)     If Chevron demonstrates that addition of 10% by weight of SO2 reducing catalyst additive results in a measurable reduction in conversion or processing rate that cannot be compensated for by adjustment of other operating parameters, then Chevron may request that the addition rate be reduced to the higher of that level where such reduction can be compensated for by adjustment of other operating parameters or the level where such reduction is no longer measurable; or

(b)     If Chevron demonstrates that the incremental pickup factor is less than 1.0 lb SO2/lb SO2 reducing catalyst additive when reducing addition rate from 10% to 5% at 1.0% increments, then Chevron may request that the addition rate be reduced to that rate at which the incremental pickup factor falls below 1.0 lb SO2/lb SO2 reducing catalyst additive.

As part of any application pursuant to this subparagraph, Chevron shall submit a baseline model and baseline data as specified by Paragraph 17.a. using data from the SO2 Reducing Catalyst Evaluation Program as the baseline to demonstrate the impact on processing rate or conversion and the incremental pick-up factor.

1

2        iv.     During the Demonstration Assessment, Chevron shall add SO2 reducing

3 catalyst and operate the FCCU and FCCU feed hydrotreater in a manner that minimizes SO2

4 emissions to the extent practicable and without interfering with conversion or processing rates.

5        v.     If at any time during the Evaluation Program or Demonstration Assessment,

6                Chevron accepts a SO2 limit for the El Segundo FCCU of 25 ppmvd @ 0% $O_2$

7                on a 365 day rolling average basis and 50 ppmvd @ 0% $O_2$ on a 7 day rolling

8                average basis, then Chevron may cease performance of the procedures set forth

9                above.

10       d.     <u>Demonstration Assessment Report</u>. Within 30 days of completing the

11 Demonstration Assessment, Chevron will submit a report summarizing the results of the

12 Demonstration Assessment. The report shall include, at a minimum, the SO2 and $O_2$ CEMS data

13 recorded during the Demonstration Assessment and all applicable baseline data as listed in

14 Paragraph 17.a. on a daily average basis for the Demonstration Assessment.

15       e.     <u>Finalizing Additional SO2 Emissions Reductions for the El Segundo FCCU</u>.

16       i.     In its Demonstration Assessment Report, Chevron shall propose 7-day rolling

17                average and 365-day rolling average concentration-based (ppmvd) SO2

18                emission limits as measured at 0% 02.  Chevron shall comply with the

19                emission limits it proposes beginning immediately upon submission of the

20                Demonstration Assessment Report.  Chevron shall continue to comply with

21                this limit unless and until it is required to comply with the emission limits set

22                by EPA pursuant to this Paragraph.  Upon request by EPA, Chevron shall

23                submit any additional, available data that EPA determines it needs to evaluate

24                the demonstration.

25       ii.     EPA will use the data collected during the Demonstration Assessment, as well

26                as all other available and relevant information, to establish limits for SO2

27                emissions from the El Segundo FCCU.  EPA will establish 7-day rolling

28                average and 365-day rolling average concentration-based (ppmvd) SO2

1    emission limits corrected to 0% oxygen.   EPA will determine the limits based

2    on: (a) the level of performance during the Evaluation Program and

3    Demonstration Assessment periods; (b) a reasonable certainty of compliance;

4    and (c) any other available and relevant information.  EPA will notify Chevron

5    of its determination of the concentration-based SO2 emissions limit and

6    averaging times for the El Segundo FCCU.  Chevron shall immediately (or

7    within ninety (90) days, if EPA's limit is more stringent than the limit

8    proposed by Chevron) operate the FCCU so as to comply with the EPA-

9    established emission limits.

10        f.      During the time period from discontinuation of use of the CO Boiler to the

11   establishment of a final SO2 emission limit for the El Segundo FCCU in the absence of a CO

12   Boiler, Chevron shall not be subject to stipulated penalties for exceeding the SO2 emission limit

13   for the El Segundo FCCU set forth in Paragraph 16.a.ii. of this Consent Decree, provided that

14   Chevron's removal of the CO Boiler and subsequent activities under the Evaluation Program and

15   Demonstration Assessment do not cause any increase in the SO2 mass emission rate from the El

16   Segundo FCCU and Chevron utilizes good air pollution control practices during this period.

17        20.     **Demonstrating Compliance with FCCU SO2 Emission Limits.**  Beginning

18   no later than the dates set forth below for each FCCU, Chevron shall use SO2 and O2 CEMS to

19   monitor performance of the FCCU and to report compliance with the terms and conditions of this

20   Consent Decree.

21            El Segundo            Date of Entry

22            Richmond              June 30, 2004

23            Hawaii                April 10, 2005

24            Pascagoula            June 30, 2004

25            Salt Lake City        June 30, 2004

26   The CEMS will be used to demonstrate compliance with the respective SO2 emission limits

27   established pursuant to Paragraph 16, 18, or 19.  Chevron shall make CEMS data available to

28   EPA and the appropriate Plaintiff-Intervenor upon demand as soon as practicable.

Chevron shall install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.  With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, Chevron must conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years.  Chevron must also conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed.  With respect to its Richmond Refinery, Chevron may conduct a Field Accuracy Test ("FAT") as defined in BAAQMD regulations or procedures in lieu of the required RAA or CGA.  With respect to the O2 CEMS required by this Paragraph, in lieu of the audit points specified in 40 C.F.R. Part 60, Appendix F § 5.1.2., Chevron may audit the O2 CEMS at 20-30% and 50-60% of the actual O2 CEMS span value.

21.    **Hydrotreater Outages**:  No later than December 31, 2004, Chevron shall submit to EPA and the appropriate Plaintiff-Intervenor, for approval by EPA, a plan for the operation of the FCCUs (including associated air pollution control equipment) at El Segundo, Richmond, Pascagoula and, if a hydrotreater is installed, Salt Lake City, during Hydrotreater Outages in a way that minimizes emissions as much as practicable.  The plan shall, at a minimum, consider the use of low sulfur feed, storage of hydrotreated feed, and an increase in additive addition rate.  The short term SO2 and NOx emission limits established pursuant to this Consent Decree shall not apply during periods of FCCU feed Hydrotreater Outages provided that Chevron is in compliance with the plan and is maintaining and operating its FCCUs in a manner consistent with good air pollution control practices.  Chevron shall comply with the approved plan at all times, including periods of Startup, Shutdown, and Malfunction of the hydrotreater.  In addition, in the event that Chevron asserts that the basis for a specific Hydrotreater Outage is a shutdown (where no catalyst changeout occurs) required by ASME pressure vessel requirements or applicable state boiler requirements, Chevron shall submit a report to EPA that identifies the relevant requirements and justifies Chevron's decision to implement the shutdown during the selected time period.

**C.**    **PM Emissions Reductions from FCCUs:**  Chevron shall continue to control and may

further reduce particulate matter ("PM") emissions from its Refineries by the operation and optimization of electrostatic precipitators ("ESPs").

22.   **Final PM Emission Limits for El Segundo FCCU.**   By no later than March 31, 2004, Chevron shall comply with an emission limit of 0.5 pounds of PM per 1000 pounds of coke burned on a 3-hour average basis for the El Segundo FCCU.

23.   **PM Emission Limits for Hawaii, Pascagoula, Richmond, and Salt Lake City FCCUs.**   In accordance with NSPS Subpart J, Chevron shall comply with an emission limit of 1.0 pounds of PM per 1000 pounds of coke burned on a 3-hour average basis for the Hawaii, Pascagoula, Richmond, and Salt Lake City FCCUs, by no later than the dates set forth below for each refinery.  Chevron shall also comply with all applicable Bay Area Air Quality Management requirements, including, but not limited to, Permit Condition 11066 and Regulation 6, at the Richmond FCCU and use such results to demonstrate compliance with the above-identified emission limit.

| Richmond | Date of Entry |
|----------|---------------|
| Hawaii | April 10, 2005 |
| Pascagoula | April 10, 2005 |
| Salt Lake City | April 10, 2005 |

23A.   **PM Testing for FCCUs.**  Chevron shall follow the stack test protocol specified in 40 C.F.R. § 60.106(b)(2) to measure PM emissions on the FCCUs at its Refineries. Chevron shall propose and submit the stack test protocol to EPA and the appropriate Plaintiff-Intervenor, for approval by EPA, no later than three (3) months after the PM limit becomes effective at the relevant Refinery.  Chevron shall conduct the first stack test no later than six (6) months after the PM limit becomes effective at the relevant Refinery.  Chevron shall conduct annual stack tests at each FCCU.  Upon demonstrating through at least three (3) annual tests that the PM limits are not being exceeded at a particular FCCU, Chevron may request EPA approval, to conduct tests less frequently than annually at that FCCU.

24.   PM emissions during periods of Startup, Shutdown, or Malfunction shall not be used in determining compliance with the emission limits of 0.5 pounds of PM per 1000

1  pounds of coke burned on a 3-hour average basis or 1.0 pounds of PM per 1000 pounds of coke

2  burned on a 3-hour average basis, provided that during such periods Chevron implements good

3  air pollution control practices to minimize PM emissions.

4          25.     **Opacity Monitoring at FCCUs.**  By the dates set forth below, Chevron shall

5  install and operate a Continuous Opacity Monitoring System ("COMS") to monitor opacity at

6  each of its Refinery FCCUs.

7              Pascagoula              Date of Entry

8              Hawaii                 April 10, 2005

9              Salt Lake City          April 10, 2005

10             El Segundo             April 10, 2005

11             Richmond               Date of Entry

12  Chevron shall install, certify, calibrate, maintain, and operate all COMS required by this Consent

13  Decree in accordance with 40 C.F.R §§ 60.11, 60.13 and Part 60 Appendix A, and the applicable

14  performance specification test of 40 C.F.R. Part 60 Appendix B.

15  **D.      CO Emissions Reductions from FCCUs:**  Chevron shall continue to operate its

16          FCCUs in a manner that minimizes CO emissions.

17          26.     **CO Emission Limit for Richmond FCCU**.  By no later than the Date of

18  Entry of this Consent Decree, the Richmond FCCU shall meet an emission limit of 500 ppmvd

19  CO corrected to 0% O2 on a 1-hour average basis and 100 ppmvd CO corrected to 0% O2 on a

20  365-day rolling average basis.  The Richmond FCCU shall also comply with all applicable Bay

21  Area Air Quality Management District requirements, including, but not limited to, Permit

22  Condition 11066 (67 ppmvd CO averaged over any rolling 30 day period or 50 ppmvd CO

23  averaged over any calendar year, corrected to 3% O2).

24          27.     **CO Emission Limits for El Segundo, Hawaii, Pascagoula, and Salt Lake**

25  **City FCCUs.**  By no later than the dates set forth below, the El Segundo, Hawaii, Pascagoula,

26  and Salt Lake City FCCUs shall meet an emission limit of 500 ppmvd CO corrected to 0% O2 on

27  a 1-hour average basis.

28              El Segundo              April 10, 2005

| | |
|---|---|
| Hawaii | April 10, 2005 |
| Pascagoula | April 10, 2005 |
| Salt Lake City | April 10, 2005 |

28.     CO emissions during periods of Startup, Shutdown, or Malfunction shall not be used in determining compliance with the emission limit of 500 ppmvd CO corrected to 0% O2 on a 1-hour average basis, provided that during such periods Chevron implements good air pollution control practices to minimize CO emissions.

29.     **Demonstrating Compliance with CO Emission Limits.**  By no later than the dates set forth below, Chevron shall use CO and O2 CEMS to monitor compliance of each FCCU with the terms and conditions of Section V.D. of this Consent Decree.  Chevron shall make CEMS and process data available to EPA and the appropriate Plaintiff-Intervenor upon demand as soon as practicable.  These CEMS will be used to demonstrate compliance with the CO emission limits established pursuant to this Section V.D. of this Consent Decree.

| | |
|---|---|
| Richmond | June 30, 2004 |
| El Segundo | April 10, 2005 |
| Hawaii | April 10, 2005 |
| Pascagoula | June 30, 2004 |
| Salt Lake City | June 30, 2004 |

Chevron shall install, certify, calibrate, maintain, and operate all CEMS required by this Paragraph in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part 60 Appendix B.  With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40 C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, Chevron must conduct either a Relative Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least once every three (3) years.  Chevron must also conduct Cylinder Gas Audits ("CGA") each calendar quarter during which a RAA or a RATA is not performed.  With respect to its Richmond Refinery, Chevron may conduct a Field Accuracy Test ("FAT") as defined in

1   BAAQMD regulations or procedures in lieu of the required RAA or CGA.  With respect to the O2

2   CEMS required by this Paragraph, in lieu of the audit points specified in 40 C.F.R. Part 60, Appendix

3   F § 5.1.2., Chevron may audit the O2 CEMS at 20-30% and 50-60% of the actual O2 CEMS span

4   value.

5   **E.      NSPS Applicability to FCCU Regenerators.**

6           30.       **Richmond FCCU Catalyst Regenerator.**  The Richmond FCCU Catalyst

7   Regenerator shall be an affected facility under NSPS Subpart J, and shall continue to be subject to and

8   comply with the applicable requirements of NSPS Subparts A and J for SO2, PM, CO and Opacity.

9           31.       **Other FCCU Catalyst Regenerators.**  Chevron's FCCU Catalyst Regenerators at

10  its El Segundo, Hawaii, Pascagoula, and Salt Lake City Refineries shall be affected facilities under

11  NSPS Subpart J for each pollutant, and Chevron shall comply with the applicable requirements of

12  NSPS Subparts A and J for each pollutant, by the dates set forth below:

13                              SO2          PM            CO            Opacity

14          Pascagoula      4/10/05      4/10/05       4/10/05       4/10/05

15          Hawaii          12/31/05     4/10/05       4/10/05       4/10/05

16          Salt Lake

17              w/HT        6/30/06      4/10/05       4/10/05       4/10/05

18              wo/HT       4/10/05      4/10/05       4/10/05       4/10/05

19          El Segundo      6/30/04      6/30/04       4/10/05       4/10/05

20          31A.    For FCCU Catalyst Regenerators that become affected facilities under NSPS Subpart J

21  pursuant to Paragraph 31, entry of this Consent Decree and compliance with the relevant monitoring

22  requirements of this Consent Decree for FCCUs shall satisfy the notice requirements of 40 C.F.R. §

23  60.7(a) and the initial performance test requirement of 40 C.F.R. § 60.8(a).

24  **F.      NOx Emissions Reductions from Heaters and Boilers.**  Chevron shall implement a

25          program to reduce $NO_x$ emissions from refinery heaters and boilers through the installation

26          of NOx controls or the shut down of certain units and the acceptance of permit emission

27          limits on the units controlled to meet the requirements of Paragraph 33.  Chevron will

28          monitor compliance with the emission limits through source testing, use

1     of CEMS, and/or the use of PEMS.

2          32.     **Installation of NOx Control Technology.**  Chevron shall select one or any

3   combination of the following "Qualifying Controls" to satisfy the requirements of Paragraphs 33

4   and 37:

5          a.     SCR or SNCR;

6          b.     Current Generation or Next Generation Ultra-Low NOx Burners;

7          c.     other technologies which Chevron demonstrates to EPA's satisfaction will

8   reduce NOx emissions to 0.040 lbs. per mmBTU or lower; or

9          d.     permanent shutdown of a heater or boiler with revocation of its operating

10  permit.

11         33.     On or before June 30, 2011, Chevron shall use Qualifying Controls to reduce

12  NOx emissions from the heaters and boilers listed in Appendix B by at least 2777 tons per year,

13  so as to satisfy the following inequality:

14

15  $$\sum_{i=1}^{n} \left[ (E_{actual})_i - (E_{allowable})_i \right] \ge 2777 \text{ tons of NOx per year}$$

16

17  Where:

18  $(E_{allowable})_i$    =     [(The permitted allowable pounds of $NO_x$ per million BTU for heater or

19                              boiler i, or, the requested portion of the permitted reduction pursuant to

20                              Paragraph 106)/(2000 pounds per ton)] x [(the lower of permitted or

21                              maximum heat input rate capacity in million BTU per hour for heater or

22                              boiler i) x (the lower of 8760 or permitted hours per year)];

23  $(E_{Actual})_i$  =     The tons of $NO_x$ per year prior actual emissions during calendar years

24                              2000 and 2001 (unless prior actual emissions exceed allowable emissions,

25                              then use allowable) as shown in Appendix B for heater or boiler i; and

26  n       =     The number of heaters and boilers with Qualifying Controls from those

27                              listed in Appendix B that are selected by Chevron to satisfy the

28                              requirements of the equation set forth in this Paragraph 33 of this Consent

1          Decree.

2  Permit limits established to implement this paragraph may use a 365-day rolling average for

3  heaters and boilers that use a CEMS or PEMS to monitor compliance.

4          34.     Appendix B to this Consent Decree provides the following information for

5  heaters or boilers larger than 40 mmBTU/hr that operated during calendar years 2000 or 2001 at

6  each of the five Chevron refineries:

7          a.     the maximum heat input capacity or, if less, the allowable heat input capacity

8  in mmBTU/hr (HHV);

9          b.     the actual NOx emission rate for both calendar years 2000 and 2001 in

10  lbs/mmBTU (HHV) and tons per year;

11          c.     the type of data used to derive the emission estimate (*i.e.*, emission factor,

12  stack test, or CEMS data); and,

13          d.     the utilization rate in annual average mmBTU/hr (HHV) for calendar years

14  2000 and 2001.

15          35.     Chevron shall submit a detailed NOx control plan ("Control Plan") to EPA and

16  Plaintiff-Intervenors for review and comment by no later than June 30, 2004, with annual

17  updates (covering the prior calendar year) on June 30 of each year thereafter until termination of

18  the Consent Decree.  The Control Plan and its updates shall describe the achieved and

19  anticipated progress of the NOx emissions reductions program for heaters and boilers and shall

20  contain the following information for each heater and boiler greater than 40 mmBTU/hr that

21  Chevron plans to use to satisfy the requirements of Paragraphs 33, 36, or 37:

22          a.     All of the information in Appendix B;

23          b.     Identification of the type of Qualifying Controls installed or planned with date

24  installed or planned (including identification of the heaters and boilers to be permanently shut

25  down);

26          c.     To the extent limits exist or are planned, the allowable NOx emission rates (in

27  lbs/mmBTU (HHV), with averaging period) and allowable heat input rate (in mmBTU/hr

28  (HHV)) obtained or planned with dates obtained or planned;

1    d.      The results of emissions tests and annual average CEMS or PEMs data (in

2 ppmvd at 3% $O_2$, lbs/mmBTU) conducted pursuant to Paragraph 38 and tons per year; and

3    e.      The amount in tons per year applied or to be applied toward satisfying

4 Paragraph 33.

5         Appendix B and the Control Plan and updates required by this Paragraph shall be for

6 informational purposes only and may contain estimates.  They shall not be used to develop

7 permit requirements or other operating restrictions.  Chevron may change any projections, plans,

8 or information that is included in the Control Plan or updates.  Nothing in this Paragraph 35 shall

9 affect any requirements for the development or submittal of a NOx control plan pursuant to

10 otherwise applicable state or local law (e.g., BAAQMD Regulation 9, Rule 10).

11        36.     By June 30, 2007, Chevron shall install sufficient Qualifying Controls and

12 have applied for emission limits from the appropriate permitting authority sufficient to achieve

13 two-thirds of the NOx emissions reductions required by Paragraph 33.  No later than September

14 30, 2007, Chevron shall provide EPA and the Plaintiff-Intervenors with a report showing how it

15 satisfied the requirement of this Paragraph.

16        37.     By no later than June 30, 2011, heaters and boilers with Qualifying Controls

17 shall represent at least 30% of the total maximum heat input capacity or, if less, the allowable

18 heat input capacity, as shown in Appendix B, of all heaters and boilers greater than 40

19 mmBTU/hr at the El Segundo, Richmond, Pascagoula and Salt Lake City Refineries.  Any

20 Qualifying Controls can be used to satisfy this requirement, regardless of when the Qualifying

21 Controls were installed.

22        37A.    By no later than December 31, 2008, Chevron shall install Qualifying Controls

23 on the FCCU heater at the Hawaii Refinery.

24        38.     Beginning no later than 180 days after installing Qualifying Controls on and

25 commencing operation of a heater and boiler that will be used to satisfy the requirements of

26 Paragraph 33, Chevron shall monitor the heaters or boilers as follows:

27        a.      For heaters and boilers with a capacity greater than 150 mmBTU/hr (HHV),

28 install or continue to operate a NOx CEMS;

1          b.        For heaters and boilers with a capacity greater than 100 mmBTU/hr (HHV) but

2  less than or equal to 150 mmBTU/hr (HHV), install or continue to operate a  NOx CEMS, or

3  monitor NOx emissions with a predictive emissions monitoring system ("PEMS") developed and

4  operated pursuant to the requirements of Appendix C of this Consent Decree.

5          c.        For heaters and boilers with a capacity of less than or equal to 100 mmBTU/hr

6  (HHV), conduct an initial performance test and any periodic tests that may be required by EPA

7  or by the applicable State or local permitting authority under other applicable regulatory

8  authority.  The results of the initial performance testing shall be reported to EPA and the

9  appropriate Plaintiff-Intervenor.

10        Chevron shall use Method 7E or an EPA-approved alternative test method to conduct

11  initial performance testing for NOx emissions required by subparagraph 38.c.  Monitoring with a

12  PEMS that is required by this paragraph shall be conducted in accordance with the requirements

13  of Appendix C.  Units with Qualifying Controls installed before the Date of Entry that are

14  subject to this Paragraph shall comply with this Paragraph by June 30, 2004, except that for units

15  at the Richmond Refinery with a capacity greater than 100 mmBTU/hr (HHV) but less than or

16  equal to 150 mmBTU (HHV) on which Qualifying Controls were installed before the Date of

17  Entry Chevron shall comply with this Paragraph by December 31, 2005.

18        39.      Beginning no later than 180 days after installing Qualifying Controls and

19  commencing operation of a heater or boiler that will be monitored by use of a NOx CEMS that is

20  required by Paragraph 38, Chevron shall install, certify, calibrate, maintain, and operate all

21  CEMS in accordance with the provisions of 40 C.F.R. § 60.13 that are applicable to CEMs

22  (excluding those provisions applicable only to Continuous Opacity Monitoring Systems) and

23  Part 60 Appendices A and F, and the applicable performance specification test of 40 C.F.R. Part

24  60 Appendix B.  With respect to 40 C.F.R. Part 60, Appendix F, in lieu of the requirements of 40

25  C.F.R. Part 60, Appendix F §§ 5.1.1, 5.1.3 and 5.1.4, Chevron must conduct either a Relative

26  Accuracy Audit ("RAA") or a Relative Accuracy Test Audit ("RATA") on each CEMS at least

27  once every three (3) years.  Chevron must also conduct Cylinder Gas Audits ("CGA") each

28  calendar quarter during which a RAA or a RATA is not performed.  With respect to its

1   Richmond Refinery, Chevron may conduct a Field Accuracy Test ("FAT") as defined in

2   BAAQMD regulations or procedures in lieu of the required RAA or CGA.  Units with

3   Qualifying Controls installed before the Date of Entry that are subject to this Paragraph shall

4   comply with this Paragraph by June 30, 2004.

5         40.    The requirements of this Section V.F. do not exempt Chevron from complying

6   with any and all Federal, state, regional, and local requirements that may require technology,

7   equipment, monitoring, or other upgrades based on actions or activities occurring after the Date

8   of Lodging of this Consent Decree, or based upon new or modified regulatory, statutory, or

9   permit requirements.

10         41.    Chevron shall retain all records required to support its reporting requirements

11   under this Section V.F. until termination of the Consent Decree.  Chevron shall submit such

12   records to EPA or the appropriate Plaintiff-Intervenor upon request.

13         42.    If Chevron transfers ownership of any refinery before achieving all of the NOx

14   reductions required by Paragraph 33, Chevron shall notify EPA and the appropriate Plaintiff-

15   Intervenor of that transfer and shall submit an allocation to EPA and the appropriate Plaintiff-

16   Intervenor for that refinery's share of NOx reduction requirements of Paragraph 33 that will

17   apply individually to the transferred refinery after such transfer.  If Chevron chooses, such

18   allocation may be zero.

19   **G.**     **SO$_2$ Emissions Reductions from and NSPS Applicability to Chevron Heaters and**

20        **Boilers and Other Specified Equipment.**  Chevron shall undertake measures to reduce

21        SO$_2$ emissions from refinery heaters and boilers and other specified equipment by

22        restricting H$_2$S in refinery fuel gas and by agreeing not to burn Fuel Oil except as

23        specifically permitted under the provisions set forth herein.

24         43.    **NSPS Applicability to Heaters and Boilers and Other Specified Equipment.**

25        a.    Upon the Date of Entry, all heaters and boilers at the Chevron Refineries shall be

26   affected facilities, under NSPS Subpart J, and shall comply with the applicable requirements of

27   NSPS Subparts A and J for fuel gas combustion devices, except for those heaters and boilers

28   listed in Appendix D, which shall be affected facilities and shall be subject to and comply with

1    the applicable requirements of NSPS Subparts A and J for fuel gas combustion devices by the

2    dates listed in Appendix D.

3         b.    By the date listed in Appendix E, all equipment listed in Appendix E shall be

4    affected facilities, under NSPS Subpart J, and shall be subject to and comply with the applicable

5    requirements of NSPS Subparts A and J for fuel gas combustion devices.

6         c.    Where Appendix D or E specifies an AMP submittal date (rather than a final

7    NSPS Subpart J compliance date), Chevron shall submit to EPA and the appropriate Plaintiff-

8    Intervenor a timely and complete alternative monitoring plan ("AMP") application.  Such an

9    AMP may be based on alternative monitoring for H2S or SO2.  If an AMP is not approved,

10   Chevron shall within ninety (90) days of Chevron receiving notice of such disapproval submit to

11   EPA for approval, with a copy to the appropriate Plaintiff-Intervenor, a plan and schedule that

12   provide for compliance with the monitoring requirements of NSPS Subpart J as soon as

13   practicable.  Such plan may include a revised AMP application, physical or operational changes

14   to the equipment, or additional or different monitoring.

15        d.    For some heaters and boilers that combust low-flow VOC streams from vents,

16   pumpseals, and other sources, it is anticipated that some of the AMP applications will rely in part

17   on calculating a weighted average H2S concentration of all VOC and fuel gas streams that are

18   burned in a single heater or boiler and demonstrating with alternative monitoring that either the

19   SO2 emissions from the heater or boiler will not exceed 20 ppm or that the weighted average

20   H2S concentration is not likely to exceed 162 ppm H2S.  EPA shall not reject an AMP solely

21   due to the AMP's use of one of these approaches to demonstrating compliance with NSPS

22   Subpart J.

23        e.    For heaters, boilers and other equipment used as fuel gas combustion devices that

24   become affected facilities under NSPS Subpart J pursuant to this Paragraph 43 and/or

25   Appendices D or E, entry of this Consent Decree and compliance with the relevant monitoring

26   requirements of this Consent Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a)

27   and the initial performance test requirement of 40 C.F.R. § 60.8(a).

28        44.   **Elimination/Reduction of Fuel Oil Burning.**  Effective on the Date of Entry,

1   Chevron shall not burn Fuel Oil in any combustion unit at its Refineries except that:

2         a.      Due to the unavailability of natural gas, Chevron may burn Fuel Oil at its Hawaii

3   Refinery;

4         b.      Chevron may burn HF polymer at the HF Alkylation Plant at the Salt Lake City

5   Refinery;

6         c.      Chevron may burn Fuel Oil at the Salt Lake City Refinery during periods of

7   Natural Gas Curtailment, test runs, and operator training.

8         d.      Chevron may burn Torch Oil in FCCU regenerators to assist in starting,

9   restarting, hot standby, or to maintain regenerator heat balance.

10         45.    [omitted]

11   **H.**    **Sulfur Recovery Plants NSPS Applicability:** The Sulfur Recovery Plants ("SRPs") at

12         El Segundo, Richmond and Pascagoula are or will be affected facilities under NSPS

13         Subpart J, effective on the dates described in Paragraphs 47.a and 49.a, and shall

14         comply with all applicable requirements of 40 C.F.R. Part 60, Subparts A and J by such

15         dates.  Furthermore, in the event that its sulfur input at the Salt Lake City Refinery SRP

16         exceeds 20 long tons in any calendar day, it shall become an affected facility under

17         NSPS Subpart J, and come into compliance with NSPS Subpart J in accordance with the

18         requirements specified in Paragraph 48.f.

19         46.    **Sulfur Pit Emissions:** Chevron shall continue to route or re-route all sulfur

20   pit emissions at all Chevron Refineries so that they are eliminated, controlled, or included and

21   monitored as part of the SRP's emissions subject to the NSPS Subpart J limit for $SO_2$, 40 C.F.R.

22   § 60.104(a)(2) or to applicable emission limits at the Salt Lake City SRP under Paragraph 48, by

23   no later than the first turnaround of the applicable Claus train that occurs on or after June 30,

24   2004 or by December 31, 2006 (whichever first occurs).

25         47.    **Compliance with NSPS Emissions Limits at the Richmond and El**

26   **Segundo SRPs and at Pascagoula SRU 4/5/6.**

27         a.      Effective on the Date of Entry, Pascagoula SRU 4/5/6 shall be affected facilities

28   under NSPS Subpart J and shall comply with all applicable provisions of NSPS Subparts A and

1    J.  Effective no later than June 30, 2004, the Richmond and El Segundo SRPs shall be affected

2    facilities under NSPS Subpart J and shall comply with all applicable provisions of NSPS

3    Subparts A and J.  Such SRPs and SRUs shall comply with 40 C.F.R. § 60.104(a)(2) at all times

4    except during periods of startup, shutdown or Malfunction of the SRP or SRU, or during a

5    Malfunction of the TGU.  For purposes of determining compliance with the emission limits of 40

6    C.F.R. § 60.104(a)(2), the "start-up/shutdown" provisions set forth in NSPS Subpart A shall

7    apply.

8            b.        Effective on the respective dates on which the Richmond and El Segundo

9    SRPs and Pascagoula SRU 4/5/6 become affected facilities pursuant to Paragraph 47.a, Chevron

10   shall monitor all emissions and shall report excess emissions from the Richmond and El Segundo

11   SRPs and Pascagoula SRU 4/5/6 under and as required by NSPS Subpart J.

12           c.        At all times, including periods of startup, shutdown and Malfunction, Chevron

13   shall, to the extent practicable, operate and maintain its SRPs, SRUs and TGUs and any

14   supplemental control devices, in accordance with good air pollution control practices as required

15   in 40 C.F.R. § 60.11(d).

16           48.       **Compliance with Emissions Limits at the Salt Lake City SRP.**

17           a.        With respect to the Salt Lake City SRP, Chevron shall comply with a 95%

18   sulfur recovery efficiency requirement for all periods of operation except during periods of

19   startup, shutdown or Malfunction of the SRP.  In addition, Chevron shall not emit more than

20   2.128 tons/day of SO2 from the SRP except during periods of startup, shutdown or Malfunction

21   of the SRP.  The actual recovery efficiency will be determined on a daily basis; however,

22   compliance with the 95% recovery requirement will be determined on a rolling 30-day average

23   basis.  Chevron shall determine the percent recovery by measuring the flow rate and

24   concentration of hydrogen sulfide in the feed streams going to the SRP and by measuring the

25   sulfur dioxide emissions with the CEMS at the SRP incinerator and calculate the sulfur in the

26   feed and sulfur in the emissions.  The flow rate will be determined continuously; the hydrogen

27   sulfide concentration will be determined quarterly for the first 6 quarters from the Date of Entry

28   and at least semiannually thereafter (samples may be collected as manual grabs or though remote

1  monitoring).  The measured flow rate and periodic hydrogen sulfide concentrations will be used

2  to determine the daily sulfur feed rate.

3        b.      Chevron shall complete an SRP optimization study at Salt Lake City SRP by

4  no later than March 31, 2004.  (For purposes of Paragraphs 48 and 49 only, the "SRP" includes

5  the amine unit, the sour water stripper, the SRU and the SRU tail gas incinerator.)   The

6  optimization study shall meet the requirements set forth in Paragraph 50.  Chevron shall

7  promptly submit a copy of the optimization study report and a schedule for implementing the

8  recommendations in that report to EPA and the State of Utah.  Chevron shall implement the

9  physical improvements and operating parameters recommended in the study to optimize

10  performance of the SRP as soon as practicable but by no later than December 31, 2004.

11        c.      Chevron shall operate the Salt Lake City SRP at all times in accordance with

12  the good engineering management practices recommended in the optimization study to ensure

13  compliance with the 95% efficiency requirement and the emission limit.  In addition, Chevron

14  shall, to the extent practicable, operate and maintain its SRP and any supplemental control

15  devices through implementation of good air pollution control practices consistent with 40 C.F.R.

16  § 60.11(d).

17        d.     Within 60 days of the completion of the recommendations contained in the

18  SRU Optimization Study Report and no later than December 31, 2004, Chevron shall conduct a

19  test to demonstrate compliance with the 95% recovery efficiency and emission limit

20  requirements.  Chevron shall submit a copy of the test protocol to EPA and the State of Utah for

21  review and comment not less than 30 days before the scheduled test date.

22        e.      In each periodic report required under this Consent Decree, Chevron shall

23  include data showing all daily percent sulfur recovery percentages, the rolling 30-day average

24  sulfur recovery percentages, all daily emissions of SO2 (tons/day) as recorded by a CEMS, the

25  operating parameters established in the optimization study, and the daily sulfur feed (calculated

26  from daily flow rate and periodic hydrogen sulfide concentrations) to the SRP.

27        f.      No later than one hundred and twenty (120) days from the date the sulfur input

28  to the Salt Lake City SRP exceeds twenty (20) long tons in any calendar day, Chevron shall

1   submit to EPA and the State of Utah a proposed schedule to comply with all applicable NSPS

2   provisions, including the installation of a Tail Gas Unit.  Any schedule proposed by Chevron

3   shall require Chevron to be in compliance with all applicable NSPS regulatory requirements no

4   later than thirty (30) months from the date the sulfur input exceeded twenty (20) long tons in any

5   calendar day; provided, however, that Chevron and the United States agree that if there is a

6   dispute as to the accuracy or reliability of the data indicating that the sulfur input to the SRP

7   exceeded the twenty (20) long tons per day, then the deadlines for submission of the compliance

8   schedule and achieving compliance with the NSPS shall be extended by the period needed to

9   resolve such dispute pursuant to the dispute resolution provisions in Section XV.  Chevron shall

10  immediately notify EPA and the State of Utah in writing if monitoring during any calendar day

11  indicates that the sulfur input to the SRP exceeded twenty (20) long tons for that calendar day.

12  The notice required by the preceding sentence shall include such monitoring data.   To the extent

13  that Chevron believes that such monitoring data is neither accurate nor reliable, Chevron shall so

14  notify EPA and the State of Utah and provide the basis(es) for such an assertion.

15          g.          If Chevron installs a Tail Gas Unit and accepts NSPS Subpart J applicability at

16  the Salt Lake City SRP, it shall no longer be subject to the requirements of this Paragraph 48 but,

17  instead, shall be subject to the requirements of NSPS Subpart J and Paragraph 47 of this Consent

18  Decree (as of the date it accepts such applicability).

19          49.          **Compliance with NSPS Emissions Limits at Pascagoula SRU 2/3.**

20          a.          By no later than July 31, 2007, and except during periods of startup, shutdown

21  or Malfunction of  SRU 2/3 or a Malfunction of the TGU, Pascagoula SRU 2/3 shall comply

22  with 40 C.F.R. § 60.104(a)(2) and the Pascagoula SRP shall comply with all applicable NSPS

23  Subpart A and J requirements, including monitoring, record keeping, reporting and operating

24  requirements, and with Paragraph 47 of this Consent Decree (as of the date Chevron completes

25  implementation of its approved compliance plan and schedule under Paragraph 49.b.i).

26          b.          Chevron shall implement the following interim measures at Pascagoula SRU

27  2/3:

28          i.          By no later than June 30, 2005, Chevron shall submit a compliance plan and

1    schedule for SRU 2/3 that will ensure compliance with SRP NSPS

2    requirements at the earliest practicable date but not later than July 31, 2007.

3    ii.    By no later than September 30, 2004, Chevron shall install, operate and

4    maintain an SO2 CEMS at SRU 2/3 in accordance with NSPS Subpart J (Part

5    60 Appendix B - Performance Specification 2).

6    iii.   By no later than March 31, 2004, Chevron shall complete an optimization

7    study to minimize emissions and maximize sulfur recovery efficiencies at SRU

8    2/3.  This study shall meet the requirements set forth in Paragraph 50.

9    Chevron  shall submit a copy of the optimization study report and a schedule

10   for  implementing the report's recommendations to EPA and the State of

11   Mississippi.  Chevron shall implement the physical improvements and

12   operating parameters recommended in the study to optimize performance of

13   SRU 2/3 in accordance with the proposed schedule.

14   iv.   At all times, including periods of startup, shutdown and Malfunction, Chevron

15   shall, to the extent practicable, operate and maintain SRU 2/3 and any

16   supplemental control devices in a manner consistent with good air pollution

17   control practices for minimizing emissions as required in 40 C.F.R. § 60.11(d).

18   v.    By no later than December 31, 2004, Chevron shall complete the

19   implementation of the recommendations in the optimization study.  Chevron

20   shall submit a report to EPA and the State of Mississippi and propose an

21   appropriate performance standard (percent recovery rate or other performance

22   standard) based upon demonstrated performance at the optimized units.

23   Chevron shall comply with the performance standard from and after the

24   submission of such report.   If EPA determines that, based on the results of the

25   study and other available and relevant information, a more stringent

26   performance standard is appropriate, EPA shall notify Chevron, and Chevron

27   shall comply within 90 days.

28   Chevron's obligations under this Paragraph 49.b shall end when Chevron completes

1   implementation of its approved compliance plan and schedule under Paragraph 49.b.i and

2   accepts NSPS Subpart J applicability for SRU 2/3 and the Pascagoula SRP.

3       49A.    For Chevron's SRPs and SRUs that become affected facilities under NSPS

4   Subpart J pursuant to Section V.H. of this Consent Decree, entry of this Consent Decree and

5   compliance with the relevant monitoring requirements of this Consent Decree shall satisfy the

6   notice requirements of 40 C.F.R. § 60.7(a) and the initial performance test requirement of 40

7   C.F.R. § 60.8(a).

8       50.     **Optimization:**

9       a.      The optimization studies required for the Salt Lake City SRP and Pascagoula

10  SRU 2/3 shall meet the following requirements:

11      i.      Detailed evaluation of plant design and capacity, operating parameters and

12              efficiencies - including catalytic activity, and material balances;

13      ii.     An analysis of the composition of the acid gas and sour water stripper gas

14              resulting from the processing of crude slate actually used, or expected to be

15              used, in the SRP;

16      iii.     A thorough review of each critical piece of process equipment and

17              instrumentation within the Claus train that is designed to correct deficiencies

18              or problems that prevent the Claus train from achieving its optimal sulfur

19              recovery efficiency and expanded periods of operation;

20      iv.     Establishment of baseline data through testing and measurement of key

21              parameters throughout the Claus train;

22      v.      Establishment of a thermodynamic process model of the Claus train;

23      vi.     For any key parameters that have been determined to be at less than optimal

24              levels, initiation of logical, sequential, or stepwise changes designed to move

25              such parameters toward their optimal values;

26      vii.    Verification through testing, analysis of continuous emission monitoring data

27              or other means, of incremental and cumulative improvements in sulfur

28              recovery efficiency, if any;

1        viii.    Establishment of new operating procedures for long term efficient operation;

2            and

3        ix.    Each study shall be conducted to optimize the performance of the Claus trains

4            in light of the actual characteristics of the feeds to the SRUs.

5      Chevron shall incorporate the results of its optimization studies into the PMO Plans

6 required under Paragraph 51.

7        b.    Chevron shall continue to maintain its Best Practices Team as a means to

8 optimize Sulfur Recovery Plant operations.  At a minimum, this team will review:

9        i.    operator and engineer training for SRP and amine treating operations;

10       ii.    operating parameters, material balances and efficiencies;

11      iii.    acid gas and SWS gas composition;

12      iv.    operating problems and corrective actions;

13       v.    incremental improvements achieved;

14      vi.    new or modified operating procedures; and

15     vii.    root cause and corrective action performed as a result of any incident

16           investigation performed as a result of an Acid Gas Flaring Incident or Tail Gas

17           Flaring Incident.

18      51.    **Good Operation and Maintenance**.

19        a.    By no later than March 31, 2004, Chevron shall submit to EPA and the

20 appropriate Plaintiff-Intervenor, a summary of each Refinery's plan for enhanced maintenance

21 and operation of its SRP, including Pascagoula SRU 2/3, the sulfuric acid plant at the Hawaii

22 Refinery, any supplemental control devices, and the appropriate Upstream Process Units that has

23 been or will be implemented.  This plan shall be termed a Preventive Maintenance and Operation

24 Plan ("PMO Plan").  The PMO Plan shall be a compilation of Chevron's approaches for

25 exercising good air pollution control practices and for minimizing $SO_2$ emissions at its

26 Refineries.  The PMO Plan shall provide for continuous operation of its SRPs between scheduled

27 maintenance turnarounds with minimization of emissions, including the continued use of

28 supplemental control devices (e.g., amine/caustic scrubbers at El Segundo, Richmond,

1    Pascagoula, and Hawaii).  The PMO Plan shall include, but not be limited to, sulfur shedding

2    procedures, startup and shutdown procedures, hot standby procedures, emergency procedures

3    and schedules to coordinate maintenance turnarounds of the SRP Claus trains and any

4    supplemental control device to coincide with scheduled turnarounds of major Upstream Process

5    Units.  The PMO Plan shall have as a goal the elimination of Acid Gas Flaring.  Chevron shall

6    comply with the PMO Plan at all times, including periods of Startup, Shutdown and Malfunction

7    of its SRPs.  Chevron's changes to a PMO Plan related to minimizing Acid Gas Flaring and/or

8    $SO_2$ emissions shall be summarized and reported to EPA and the appropriate Plaintiff-Intervenor

9    on an annual basis.

10         b.      EPA and the appropriate Plaintiff-Intervenor do not, by their review of a PMO

11    Plan and/or by their failure to comment on a PMO Plan, warrant or aver in any manner that any

12    of the actions that Chevron may take pursuant to such PMO Plan will result in compliance with

13    the provisions of the Clean Air Act or any other applicable federal, state, or local law or

14    regulation. Notwithstanding EPA's or appropriate Plaintiff-Intervenor's review of a PMO Plan,

15    Chevron shall remain solely responsible for compliance with the Clean Air Act and such other

16    laws and regulations.

17         52.     By no later than December 31, 2003, Chevron shall install and operate a

18    caustic scrubber at the Hawaii Refinery to eliminate Acid Gas Flaring during periods of sulfuric

19    acid plant startup, shutdown and Malfunction.

20    **I.**      **Flaring Devices - NSPS Applicability**:  All Flaring Devices at the Refineries are

21              identified in Appendix F to this Consent Decree.  These Flaring Devices are or will be

22              affected facilities (as that term is used in NSPS, 40 C.F.R. Part 60) by the dates

23              Chevron certifies compliance with applicable NSPS Subpart J requirements and accepts

24              NSPS Subpart J applicability for such Flaring Device under Paragraph 54.a.  Such

25              Flaring Devices will then be subject to and required to comply with the fuel gas

26              combustion device requirements of 40 C.F.R. Part 60, Subparts A and J; they may also

27              be used as emergency control devices for the quick and safe release of gases generated

28              as a result of startup, shutdown, upset or Malfunction.

53. **Good Air Pollution Control Practices**.  On and after the Date of Entry, Chevron shall at all times and to the extent practicable, including during periods of Startup, Shutdown, and/or Malfunction, implement good air pollution control practices for minimizing emissions consistent with 40 C.F.R. § 60.11(d).

54. **Refinery Fuel Gases**

a. Continuous or Intermittent, Routinely-Generated Refinery Fuel Gases. Chevron shall identify all continuous or intermittent, routinely-generated refinery fuel gases that are combusted in any of the Flaring Devices identified in Appendix F and determine whether all such gases are monitored and comply with applicable NSPS Subpart J requirements.  By no later than December 31, 2006, Chevron shall:

    i. certify compliance with applicable NSPS requirements and accept NSPS Subpart J applicability for at least 50% of the Flaring Devices identified in Appendix F; and

    ii. submit a schedule of activities that Chevron will undertake to ensure continuous compliance with applicable NSPS requirements as soon as practicable at all other Flaring Devices.  The schedule for each such other Flaring Device shall identify whether Chevron will: (a) eliminate gas streams; (b) monitor continuous or intermittent routinely-generated refinery fuel gas streams and comply with the emission limit at 40 C.F.R. § 60.104(a)(1); or (c) take other identified actions to ensure that only Non-Routinely Generated Gases are combusted in such other Flaring Device (*e.g.*, design, install, maintain and operate a flare gas recovery system).  Except for a maximum of three flares, Chevron shall certify compliance with applicable NSPS Subpart J requirements and accept NSPS Subpart J applicability for all those Flaring Devices not previously addressed under Paragraph 54.a.i. by December 31, 2008.  For any remaining flares, Chevron shall certify compliance with applicable NSPS Subpart J requirements and accept NSPS Subpart J applicability for those Flaring Devices by December 31, 2010.

1     b.  Non-Routinely Generated Gases.  The combustion of gases generated as a

2 result of startup, shutdown, upset or Malfunction of a refinery process unit or released to a

3 Flaring Device as a result of relief valve leakage or other emergency malfunction are exempt

4 from the requirement to comply with 40 C.F.R. § 60.104(a)(1).

5     55.  For Chevron's Flaring Devices identified in Appendix F that become affected

6 facilities under NSPS Subpart J pursuant to Section V.I. of this Consent Decree, entry of this

7 Consent Decree and compliance with the relevant monitoring requirements of this Consent

8 Decree shall satisfy the notice requirements of 40 C.F.R. § 60.7(a) and the initial performance

9 test requirement of 40 C.F.R. § 60.8(a).

10     56.  [omitted]

11 **J.**  **Control of Acid Gas Flaring Incidents and Tail Gas Incidents.**  Chevron has

12    implemented (or is in the process of identifying and implementing) corrective actions to

13    minimize the number and duration of Acid Gas Flaring Incidents identified under

14    Paragraph 59.  Chevron agrees to implement a program to investigate the cause of

15    future Acid Gas Flaring Incidents, to take reasonable steps to correct the conditions that

16    have caused or contributed to such Acid Gas Flaring Incidents, and to minimize the

17    flaring of acid gas and sour water stripper gases at each Refinery.  Chevron shall follow

18    the procedures in this Section V.J to evaluate whether acid gas/sour water stripper gas

19    flaring incidents occurring after the Date of Entry are due to Malfunctions or are subject

20    to stipulated penalties.  The investigative and evaluative procedures in this Section V.J

21    will also be used to assess whether Tail Gas Incidents, as described in Paragraph 66, are

22    due to Malfunctions or are subject to stipulated penalties.  The procedures set forth in

23    this Section V.J require root cause analysis and corrective action for all types of flaring

24    and stipulated penalties for acid/sour water stripper gas flaring incidents and/or tail gas

25    incidents if the root causes were not due to malfunctions.

26     57.  **Investigation and Reporting.**  By no later than forty-five (45) days

27 following the end of an Acid Gas Flaring Incident occurring after the Date of Entry, Chevron

28 shall submit to EPA and the appropriate Plaintiff-Intervenor a report that sets forth the following:

i.      The date and time that the Acid Gas Flaring Incident started and ended.  To the extent that the Acid Gas Flaring Incident involved multiple releases either within a twenty-four (24) hour period or within subsequent, contiguous, non-overlapping twenty-four (24) hour periods, Chevron shall set forth the starting and ending dates and times of each release;

ii.     An estimate of the quantity of sulfur dioxide that was emitted and the calculations that were used to determine that quantity;

iii.    The steps, if any, that Chevron took to limit the duration and/or quantity of sulfur dioxide emissions associated with the Acid Gas Flaring Incident;

iv.     A detailed analysis that sets forth the Root Cause and all contributing causes of that Acid Gas Flaring Incident, to the extent determinable;

v.      An analysis of the measures, if any, that are available to reduce the likelihood of a recurrence of an Acid Gas Flaring Incident resulting from the same Root Cause or contributing causes in the future.  The analysis shall discuss the alternatives, if any, that are available, the probable effectiveness and cost of the alternatives, and whether or not an outside consultant should be retained to assist in the analysis.  Possible design, operation and maintenance changes shall be evaluated.  If Chevron concludes that corrective action(s) is (are) required under Paragraph 58, the report shall include a description of the action(s) and, if not already completed, a schedule for its (their) implementation, including proposed commencement and completion dates.  If Chevron concludes that corrective action is not required under Paragraph 58, the report shall explain the basis for that conclusion;

vi.     A statement that: (a) specifically identifies each of the grounds for stipulated penalties in Paragraphs 60 and 61 of this Decree and describes whether or not the Acid Gas Flaring Incident falls under any of those grounds; (b) if an Acid Gas Flaring Incident falls under Paragraph 61of this Decree, describes which Paragraph (61.a or b) applies and why; and (c) if an Acid Gas Flaring Incident

falls under either Paragraph 60 or 61.b, states whether or not Chevron asserts a

defense to the Flaring Incident, and if so, a description of the defense;

vii.   To the extent that investigations of the causes and/or possible corrective actions

still are underway on the due date of the report, a statement of the anticipated date

by which a follow-up report fully conforming to the requirements of this

Paragraph 57.iv and 57.v shall be submitted; provided, however, that if Chevron

has not submitted a report or a series of reports containing the information

required to be submitted under this Paragraph within the 45 day time period set

forth in Paragraph 57 (or such additional time as EPA may allow) after the due

date for the initial report for the Acid Gas Flaring Incident, the stipulated penalty

provisions of Paragraph 144 shall apply, but Chevron shall retain the right to

dispute, under the dispute resolution provision of this Consent Decree, any

demand for stipulated penalties that was issued as a result of Chevron's failure to

submit the report required under this Paragraph within the time frame set forth.

Nothing in this Paragraph shall be deemed to excuse Chevron from its

investigation, reporting, and corrective action obligations under this Section for

any Acid Gas Flaring Incident which occurs after an Acid Gas Flaring Incident

for which Chevron has requested an extension of time under Paragraph 58; and

viii.  To the extent that completion of the implementation of corrective action(s), if

any, is not finalized at the time of the submission of the report required under this

Paragraph, then, by no later than thirty (30) days after completion of the

implementation of corrective action(s), Chevron shall submit a report identifying

the corrective action(s) taken and the dates of commencement and completion of

implementation.

58.    **Corrective Action**.

a.     In response to an AG Flaring Incident occurring after the Date of Entry,

Chevron shall take, as expeditiously as practicable, such interim and/or long-term corrective

actions, if any, as are consistent with good engineering practice to minimize the likelihood of a

1   recurrence of the Root Cause and all contributing causes of that AG Flaring Incident.

2        b.    If EPA does not notify Chevron in writing within thirty (30) days of receipt of

3   the report(s) required by Paragraph 57 that it objects to one or more aspects of the proposed

4   corrective action(s), if any, and schedule(s) of implementation, if any, then that (those) action(s)

5   and schedule(s) shall be deemed acceptable for purposes of compliance with Paragraph 58.a of

6   this Decree.  EPA does not, however, by its consent to the entry of this Consent Decree or by its

7   failure to object to any corrective action that Chevron may take in the future, warrant or aver in

8   any manner that any corrective actions in the future shall result in compliance with the

9   provisions of the Clean Air Act or its implementing regulations.  Notwithstanding EPA's review

10   of any plans, reports, corrective actions or procedures under this Section V.J, Chevron shall

11   remain solely responsible for non-compliance with the Clean Air Act and its implementing

12   regulations.  Nothing in this Section shall be construed as a waiver of EPA's rights under the

13   Clean Air Act and its regulations for future violations of the Act or its regulations.

14        c.    If EPA objects, in whole or in part, to the proposed corrective action(s) and/or

15   the schedule(s) of implementation or, where applicable, to the absence of such proposal(s) and/or

16   schedule(s), it shall notify Chevron of that fact within thirty (30) days following receipt of the

17   report(s) required by Paragraph 57, above.  If EPA and Chevron cannot agree on the appropriate

18   corrective action(s), if any, to be taken in response to a particular Acid Gas Flaring Incident,

19   either Party may invoke the Dispute Resolution provisions of Section XV of the Consent Decree.

20        d.    Nothing in this Section V.J shall be construed to limit the right of Chevron to

21   take such corrective actions as it deems necessary and appropriate immediately following an

22   Acid Gas Flaring Incident or in the period during preparation and review of any reports required

23   under this Paragraph.

24        59.    **Flaring History**.  Chevron has provided to EPA a report identifying AG

25   Flaring Incidents that occurred in recent years, their probable causes and estimated emissions,

26   and the corrective measures taken by Chevron to avoid future AG Flaring Incidents.

27        59A.    **CERCLA/EPCRA Compliance Review**.  In conjunction with or in addition

28   to the review of flaring incidents required by Paragraph 59, Chevron may elect to conduct a

1  review of past flaring events occurring between July 1, 1998 and the Date of Lodging to

2  determine its compliance with applicable requirements of Section 103(a) of CERCLA, 42 U.S.C.

3  § 9603(a), and Section 304 of EPCRA, 42 U.S.C. § 11004, with respect to those flaring events.

4  Upon completion of this review, Chevron may resolve its liability, pursuant to Paragraph 217 of

5  this Consent Decree, for violations of Section 103(a) of CERCLA and Section 304 of EPCRA

6  with respect to the flaring events identified in its compliance review by completing the following

7  activities no later than 120 days from the Date of Entry:

8          a.      submit a CERCLA/EPCRA Compliance Review Report to EPA and Plaintiff-

9  Intervenors that identifies all flaring events and associated violations of Section 103(a) of

10  CERCLA and Section 304 of EPCRA for which Chevron seeks a resolution of liability, and

11  attach to that report copies of any corrective reports filed by Chevron pursuant to subparagraph

12  b., below; and

13          b.      correct any identified violations by submitting reports to the appropriate

14  agencies consistent with the requirements of Section 103(a) of CERCLA and Section 304 of

15  EPCRA.

16          59B.    **Stipulated Penalties.**  The provisions of Paragraphs 60 through 62 are

17   intended to implement the process outlined in the logic diagram attached hereto as Appendix H

18  to this Consent Decree.  These provisions shall be interpreted and construed, to the maximum

19  extent feasible, to be consistent with that Appendix.  However, in the event of a conflict between

20  the language of those Paragraphs and Appendix H, the language of those Paragraphs shall

21  control.

22          60.     The stipulated penalty provisions of Paragraph 143 shall apply to any Acid

23  Gas Flaring Incident for which the Root Cause was one or more of the following acts, omissions,

24  or events:

25          a.      Error resulting from careless operation by the personnel charged with the

26  responsibility for the Sulfur Recovery Plant, TGU, or Upstream Process Units;

27          b.      Failure to follow written procedures;

28          c.      A failure of a part, equipment or system that is due to a failure by Chevron to

1   operate and maintain that part, equipment or system in a manner consistent with good

2   engineering practice; and

3           d.     Fire eye at the Salt Lake City Refinery.

4          61.     If the Acid Gas Flaring Incident is not a result of one of the root causes

5   identified in Paragraph 60, then the stipulated penalty provisions of Paragraph 143 shall apply if

6   the Acid Gas Flaring Incident:

7           a.     Results in emissions of sulfur dioxide at a rate greater than twenty (20.0)

8   pounds per hour continuously for three (3) consecutive hours or more and Chevron failed to act

9   consistent with the PMO Plan and/or to take any action during the Acid Gas Flaring Incident to

10  limit the duration and/or quantity of SO2 emissions associated with such incident; or

11          b.     Causes the total number of Acid Gas Flaring Incidents in a rolling twelve (12)

12  month period to exceed five (5).

13         In the event that a Flaring Incident falls under both Paragraphs 60 and 61, then

14  Paragraph 60 shall apply.

15         62.     With respect to any Acid Gas Flaring Incident not identified in Paragraph 60 or

16  61, the following provisions shall apply:

17          a.     <u>Agreed Upon Malfunction</u>:  If the Root Cause of the Acid Gas Flaring Incident

18  was sudden, infrequent, and not reasonably preventable through the exercise of good engineering

19  practice, then that cause shall be designated as an agreed-upon malfunction for purposes of

20  reviewing subsequent Acid Gas Flaring Incidents, and the stipulated penalty provisions of

21  Paragraph 143 shall not apply.

22          b.     <u>First Time</u>: If the Root Cause of the Acid Gas Flaring Incident was sudden and

23  infrequent but reasonably preventable through the exercise of good engineering practices then

24  Chevron shall implement corrective action(s) pursuant to Paragraph 59.a, and the stipulated

25  penalty provisions of Paragraph 143 shall not apply.

26          c.     <u>Recurrence</u>: If the Root Cause of the Acid Gas Flaring Incident is a recurrence

27  of the same Root Cause that caused a previous Acid Gas Flaring Incident occurring after the

28  Date of Entry, then the stipulated penalty provisions of Paragraph 143 shall apply unless either

1    the Root Cause of the previous Acid Gas Flaring Incident was designated as an Agreed Upon

2    Malfunction under Paragraph 62.a. or Chevron was in the process of timely developing or

3    implementing a corrective action plan under Paragraph 58.a for such previous Acid Gas Flaring

4    Incident

5        63.    **Defenses:** Chevron may raise the following affirmative defenses in response to

6    a demand by the United States for stipulated penalties:

7        a.    <u>Force majeure</u>.

8        b.    As to Paragraphs 60, the Acid Gas Flaring Incident does not meet the

9    identified criteria.

10       c.    As to Paragraphs 61, the Acid Gas Flaring Incident does not meet the

11   identified criteria and/or was due to a Malfunction.

12       d.    As to Paragraph 62, the Acid Gas Flaring Incident does not meet the identified

13   criteria, was due to a Malfunction and/or Chevron was in the process of timely developing or

14   implementing a corrective action plan under Paragraph 58.a for the previous Acid Gas Flaring

15   Incident.

16       In the event a dispute under Paragraph 61 or 62 is brought to the Court pursuant to the

17   Dispute Resolution provisions of this Consent Decree, Chevron may also assert a start up,

18   shutdown and/or upset defense, but the United States shall be entitled to assert that such defenses

19   are not available.  If Chevron prevails in persuading the Court that the defenses of startup,

20   shutdown and/or upset are available for AG Flaring Incidents under 40 C.F.R. § 60.104(a)(1),

21   Chevron shall not be liable for stipulated penalties for emissions resulting from such startup,

22   shutdown and/or upset.  If the United States prevails in persuading the Court that the defenses or

23   startup, shutdown and/or upset are not available, Chevron shall be liable for such stipulated

24   penalties.

25       64.    Other than for a Malfunction or <u>force majeure</u>, if no Acid Gas Flaring Incident

26   and no violation of the emission limit under Paragraph 54 occurs at a Refinery for a rolling 36

27   month period, then the stipulated penalty provisions of Paragraph 143 shall no longer apply to

28   that Refinery.  EPA may elect to prospectively reinstate the stipulated penalty provision if

1   Chevron has an Acid Gas Flaring Incident which would otherwise be subject to stipulated

2   penalties.  EPA's decision shall not be subject to dispute resolution.  Once reinstated, the

3   stipulated penalty provision shall continue for the remaining life of this Consent Decree for that

4   Refinery.

5       65.    **Emission Calculations**.

6       a.    Calculation of the Quantity of Sulfur Dioxide Emissions Resulting from AG

7   Flaring.    For purposes of this Consent Decree, the quantity of $SO_2$ emissions resulting from AG

8   Flaring shall be calculated by the following formula:

9       Tons of $SO_2$ = [FR][TD][ConcH$_2$S][8.44 x $10^{-5}$].

10   The quantity of $SO_2$ emitted shall be rounded to one decimal point.  (Thus, for example,

11   for a calculation that results in a number equal to 10.050 tons, the quantity of $SO_2$ emitted shall

12   be rounded to 10.1 tons, and less than 10.050 shall be rounded to 10.0.)  For purposes of

13   determining the occurrence of, or the total quantity of $SO_2$ emissions resulting from, a AG

14   Flaring Incident that is comprised of intermittent AG Flaring, the quantity of $SO_2$ emitted shall

15   be equal to the sum of the quantities of $SO_2$ flared during each such period of intermittent AG

16   Flaring.

17       b.    Calculation of the Rate of $SO_2$ Emissions During AG Flaring.  For purposes of

18   this Consent Decree, the rate of $SO_2$ emissions resulting from AG Flaring shall be expressed in

19   terms of pounds per hour and shall be calculated by the following formula:

20       ER = [FR][ConcH$_2$S][0.169].

21   The emission rate shall be rounded to one decimal point.  (Thus, for example, for a calculation

22   that results in an emission rate of 19.95 pounds of $SO_2$ per hour, the emission rate shall be

23   rounded to 20.0 pounds of $SO_2$ per hour; for a calculation that results in an emission rate of 20.05

24   pounds of $SO_2$ per hour, the emission rate shall be rounded to 20.1.)

25       c.    Meaning of Variables and Derivation of Multipliers Used in the Equations in

26   this Paragraph 65:

27       ER =             Emission Rate in pounds of $SO_2$ per hour

28       FR =             Average Flow Rate to Flaring Device(s) during Flaring, in

1    standard cubic feet per hour

2    TD =    Total Duration of Flaring in hours

3    $ConcH_2S$ =    Average Concentration of Hydrogen Sulfide in gas during Flaring

4    (or immediately prior to Flaring if all gas is being flared)

5    expressed as a volume fraction (scf $H_2S$/scf gas)

6    $8.44 \times 10^{-5}$ =    [lb mole $H_2S$/379 scf $H_2S$][64 lbs $SO_2$/lb mole $H_2S$][Ton/2000 lbs]

7    0.169 =    [lb mole $H_2S$/379 scf $H_2S$][1.0 lb mole $SO_2$/1 lb mole $H_2S$][64 lb

8    $SO_2$/1.0 lb mole $SO_2$]

9

10   The flow of gas to the AG Flaring Device(s) ("FR") shall be as measured by the relevant flow

11   meter or reliable flow estimation parameters.  Hydrogen sulfide concentration ("$ConcH_2S$") shall

12   be determined from the Sulfur Recovery Plant feed gas analyzer, from knowledge of the sulfur

13   content of the process gas being flared, by direct measurement by tutwiler or draeger tube

14   analysis or by any other method approved by EPA or the Plaintiff-Intervenors.  In the event that

15   any of these data points is unavailable or inaccurate, the missing data point(s) shall be estimated

16   according to best engineering judgment.  The report required under Paragraph 57 shall include

17   the data used in the calculation and an explanation of the basis for any estimates of missing data

18   points.

19        **66.    Tail Gas Incidents.**

20        a.    <u>Investigation, Reporting, Corrective Action and Stipulated Penalties</u>.  For Tail

21   Gas Incidents, Chevron shall follow the same investigative, reporting, corrective action and

22   assessment of stipulated penalty procedures as those outlined in Paragraphs 57 through 64 for

23   Acid Gas Flaring Incidents.  Those procedures shall be applied to TGU shutdowns, bypasses of a

24   TGU, unscheduled shutdowns of a Sulfur Recovery Plant or other miscellaneous unscheduled

25   Sulfur Recovery Plant events which result in a Tail Gas Incident.  This Paragraph 66 shall apply

26   to the Salt Lake City SRP and Pascagoula SRU 2/3 on and after the date Chevron is required to

27   be in compliance with NSPS Subpart J under Paragraph 48 and 49, as applicable.

28

b.      Calculation of the Quantity of $SO_2$ Emissions Resulting from a Tail Gas Incident:  For the purposes of this Consent Decree, the quantity of $SO_2$ emissions resulting from a Tail Gas Incident shall be calculated by one of the following methods, based on the type of event:

    i.      If the Tail Gas Incident is combusted in a flare the $SO_2$ emissions are calculated using the methods outlined in Paragraph 65; or

    ii.      If the Tail Gas Incident is a event exceeding the 250 ppmvd (NSPS J limit), from a monitored Sulfur Recovery Plant incinerator, then the following formula applies:

$$ER_{TGI} = \sum_{i=1}^{TD_{TGI}} [FR_{Inc.}]_i [\text{Conc. } SO_2 - 250]_i [0.169 \times 10^{-6}] \left[\frac{20.9 - \% O_2}{20.9}\right]_i$$

Where:

$ER_{TGI}$   =      Emissions from Tail Gas at the Sulfur Recovery Plant incinerator, $SO_2$ lb over a 24 hour period

$TD_{TGI}$   =      Total Duration (number of hours) when the incinerator CEMS exceeded 250 ppmvd $SO_2$ corrected to 0% $O_2$ on a rolling twelve hour average, in each 24 hour period of the Incident

  i     =      Each hourly average

$FR_{Inc.}$   =      Incinerator Exhaust Gas Flow Rate (standard cubic feet per hour, dry basis) (actual stack monitor data or engineering estimate based on the acid gas feed rate to the SRP) for each hour of the Incident

Conc. $SO_2$ =      Each actual 12 hour rolling average $SO_2$ concentration (CEMS data) that is greater than 250 ppm in the incinerator exhaust gas, ppmvd corrected to 0% $O_2$, for each hour of the Incident

% $O_2$   =      $O_2$ concentration (CEMS data) in the incinerator exhaust gas in volume % on dry basis for each hour of the Incident

$0.169 \times 10^{-6}$ =     [lb mole of $SO_2$ / 379 $SO_2$ ] [64 lbs $SO_2$ / lb mole $SO_2$ ] [1 x $10^{-6}$ ]

1   Standard conditions   =   60 degree F; 14.7 lb$_{force}$/sq.in. absolute

2   In the event the concentration SO$_2$ data point is inaccurate or not available or a flow

3   meter for FR$_{Inc}$, does not exist or is inoperable, then estimates will be used based on best

4   engineering judgment.

5   K.   **Control of Hydrocarbon Flaring Incidents**.

6   67.   For Hydrocarbon Flaring Incidents occurring after the Date of Entry, Chevron

7   shall follow the same investigative, reporting, and corrective action procedures as those outlined

8   in Paragraphs 57 and 58 for Acid Gas Flaring Incidents; provided however, that in lieu of

9   analyzing possible corrective actions under Paragraph 57.v and taking interim and/or long-term

10   corrective action under Paragraph 58.a for a Hydrocarbon Flaring Incident attributable to the

11   Startup or Shutdown of a unit that Chevron has previously analyzed under this Paragraph,

12   Chevron may identify such prior analysis when submitting the report required under this

13   Paragraph.  Stipulated penalties under Paragraphs 60 through 62 and 143 shall not apply to

14   Hydrocarbon Flaring Incident(s).  The formulas at Paragraph 65, used for calculating the

15   quantity and rate of sulfur dioxide emissions during AG Flaring Incidents, shall be used to

16   calculate the quantity and rate of sulfur dioxide emissions during HC Flaring Incidents.

17   If Chevron determines that the Hydrocarbon Flaring Incident is attributable solely to the

18   combustion of refinery fuel gas that contains less than 160 ppm of H2S, it shall so demonstrate

19   in its report under this Paragraph 67, and no further action shall be required for such incidents

20   under this Paragraph 67.  In addition or in the alternative, if Chevron determines that the

21   Hydrocarbon Flaring Incident is attributable to the combustion of a stream or streams of

22   Continuous or Intermittent Routinely-Generated Fuel Gases prior to Chevron's implementing

23   actions to address such stream(s) when and as required by Paragraph 54.a.ii., it shall so

24   demonstrate in its report under this Paragraph 67, and no further action shall be required for such

25   incidents under this Paragraph 67.

26   L.   **Benzene Waste NESHAP Program Enhancements**.  In addition to continuing to

27   comply with all applicable requirements of 40 C.F.R. Part 61, Subpart FF ("Benzene

28   Waste NESHAP" or "Subpart FF"), Chevron agrees to undertake the measures set forth

1    in this Section V.L to ensure continuing compliance with Subpart FF and to minimize or

2    eliminate fugitive benzene waste emissions at each Refinery that is subject to this Consent

3    Decree.

4    68.    **Current Compliance Status.**  Chevron shall comply with the compliance

5    options specified below:

6    a.    On the Date of Entry, the El Segundo, Hawaii and Pascagoula Refineries shall

7    comply with the compliance option set forth at 40 C.F.R. § 61.342(c), utilizing the exemptions set

8    forth in 40 C.F.R. § 61.342(c)(2) and (c)(3)(ii) (hereinafter referred to as the "2 Mg compliance

9    option");

10   b.    On the Date of Entry, the Richmond Refinery shall comply with the compliance

11   option set forth at 40 C.F.R. § 61.342(e) (herein referred to as the "6BQ compliance option");

12   c.    By no later than December 31, 2005, the Salt Lake City Refinery shall comply

13   with the 6BQ compliance option, consistent with the provisions of Paragraph 71.c.

14   69.    **Refinery Compliance Status Changes**.  Commencing on the Date of Entry and

15   continuing through termination, Chevron shall not change the compliance status of any Refinery

16   from the 6BQ compliance option to the 2 Mg compliance option.  Chevron shall consult with EPA

17   and the appropriate Plaintiff-Intervenor before making any change in compliance strategy not

18   expressly prohibited by this Paragraph.  All changes must be undertaken in accordance with the

19   regulatory provisions of the Benzene Waste NESHAP.

20   70.    **One-Time Review and Verification of Each Refinery's TAB and**

21   **Compliance with the Benzene Waste NESHAP, including the 2 Mg or 6 BQ Compliance**

22   **Options.**

23   a    Phase One of the Review and Verification Process.  By no later than 150 days

24   from the Date of Entry of this Consent Decree, Chevron shall complete a review and verification of

25   each Refinery's most recent TAB submittal and, except for Salt Lake City, each Refinery's

26   compliance with the Benzene Waste NESHAP, including the 2 Mg or 6 BQ compliance option, as

27   applicable.  For each Refinery, Chevron's review and verification process shall include, but not be

28   limited to:

i.      an identification of each waste stream that is required to be included in the Refinery's TAB (e.g., slop oil, tank water draws, spent caustic, desalter rag layer dumps, desalter vessel process sampling points, other sample wastes, maintenance wastes, and turnaround wastes);

ii.     a review and identification of the calculations and/or measurements used to determine the flows of each waste stream for the purpose of ensuring the accuracy of the annual waste quantity for each waste stream;

iii.    an identification of the benzene concentration in each waste stream, including sampling for benzene concentration at no less than 10 waste streams per Refinery consistent with the requirements of 40 C.F.R. § 61.355(c)(1) and (3); provided however, that previous analytical data or documented knowledge of waste streams may be used, 40 C.F.R. § 61.355(c)(2), for streams not sampled;

iv.     an identification of whether or not the stream is controlled consistent with the requirements of Subpart FF; and

an identification of any existing noncompliance with the requirements of Subpart FF.

By no later than thirty (30) days following the completion of Phase One of the review and verification process, Chevron shall submit a Benzene Waste NESHAP Compliance Review and Verification report ("BWON Compliance Review and Verification Report") to EPA and the appropriate Plaintiff-Intervenor(s) that sets forth the results of Phase One, including but not limited to the items identified in (i) through (v) of this Paragraph 70.a.  At its option, Chevron may submit one BWON Compliance Review and Verification Report that includes the results of all Refineries or may submit separate BWON Compliance Review and Verification Reports.

b.      Phase Two of the Review and Verification Process.  Based on EPA's review of the BWON Compliance Review and Verification Report(s), EPA may select up to 20 additional waste streams at each Refinery for sampling for benzene concentration.  Chevron will conduct the required sampling and submit the results to EPA within sixty (60) days of receipt of EPA's request.  Chevron will use the results of this additional sampling to reevaluate the TAB and the

1  uncontrolled benzene quantity and to amend the BWON Compliance Review and Verification

2  Report, as needed.  To the extent that EPA requires Chevron to re-sample any waste stream

3  sampled by Chevron on or after January 1, 2002, Chevron may average the results of such

4  sampling events.  Chevron shall submit an amended BWON Compliance Review and

5  Verification Report within ninety (90) days following the date of the completion of the required

6  Phase Two sampling, if Phase Two sampling is required by EPA.

7       71.    **Implementation of Actions Necessary to Correct Non-Compliance or to**

8  **Come Into Compliance**.

9       a.    <u>Amended TAB Reports</u>.  If the results of the BWON Compliance Review and

10  Verification Report(s) indicate(s) that the Refinery's most recently-filed TAB report does not

11  satisfy the requirements of Subpart FF, Chevron shall submit, by no later than sixty (60) days

12  after completion of the BWON Compliance Review and Verification Report(s), an amended

13  TAB report to the appropriate Plaintiff-Intervenor.  Chevron's BWON Compliance Review and

14  Verification Report(s) shall be deemed a TAB report for purposes of Subpart FF reporting to

15  EPA.

16       b.    <u>All Refineries (except Salt Lake City)</u>.  If the results of the BWON

17  Compliance Review and Verification Report(s) indicate that Chevron is not in compliance with

18  the Benzene Waste NESHAP, including the 6BQ compliance option at the Richmond Refinery

19  and the 2 Mg compliance option at the El Segundo, Hawaii and Pascagoula Refineries, Chevron

20  shall submit to EPA and the appropriate Plaintiff-Intervenor, by no later than sixty (60) days

21  after completion of the BWON Compliance Review and Verification Report(s), a plan that

22  identifies with specificity the compliance strategy and schedule that Chevron will implement to

23  ensure that the subject Refinery complies with its applicable compliance option as soon as

24  practicable.

25       c.    <u>Salt Lake City Refinery</u>  By March 31, 2004, Chevron shall submit to EPA and

26  to the State of Utah a plan that identifies with specificity the compliance strategy and activities

27  that Chevron will implement and undertake to ensure that the Refinery complies with the 6BQ

28  Compliance Option and with all other provisions of this Section V.L applicable to the Richmond

1  Refinery under this Consent Decree, as soon as practicable but by no later than December 31,
2  2005.

3          If Chevron intends to seek an alternative means of emission limitation under 40 C.F.R.
4  § 61.353 based on its biodisc system being equivalent to an enhanced biodegradation unit under
5  40 C.F.R. § 61.348(b)(2)(ii)(B), this plan must also identify the activities Chevron will undertake
6  to ensure compliance by December 31, 2005, if its request is denied within 90 days of its receipt
7  by EPA.  If Chevron's request has not been approved or denied within 90 days after its receipt
8  by EPA, the parties understand and agree that the December 31, 2005 compliance date shall then
9  be extended by an identical period (e.g., if the request is denied on the 100th day after EPA
10 receipt, then the compliance date would then be January 10, 2006).

11         d.      Review and Approval of Plans.  Any plans submitted pursuant to Paragraphs
12 71.b and 71.c shall be subject to the approval of, disapproval of, or modification by EPA, which
13 shall act after an opportunity for consultation with the appropriate Plaintiff-Intervenor.  Within
14 sixty (60) days after receiving any notification of disapproval or request for modification from
15 EPA, Chevron shall submit to EPA and the appropriate Plaintiff-Intervenor a revised plan that
16 responds to all identified deficiencies.  Upon receipt of approval or approval with conditions,
17 Chevron shall implement the plan.  Disputes arising under this Paragraph 71.d shall be resolved
18 in accordance with the dispute resolution provisions of this Consent Decree.

19         e.      Certification of Compliance with the 2 Mg or 6 BQ Compliance Option, as
20 Applicable.  By no later than thirty (30) days after completion of all actions required pursuant to
21 Paragraphs 71.b and 71.c to come into compliance with the applicable compliance option,
22 Chevron shall submit its certification and a report to EPA and the appropriate Plaintiff-
23 Intervenor that each such Refinery is in compliance with the Benzene Waste NESHAP.

24         72.     **Carbon Canisters:**  Chevron shall comply with the requirements of this
25 Paragraph 72 at all locations at Chevron's Refineries where a carbon canister(s) is utilized as a
26 control device under the Benzene Waste NESHAP.

27         a.      By not later than June 30, 2004, Chevron shall complete installation of primary
28 and secondary carbon canisters at locations currently utilizing single canisters and operate them

1    in series at all Refineries (except Salt Lake City).  For the Salt Lake City Refinery, Chevron shall

2    complete installation of primary and secondary carbon canisters and operate them in series by no

3    later than such time as Chevron completes installation and start-up of the equipment necessary to

4    ensure compliance under its approved plan and schedule under Paragraph 71.  By no later than

5    thirty (30) days following completion of the installation of the dual canisters, Chevron shall

6    submit a report certifying the completion of the installation, except that the Salt Lake City

7    Refinery certification and report shall be a made a part of its certification and report under

8    Paragraph 71.e.  The report shall include a list of all locations within each Refinery where

9    secondary carbon canisters were installed, the installation date of each secondary canister, the

10   date that each secondary canister was put into operation and whether VOC or benzene will be

11   used to monitor for breakthrough at each such canister under and as required by Paragraph 72.c.

12          b.       Except as expressly permitted under Paragraph 72.f., Chevron shall not use

13   single carbon canisters for any new units or installations that require vapor control pursuant to

14   the Benzene Waste NESHAP at any of its Refineries.

15          c.       For dual carbon canister systems, "breakthrough" between the primary and

16   secondary canister is defined as any reading equal to or greater than 50 ppm volatile organic

17   compounds excluding ethane and methane (hereinafter "VOC") or 5 ppm benzene.  If, however,

18   EPA determines, in consultation with Chevron, that the results of the study in Paragraph 81.b

19   demonstrate that a concentration greater than 50 ppm VOCs or 5 ppm benzene is a more

20   appropriate measure of breakthrough, then breakthrough under this Paragraph 72.c shall be re-

21   defined consistent with EPA's determination.

22          d.       By no later than seven (7) days after the installation of each secondary carbon

23   canister (and by June 30, 2004 for in-series dual canister systems already used or installed prior

24   to the Date of Entry), Chevron shall start to monitor for breakthrough between the primary and

25   secondary carbon canisters at times when there is actual flow to the carbon canister, in

26   accordance with the frequency specified in 40 C.F.R. § 61.354(d), and shall monitor the outlet of

27   the secondary canister on a monthly basis or at its design replacement interval (whichever is

28   less) to verify the proper functioning of the system .

e.      Chevron shall replace the original primary carbon canisters (or route flow to an appropriate alternative control device) immediately when breakthrough is detected between the primary and secondary canister.  The original secondary carbon canister (or a fresh carbon canister) will become the new primary carbon canister and a fresh carbon canister will become the secondary canister.  For purposes of this Paragraph 72.e, "immediately" shall mean eight (8) hours for canisters of 55 gallons or less, twenty-four (24) hours for canisters greater than 55 gallons but less than 10,000 pounds, and 48 hours for canisters of 10,000 pounds or larger.  If breakthrough is detected at a canister of 10,000 pounds or larger, Chevron shall make every effort practicable to shut off the flow to the canister system until the replacement canister is in place.

In lieu of replacing the primary canister immediately, Chevron may elect to monitor the secondary canister the day breakthrough between the primary and secondary canister is identified and each calendar day thereafter.  This daily monitoring shall continue until the primary canister is replaced.  If either benzene or VOC is detected at the outlet of the secondary canister during this period of daily monitoring, both canisters must be replaced within 8 hours.

f.      Chevron may utilize properly sized single canisters for short-term operations such as with temporary storage tanks or as temporary control devices.  For canisters operated as part of a single canister system, breakthrough is defined for purposes of this Decree as any reading of VOC or benzene above background.  Beginning no later than January 1, 2004, Chevron shall monitor for breakthrough from single carbon canisters each business day (Monday through Friday, excluding legal holidays) there is actual flow to the carbon canister.  Chevron shall replace the single carbon canister with a fresh carbon canister, discontinue flow or route the stream to an alternate, appropriate device immediately when breakthrough is detected.  For this Paragraph 72.f., "immediately" shall mean eight (8) hours for canisters of 55 gallons or less and twenty-four (24) hours for canisters greater than 55 gallons.  If a single canister has been found to exceed the applicable breakthrough concentration, flow must be discontinued to that canister immediately.  Such a spent canister may not be placed back into BWON vapor control service until it has been appropriately regenerated.

1      g.      Chevron shall maintain a supply of fresh carbon canisters at each Refinery at

2  all times.

3      h.      Records for the requirements of Paragraph 72 shall be maintained in

4  accordance with 40 C.F.R. § 61.356(j)(10).

5      73.    **Annual Program.**  By not later than June 30, 2004, Chevron shall establish an

6  annual program of reviewing process information for each Refinery, including but not limited to

7  construction projects, to ensure that all new benzene waste streams are included in each

8  Refinery's waste stream inventory.

9      74.    **Laboratory Audits.**  Chevron shall conduct audits of all laboratories that perform

10  analyses of Chevron's Benzene Waste NESHAP samples to ensure that proper analytical and

11  quality assurance/quality control procedures are followed.

12      a.      By no later than June 30, 2004, Chevron shall complete at least three audits of

13  laboratories used by it.  By December 31, 2004, Chevron shall complete audits of all other

14  laboratories used by it.  In addition, Chevron shall audit any laboratory to be used for analyses of

15  benzene samples prior to such use.

16      b.      If Chevron has completed an audit of any laboratory on or after June 30, 2002,

17  Chevron shall not be required to perform additional audits of those laboratories pursuant to

18  Paragraph 74.a., above.

19      c.      During the life of this Consent Decree, Chevron shall conduct subsequent

20  laboratory audits, such that each laboratory is audited every two (2) years.

21      d.      Chevron may retain third parties to conduct these audits or use audits

22  conducted by others as its own, but the responsibility and obligation to ensure compliance with

23  this Consent Decree and Subpart FF are solely Chevron's.

24      75.    **Benzene Spills.**  Beginning on the Date of Entry, for each spill at each

25  Refinery, Chevron shall review such spills to determine if more than 10 pounds of benzene waste

26  was generated in any 24 hour period.  Chevron shall include the benzene generated by such spills

27  in the TAB and in the uncontrolled benzene quantity calculations for each Refinery, as and to the

28  extent required by Subpart FF.

1   76.   **Training**.

2   a.   By no later than January 1, 2004, Chevron shall develop and begin

3   implementation of annual (i.e., once each calendar year) training for all employees asked to draw

4   benzene waste samples.

5   b.   By no later than March 31, 2004, (June 30, 2005 at Salt Lake City Refinery),

6   Chevron shall complete the development of standard operating procedures for all control

7   devices used to comply with the Benzene Waste NESHAP.  By no later than December 31, 2004

8   (December 31, 2005 at Salt Lake City Refinery), Chevron shall complete an initial training

9   program regarding these procedures for all operators assigned to this equipment.  Comparable

10   training shall also be provided to any persons who subsequently become operators, prior to their

11   assumption of this duty.  "Refresher" training in these procedures shall be performed on a three

12   year cycle.

13   c.   As part of Chevron's training program, Chevron must ensure that the

14   employees of any contractors hired to perform the requirements of this Paragraph are properly

15   trained to implement all applicable provisions of this Consent Decree.

16   77.   **Waste Slop/Off-Spec Oil Management**.

17   a.   By no later than March 31, 2004, Chevron shall submit to EPA and the

18   appropriate Plaintiff-Intervenor schematics for each Refinery that: (a) depict the waste

19   management units (including sewers) that handle, store, and transfer waste slop/off-spec oil

20   streams; (b) identify the control status of each waste management unit; and (c) show how such

21   oil is transferred within the Refinery.  Representatives from Chevron and EPA thereafter may

22   confer about the appropriate characterization of each Refinery's waste/slop/off-spec oil streams

23   and the necessary controls, if any, for the waste management units handling such oil streams for

24   purposes of each Refinery's TAB calculation and compliance option.  At a mutually agreed upon

25   time, Chevron shall submit revised schematics that reflect the Parties' agreements regarding the

26   characterization of these oil streams and the appropriate control standards, if necessary.

27   b.   Non-Aqueous Benzene Waste Streams.  All waste management units handling

28   non-exempt, non-aqueous benzene wastes, as defined in Subpart FF, shall meet the applicable

1   control standards of Subpart FF.

2          c.      <u>Aqueous Benzene Waste Streams</u>.  For purposes of calculating each Refinery's

3   TAB pursuant to the requirements of 40 C.F.R. § 61.342(a), Chevron shall include all

4   waste/slop/off-spec oil streams that become "aqueous" until such streams are recycled to a

5   process or put into a process feed tank (unless the tank is used primarily for the storage of

6   wastes).  Appropriate adjustments shall be made to such calculations to avoid the double-

7   counting of benzene.  For purposes of complying with the 2 megagram or 6BQ compliance

8   option, all waste management units handling benzene waste streams shall either meet the

9   applicable control standards of Subpart FF or shall have their uncontrolled benzene quantity

10  count toward the applicable 2 megagram or 6BQ limit.  Wastes with a flow weighted annual

11  average benzene concentration of less than 10 ppmw shall not be counted against the 2

12  megagram limit.  40 C.F.R. § 61.342(c)(2).

13         d.      <u>Plan to Quantify Uncontrolled Waste Slop/Off-Spec Oil Streams</u>.  By no later

14  than June 30, 2004 (December 31, 2005 for Salt Lake City Refinery), Chevron shall submit

15  plan(s) to EPA and the appropriate Plaintiff-Intervenor to quantify waste slop/off-spec oil

16  movements for all benzene waste streams which are not controlled at each of its Refineries.  EPA

17  will review the plan and may recommend revisions consistent with the Benzene Waste

18  NESHAP.

19         e.      Disputes under this Paragraph 77 shall be resolved in accordance with the

20  dispute resolution provisions of this Consent Decree.

21         78.     **End of Line Sampling (6 BQ Compliance Option)**.  Chevron shall conduct a

22  quarterly "end of the line" benzene determination at the Richmond and Salt Lake City Refineries

23  under the terms of this Paragraph 78.

24         a.      By no later than March 30, 2004, for the Richmond Refinery and by no later

25  than December 31, 2005, for the Salt Lake City Refinery (or such other period as may be

26  identified in its approved compliance schedule and plan under Paragraph 71.c), Chevron shall

27  submit to EPA and the appropriate Plaintiff-Intervenor for approval by EPA a plan designed to

28  determine the benzene quantity in uncontrolled waste streams that includes, but need not be

1   limited to, sampling locations and methods for flow calculations to be used in the quarterly "end

2   of line" benzene determination ("EOL Plan").  Each such plan shall also require quarterly

3   sampling of all uncontrolled waste streams that count toward the 6 Mg/yr calculation and that

4   contain greater than 0.05 Mg/yr of benzene to the Refinery's Total Annual Benzene quantity

5   (BQ).  Such EOL Plans may identify commingled, exempt waste streams for sampling, provided

6   Chevron demonstrates that the benzene quantity of these commingled streams will not be

7   underestimated.  Additionally, waste streams that are non-aqueous at their point of generation

8   and do not become aqueous thereafter shall not be included in the EOL Plan.

9        b.        If changes in processes, operations, or other factors lead Chevron to conclude

10   that its approved EOL Plan may no longer provide an accurate measure of the Refinery's

11   quarterly "end of line" benzene determination and/or its uncontrolled aqueous waste streams,

12   Chevron shall submit to EPA and the appropriate Plaintiff-Intervenor a revised EOL Plan for

13   EPA approval.

14        c.        Chevron shall commence sampling under its EOL Plan during the third

15   calendar quarter of 2004 at the Richmond Refinery and not later than the second calendar quarter

16   of 2006 at the Salt Lake City Refinery.   Chevron shall take, and have analyzed, at least three

17   representative samples from each approved sampling location.  Chevron shall use the average of

18   all samples taken and the approved flow calculations to make its quarterly "end of the line"

19   benzene determination and in estimating a calendar year value for each Refinery.

20        d.        If the quarterly benzene determination exceeds 1.5 Mg/yr or if the estimated

21   calendar year value exceeds 6 Mg/yr, Chevron shall prepare and provide to EPA and the

22   appropriate Plaintiff-Intervenor a written summary and schedule of activities necessary to

23   minimize benzene wastes at such Refinery so as to ensure that it complies with the 6 BQ

24   compliance option for that calendar year.  This summary and schedule are due no later than sixty

25   (60) days after the close of such quarter.

26        e.        After at least 8 quarters of sampling under an approved EOL Plan, Chevron

27   may submit to EPA and the appropriate Plaintiff-Intervenor a report that places uncontrolled

28   aqueous waste streams at a Refinery into three categories: (a) consistently <0.05 Mg/yr benzene

1  that may not warrant continued sampling; (ii) consistently $\geq 0.05$ Mg/yr benzene but with low

2  variability that may warrant less frequent sampling; and (iii) all others that are consistently $\geq 0.05$

3  Mg/yr benzene.  If EPA determines, after an opportunity for consultation with Chevron and the

4  affected Plaintiff-Intervenor, that such report warrants a change in monitoring required at that

5  Refinery under Paragraph 78.a, that requirement will be modified under and as provided for in

6  Paragraph 234 (Modification).

7        79.    **End of Line Sampling (2 Mg Compliance Option)**.  Chevron shall conduct a

8  quarterly "end of the line" benzene determination at the El Segundo, Hawaii and Pascagoula

9  Refineries under the terms of this Paragraph 79.

10       a.     By no later than March 30, 2004, Chevron shall submit to EPA and the

11  appropriate Plaintiff-Intervenor for approval a by EPA plan designed to determine the benzene

12  quantity in uncontrolled waste streams that includes sampling locations and methods for flow

13  calculations to be used in the quarterly "end of line" benzene determination ("EOL Plan").  Each

14  such plan shall also require:  (i) quarterly sampling of all uncontrolled waste streams that count

15  toward the 2 Mg/yr calculation and that contain greater than 0.05 Mg/yr of benzene; and (ii)

16  monthly sampling of all uncontrolled waste streams that qualify for the 10 ppmw exemption (40

17  C.F.R. § 61.342(c)(2)) and that contain greater than 0.1 Mg/yr of benzene.  Such EOL Plans may

18  identify commingled, exempt waste streams for sampling, provided Chevron demonstrates that

19  the benzene quantity of these commingled streams will not be underestimated.

20       b.     If changes in processes, operations, or other factors lead Chevron to conclude

21  that its approved EOL Plan may no longer provide an accurate measure of the Refinery's

22  quarterly "end of line" benzene determination and/or its uncontrolled waste streams,  Chevron

23  shall submit a revised EOL Plan to EPA and the appropriate Plaintiff-Intervenor for EPA

24  approval.

25       c.     Chevron shall commence sampling under its EOL Plan during the third

26  calendar quarter of 2004.   Chevron shall take, and have analyzed, at least three representative

27  samples from each approved sampling location.  Chevron shall use the average of all samples

28  and approved flow calculations to make its quarterly "end of the line" benzene determination and

1   in estimating a calendar year value for each Refinery.

2          d.      If the quarterly benzene determination exceeds 0.5 Mg/yr or if the estimated

3   calendar year value exceeds 2 Mg/yr, Chevron shall prepare and provide to EPA and the

4   appropriate Plaintiff-Intervenor a written summary and schedule of activities necessary to

5   minimize benzene wastes at such Refinery so as to ensure that it complies with the 2 Mg

6   compliance option for that calendar year.  This summary and schedule are due no later than sixty

7   (60) days after the close of such quarter.

8          e.      After at least 8 quarters of sampling under an approved EOL Plan, Chevron

9   may submit a report to EPA and the appropriate Plaintiff-Intervenor that places uncontrolled

10  aqueous waste streams at a Refinery into three categories: (a) consistently <0.05 Mg/yr benzene

11  that may not warrant continued sampling; (ii) consistently ≥0.05 Mg/yr benzene but with low

12  variability that may warrant less frequent sampling; and (iii) all others that are consistently ≥0.05

13  Mg/yr benzene.  If EPA determines, after an opportunity for consultation with Chevron and the

14  affected Plaintiff-Intervenor, that such report warrants a change in monitoring required at that

15  Refinery under Paragraph 79.a, this requirement will be modified under and as provided for in

16  Paragraph 234 (Modification).

17         80.     **Miscellaneous Measures.**  By June 30, 2004 (or for Salt Lake City Refinery,

18  December 31, 2005), Chevron shall:

19         a.      Manage all groundwater remediation wastes at each of its Refineries in

20  appropriate waste management units under and as required by the Benzene Waste NESHAP;

21         b.      Conduct monthly visual inspections of all Subpart FF water traps within the

22  Refinery's individual drain systems;

23         c.      Identify and mark all area drains that are segregated stormwater drains;

24         d.      On a weekly basis, visually inspect all Subpart FF conservation vents on

25  process sewers for detectable leaks; reset any vents where leaks are detected; and record the

26  results of the inspections.  After two (2) years of weekly inspections, and based upon an

27  evaluation of the recorded results, Chevron may submit a request to the appropriate EPA Region

28  to modify the frequency of the inspections.  EPA shall not unreasonably withhold its consent.

1   Nothing in this Paragraph 80.d. shall require Chevron to monitor conservation vents on fixed

2   roof tanks.  Alternatively, for conservation vents with indicators that identify whether flow has

3   occurred, Chevron may elect to visually inspect such indicators on a monthly basis and, if flow is

4   then detected, Chevron shall then visually inspect that indicator on a weekly basis for four

5   weeks.  If flow is detected during any two of those four weeks, Chevron shall install a carbon

6   canister on that vent until appropriate corrective action(s) can be implemented to prevent such

7   flow.; and

8          e.      Conduct quarterly monitoring of the oil-water separators in accordance with

9   the "no detectable emissions" provision in 40 C.F.R. § 61.347.

10         81.     **Projects/Investigations.**

11         a.      By no later than January 1, 2004, Chevron will report to EPA and the

12  appropriate Plaintiff-Intervenor that, for waste and process stream sampling points that are

13  subject to the closed purge sampling device requirements of 40 C.F.R., Part 63, Subpart CC,

14  compliance with those requirements has been achieved.

15         b.      Chevron may conduct a study of the effectiveness of the benzene and VOC

16  limits under Paragraph 72.c.  This study shall last no less than two (2) years and must be

17  performed in accordance with the guidelines established in Appendix J.  Chevron shall submit a

18  schedule and statement of work to EPA at least 90 days prior to beginning such work.  Chevron

19  shall submit a report to EPA and the appropriate Plaintiff-Intervenor summarizing the results of

20  the study within ninety (90) days of completion and may request a revision of the limits under

21  Paragraph 72.c based upon the results of that study and any other relevant information, including

22  similar studies that may be performed by or for others.

23         82.     **Recordkeeping and Reporting Requirements for Section V.L.**  Chevron

24  shall submit, as and to the extent required, the following materials in the progress report(s) for

25  the quarter in which the following identified activities occurred or are required:

26         a.      BWON Compliance Review and Verification Report (¶ 70.a), as amended, if

27  necessary (¶ 70.b);

28         b.       Amended TAB Report, if necessary (¶ 71.a);

1          c.          Schedule and plan to come into compliance with the applicable compliance

2  option, if the BWON Compliance Review and Verification Reports indicate non-compliance (¶

3  71.b);

4          d.          Schedule and plan for the Salt Lake City Refinery to come into compliance

5  with the 6 BQ compliance option and the applicable provisions of this Consent Decree (¶ 71.c),

6          e.          Compliance certification, if and as necessary (¶ 71.e);

7          f.          Report certifying the completion of the installation of dual carbon canisters

8  (¶ 72.a);

9          g.          Schematics of waste/slop/off-spec oil movements (¶ 77.a), as revised, if

10  necessary (¶ 77.a);

11          h.          Plan to quantify uncontrolled waste/slop/off-spec oil movements (¶ 77.d)

12          i.          EOL Plans and revised EOL Sampling Plans, if necessary (¶¶ 78.a and 78.b);

13          j.          Plan to ensure that uncontrolled benzene does not equal or exceed, as

14  applicable, 2 or 6 Mg/yr -- or is minimized -- based on projected calendar year uncontrolled

15  benzene quantities as determined through EOL sampling (¶¶ 78.d and 79.d)

16          k.          Results of the study of "breakthrough" in carbon canisters (¶ 81.b).

17          l.          Identify all laboratory audits completed during the preceding calendar year

18  under Paragraph 74.a, including the laboratory audited during that quarter, a description of the

19  methods used in the audit and the results of the audit, in the progress report for the 4th quarter of

20  that year.

21          m.          Describe the measures taken that calendar quarter to comply with the training

22  provisions of Paragraph 76;

23          n.          Provide all quarterly "end of line" benzene determinations and a summary of

24  supporting sampling results for the preceding calendar year under Paragraphs 78 and 79 in the

25  progress report for the 4th quarter of that year.  The report shall include a list of all waste streams

26  sampled and the results of the benzene analysis for each sample; and

27          o.          Describe the actions that Chevron is taking to identify and correct the source of

28  the potentially elevated benzene quantities and/or to ensure continuing compliance with the

1  Benzene Waste NESHAP under and as provided in Paragraphs 78 and 79.

2  **M.**    **Leak Detection and Repair ("LDAR") Program Enhancements**.  In order to minimize or

3  eliminate fugitive emissions of volatile organic compounds ("VOCs"), benzene, volatile hazardous

4  air pollutants ("VHAPs"), and organic hazardous air pollutants ("HAPs") from equipment in light

5  liquid and/or in gas/vapor service, Chevron shall undertake the enhancements in this Section V.M.

6  to its LDAR programs under Title 40 of the Code of Federal Regulations, Part 60, Subparts VV and

7  GGG; Part 61, Subparts J and V; Part 63, Subparts F, H, and CC; and applicable state or local

8  LDAR requirements at each Refinery that is subject to this Consent Decree.  The terms

9  "equipment," "in light liquid service" and "in gas/vapor service" shall have the definitions set forth

10  in the applicable provisions of Title 40 of the Code of Federal Regulations, Part 60, Subparts VV

11  and GGG; Part 61, Subparts J and V; Part 63, Subparts F, H and CC; and applicable state and/or

12  local LDAR regulations.  Chevron is not required to include in the enhanced program described

13  herein any equipment or units not in light liquid or gas/vapor service and not otherwise subject to

14  any applicable federal, state, or local LDAR regulation that is enforceable by the United States or a

15  Plaintiff-Intervenor.

16  83.    **Written Refinery-Wide LDAR Program**.  By no later than June 30, 2004, Chevron shall

17  develop and maintain a written LDAR program for compliance with all applicable federal, state, and local

18  LDAR regulations applicable to equipment in light liquid or gas/vapor service at each of its Refineries.

19  Chevron shall update each such program as may be necessary to ensure continuing compliance.  Each

20  Refinery's program shall include at a minimum:

21  a.    An overall, Refinery leak rate goal that will be a target for achievement on a process-unit-

22  by-process-unit basis;

23  b.    An identification of all equipment in light liquid and/or in gas/vapor service that has the

24  potential to leak VOCs, HAPs, VHAPs, and benzene within process units that are owned and maintained by

25  the Refinery.  Chevron is not required to identify any equipment or units not otherwise subject to any

26  applicable federal, state, or local LDAR regulation that is enforceable by the United States or a Plaintiff-

27  Intervenor;

28  c.    Procedures for identifying leaking equipment within process units that are

1    owned and maintained by the Refinery;

2        d.       Procedures for repairing and keeping track of leaking equipment;

3        e.       Procedures for identifying and including in the LDAR program new

4    equipment;

5        f.       A process for evaluating new and replacement equipment to promote

6    consideration and installation of equipment that will minimize leaks and/or eliminate chronic

7    leakers; and

8        g.       A description of the Refinery's LDAR monitoring organization and a

9    designation of the person or position that is responsible for LDAR management and that has the

10   authority to implement LDAR improvements at the Refinery, as required by Paragraph 93.

11       84.      **Training.**  By no later than June 30, 2004, Chevron shall implement the

12   following training programs at each Refinery:

13       a.       For personnel newly-assigned to LDAR responsibilities, Chevron shall require

14   LDAR training prior to each employee beginning such work;

15       b.       For all personnel assigned LDAR responsibilities, Chevron shall provide and

16   require completion of annual LDAR training or require its LDAR contractor to provide such

17   training (initial annual LDAR training for all such personnel will be completed not later than

18   December 31, 2004); and

19       c.       For all other Refinery operations and maintenance personnel (including

20   contract personnel), Chevron shall provide and require completion of an initial training program

21   that includes instruction on aspects of LDAR that are relevant to the person's duties (initial

22   LDAR training for all such personnel will be completed not later than December 31, 2004).

23   "Refresher" training in LDAR shall be performed on a three year cycle.

24       85.      **LDAR Audits**.  Chevron shall implement Refinery audits according to the

25   schedule and requirements set forth in this Paragraph 85 to ensure each Refinery's compliance

26   with all applicable LDAR requirements.  The LDAR audits shall include but not be limited to,

27   comparative monitoring, records review, tagging, data management, and observation of the

28   LDAR technicians' calibration and monitoring techniques.

1      a.      Initial Audits.  By no later than 210 days from the Date of Entry of this Consent

2    Decree, Chevron shall complete a Third-Party Audit at each Refinery, submit all such audit reports to

3    EPA and the appropriate Plaintiff-Intervenor, including an identification of any noncompliance issues,

4    and certify that such Refinery is then in compliance with applicable LDAR requirements.  For

5    noncompliance that cannot reasonably be remedied by 210 days from the Date of Entry of this Consent

6    Decree, Chevron shall submit and adhere to an EPA approved compliance schedule to remedy such

7    noncompliance.

8      b.      Third-Party Audits.  Chevron shall retain a contractor(s) to perform a third-party

9    audit of the Refinery's LDAR program at least once every four years.  The first third-party audit for each

10    Refinery shall be completed no later than 210 days from the Entry of the Consent Decree.

11      c.      Internal Audits.  Chevron shall conduct internal audits of each Refinery's LDAR

12    program by sending personnel familiar with the LDAR program and its requirements from one or more

13    of Chevron's other Refineries or locations to audit another Chevron Refinery.  Chevron shall complete

14    an internal LDAR audit by no later than two years from the date of the completion of the third-party

15    audits required in Paragraphs 85.a and 85.b.  Chevron shall perform an internal audit of the each

16    Refinery's LDAR program at least once every four years.  Chevron may elect to retain third-parties to

17    undertake the internal audit, provided that an LDAR audit at each Refinery occurs every two (2) years.

18      d.      To ensure that an audit occurs every two years at each Refinery, third-party and

19    internal audits shall be separated by not more than two years.

20      86.     **Implementation of Actions Necessary to Correct Non-Compliance**.  If the results

21    of any of the audits conducted pursuant to Paragraph 85 identify any areas of non-compliance, Chevron

22    shall implement, as soon as practicable, all steps necessary to correct the area(s) of non-compliance and

23    to prevent, to the extent practicable, a recurrence of the cause of such non-compliance.  Chevron shall

24    retain the audit reports generated pursuant to Paragraph 85 and shall maintain a written record of the

25    corrective actions that Chevron takes in response to deficiencies identified in any audits.  In the quarterly

26    report submitted pursuant to the provisions of Section IX of this Consent Decree (Recordkeeping and

27    Reporting) for the first calendar quarter of each year, Chevron shall submit to EPA and the appropriate

28    Plaintiff-Intervenor the

1 audit reports and corrective action records for audits performed and actions taken during the

2 previous year.

3       87.    **Internal Leak Definition for Valves and Pumps**.  Chevron shall utilize the

4 following internal leak definitions for valves and pumps in light liquid and/or gas/vapor service,

5 unless other permit(s), regulations, or laws require the use of lower leak definitions.

6       a.    Leak Definition for Valves.  By no later than June 30, 2005, Chevron shall

7 utilize an internal leak definition of no greater than 500 ppm VOCs for each Refinery's valves,

8 excluding pressure relief devices.

9       b.    Leak Definition for Pumps.  By no later than June 30, 2005, Chevron shall

10 utilize an internal leak definition of no greater than 2000 ppm for each Refinery's pumps.

11       88.    **Reporting, Recording, Tracking, Repairing and Remonitoring Leaks of**

12 **Valves and Pumps Based on the Internal Leak Definitions**.

13       a.    Reporting.  For regulatory reporting purposes, Chevron may continue to report

14 leak rates in valves and pumps against the applicable regulatory leak definition, or may use the

15 lower, internal leak definitions specified in Paragraph 87.

16       b.    Recording, Tracking, Repairing and Remonitoring Leaks.  Chevron shall

17 record, track, repair and re-monitor all leaks in excess of the internal leak definitions of

18 Paragraph 87 at such time as those definitions become applicable.  Except as provided otherwise

19 in this Section V.M, Chevron shall make a first attempt at repair within five (5) calendar days

20 and either complete repairs and re-monitor leaks or place such component on the Refinery's

21 delay of repair list within thirty (30) days.

22       89.    **Initial Attempt at Repair of Valves.**  By no later than March 31, 2004,

23 Chevron shall promptly make an "initial attempt" to repair any valve that has a reading greater

24 than 100 ppm of VOCs, excluding control valves and components that LDAR personnel are not

25 authorized to repair.  Chevron or its designated contractor shall re-monitor, within five (5)

26 calendar days, all valves that LDAR personnel attempted to repair under this Paragraph.  Unless

27 the re-monitored leak rate is greater than the applicable leak definition, no further action will be

28 necessary.  If Chevron can demonstrate with sufficient, statistically significant monitoring data

1   over a period of at least two years that "initial attempts" to repair at 100 ppm worsen or do not

2   improve refinery leak rates, Chevron may request EPA to reconsider or amend this requirement.

3        90.   **LDAR Monitoring Frequency.**

4        a.   Pumps.  When the lower internal leak definition for pumps becomes applicable

5   under Paragraph 87.b and unless more frequent monitoring is required by applicable federal,

6   state and/or local requirements, Chevron shall monitor pumps at the internal leak definition on a

7   monthly basis.

8        b.   Valves.  When the lower internal leak definition for valves becomes applicable

9   under Paragraph 87.a and unless more frequent monitoring is required by applicable federal,

10   state and/or local requirements, Chevron shall monitor valves at the internal leak definition on a

11   quarterly basis (other than difficult to monitor or unsafe to monitor valves).  No monitoring skip

12   periods are permitted except as expressly authorized under Paragraph 90.c.

13        c.   Skip Periods (Salt Lake City and Richmond).  Chevron may implement the

14   Sustainable Skip Period Program set forth in Appendix K to this Consent Decree, which is

15   incorporated herein by reference, at the Salt Lake City and Richmond Refineries only.  For units

16   complying with the Sustainable Skip Period, previous process unit monitoring results may be

17   used to determine the initial skip period interval provided that each valve has been monitored

18   using the 500 ppm leak definition.  EPA or the appropriate Plaintiff-Intervenor may require

19   Chevron to implement more frequent monitoring of valves if the leak rate determined during an

20   EPA, State or local inspection demonstrates that more frequent monitoring is necessary because

21   actual leak percentages are higher than allowed under this Sustainable Skip Period Program, or

22   because more frequent inspections are required by law or regulation.  In evaluating whether the

23   leak rate demonstrates that more frequent monitoring of valves is necessary, EPA or the

24   appropriate Plaintiff-Intervenor will determine the leak rate based on the total number of valves

25   then monitored in the process unit during such inspection.  If a process unit that is included in

26   the Sustainable Skip Period Program is found to have a leaking valve percentage above two

27   percent during any monitoring period, that process unit must be monitored no less than monthly

28   thereafter, until such time as less frequent monitoring can be instituted under the Sustainable

1   Skip Period Program as set forth in Appendix K.

2           d.        Monitoring After Turnaround or Maintenance.  Chevron shall have the option

3   of monitoring affected valves and pumps within process unit(s) after completing a documented

4   maintenance, startup, or shutdown activity without having the results of the monitoring count as

5   a scheduled monitoring activity, provided that Chevron monitors according to the following

6   schedule:

7           i.        For events involving 1000 or fewer valves and pumps, monitor within one (1)

8           week of the documented maintenance, start-up, or shutdown activity;

9           ii.        For events involving greater than 1000 but fewer than 5000 valves and pumps,

10          monitor within two (2) weeks of the documented maintenance, start-up, or

11          shutdown activity; and

12          iii.        For events involving greater than 5000 pumps and valves, monitor within four

13          (4) weeks of the documented maintenance, start-up, or shutdown activity.

14          91.        **Electronic Monitoring, Storing, and Reporting of LDAR Data**.

15          a.        Electronic Storing and Reporting of LDAR Data.   Chevron has and will

16  continue to maintain an electronic database for storing and reporting LDAR data.  By no later

17  than January 1, 2004, the electronic database shall include data identifying the date and time of

18  the monitored event, and the operator and instrument used in the monitored event.

19          b.        Electronic Data Collection During LDAR Monitoring and Transfer Thereafter.

20  By no later than January 1, 2004, Chevron shall maintain operational specifications for the data

21  logger, software and monitoring equipment it elects to use under this Consent Decree.  Chevron

22  shall use dataloggers and/or electronic data collection devices during all LDAR monitoring.

23  Chevron, or its designated contractor, shall use its/their best efforts to transfer, by the end of the

24  next business day electronic data from electronic data logging devices to the electronic database

25  of Paragraph 91.a.  For all monitoring events in which an electronic data collection device is

26  used, the collected monitoring data shall include a time and date stamp and identify the

27  operator/monitoring technician and the monitoring instrument used.  Chevron may use paper

28  logs where necessary or more feasible (e.g., small rounds, re-monitoring, or when data loggers

1   are not available or broken), and shall record, at a minimum, the identity of the technician, the

2   date, monitoring starting and ending times, and an identification of the monitoring equipment.

3   Chevron shall use its best efforts to transfer any manually recorded monitoring data to the

4   electronic database of Paragraph 91.a within seven days of monitoring.

5       92.    **QA/QC of LDAR Data**.  By no later than March 31, 2004, Chevron (or a third

6   party contractor retained by Chevron) shall have developed and begun implementing procedures

7   for quality assurance/quality control ("QA/QC") reviews of all data generated by LDAR

8   monitoring technicians.  Chevron shall ensure that monitoring data provided by its contractors is

9   periodically reviewed for QA/QC by the contractors.  At least once per calendar quarter,

10  Chevron shall perform a QA/QC review of each contractor's monitoring data which shall

11  include, but not be limited to:  number of components monitored per technician, time between

12  monitoring events and abnormal data patterns.

13      93.    **LDAR Personnel**. Chevron has established a program that holds LDAR

14  personnel accountable for LDAR performance.  Chevron shall continue to maintain a position at

15  each Refinery that is responsible for LDAR management and that has the authority to implement

16  LDAR improvements.

17      94.    **Adding New Valves and Pumps**.  By no later than June 30, 2004, Chevron

18  shall establish a tracking program for maintenance records (e.g., a Management of Change

19  program) to ensure that valves and pumps added to the Refinery during maintenance and

20  construction are integrated into each Refinery's LDAR program.

21      95.    **Calibration/Calibration Drift Assessment.**

22      a.     Calibration.  Chevron shall conduct all calibrations of LDAR monitoring

23  equipment using methane as the calibration gas, in accordance with 40 C.F.R. Part 60, EPA

24  Reference Test Method 21.

25      b.     Calibration Drift Assessment.  By no later than January 1, 2004, Chevron shall

26  conduct calibration drift assessments of LDAR monitoring equipment at the end of each

27  monitoring shift, at a minimum.  Chevron shall conduct the calibration drift assessment using a

28  calibration gas with a concentration approximately equal to the applicable internal leak

1    definition,  If any calibration drift assessment after the initial calibration shows a negative drift

2    of more than 10% from the previous calibration, Chevron shall re-monitor all valves that were

3    monitored since the last calibration that had a reading greater than 100 ppm and shall re-monitor

4    all pumps that were monitored since the last calibration that had a reading greater than 500 ppm.

5         96.    **Delay of Repair.**

6         a.    By no later than January 1, 2004, Chevron shall take the following actions for

7    any equipment that it intends and is allowed to place on the "delay of repair" list under

8    applicable regulations:

9         i.    Require sign-off by the unit supervisor within thirty (30) days of identifying

10             that a piece of equipment is leaking at a rate greater than the applicable leak

11             definition) that such equipment qualifies for delayed repair under applicable

12             regulations,

13        ii.    Include equipment that is placed on the "delay of repair" list in Chevron's

14             regular LDAR monitoring,

15       iii.    Use its best efforts to isolate and repair pumps identified as leaking at a rate of

16             2000 ppm or greater.

17        b.    By no later than June 30, 2004, Chevron shall take the following actions for

18    any equipment that it intends and is allowed to place on the "delay of repair" list under

19    applicable regulations:

20        i.    For valves, other than control valves and pressure relief valves, that qualify to

21             be on the "delay of repair" list, use the "drill and tap" method (or an

22             equivalent), rather than place a valve on the "delay of repair" list, if it is

23             leaking at a rate of 50,000 ppm or greater unless Chevron can demonstrate that

24             there is a safety or major environmental concern by attempting to repairing the

25             leak in this manner.  Chevron shall perform the first "drill and tap" (or

26             equivalent repair method) within fifteen days, except at the Hawaii Refinery

27             which shall perform such a first attempt within twenty-one days, and a second

28             attempt (if necessary) within thirty (30) days after the leak is detected.  After

two unsuccessful attempts to repair a leaking valve through the drill and tap (or
equivalent) method, Chevron may place the leaking valve on its "delay of
repair" list.

    ii.      For valves, other than control valves and pressure relief valves, that qualify to
be on the "delay of repair" list, use the "drill and tap" method (or an
equivalent), rather than place a valve on the "delay of repair" list, if it is
leaking at a rate of 10,000 ppm or greater unless Chevron can demonstrate that
there is a safety or major environmental concern by attempting to repairing the
leak in this manner.  Chevron shall perform a first and (if necessary) a second
"drill and tap" (or equivalent repair method) as soon as practicable but not
later than 90 days after such leak was detected.  After two unsuccessful
attempts to repair a leaking valve through the drill and tap (or equivalent)
method, Chevron may place the leaking valve on its "delay of repair" list and
need not make additional attempts to repair such leaks unless subsequent
monitoring identifies that it is leaking at a rate of 50,000 ppm or greater.

    c.      If a new valve repair method not currently in use by the refining industry is
planned to be used by Chevron, Chevron will advise EPA prior to implementing such a method
or, if prior notice is not practicable, as soon as practicable after implementation.

    97.      **Recordkeeping and Reporting Requirements for this Paragraph**.

    a.      <u>As Part of Quarterly Progress Reports - Section IX (Recordkeeping and
Reporting)</u>.  Consistent with the requirements of Section IX (Recordkeeping and Reporting),
Chevron shall include the following information in the progress report(s) for the quarter in which
the identified activity occurred or was required:

    i.      A certification that training has been implemented as required by Paragraph
84;

    ii.      A certification of the implementation of the "first attempt at repair" program of
Paragraph 89;

    iii.      A certification of the implementation of QA/QC procedures for review of data

generated by LDAR technicians as required by Paragraph 92;

iv.    An identification of the individual at the Refinery responsible for LDAR performance as required by Paragraph 93;

v.    A certification of the development of a tracking program for new valves and pumps added during maintenance and construction as required by Paragraph 94;

vi.    A certification of the implementation of the calibration drift assessment procedures of Paragraph 95.b;

vii.    A certification of the implementation of the "delay of repair" procedures of Paragraph 96; and

viii.    A copy of each Refinery's LDAR program under Paragraph 83.

b.    Quarterly Progress Report for the First Calendar Quarter of Each Year. Chevron shall identify each audit that was conducted under Paragraph 85 in the previous calendar year, including an identification of the auditors, a summary of the audit results and the actions that Chevron took or intends to take to correct identified deficiencies.

c.    In Each Report due under 40 C.F.R. § 63.654. In each report due under 40 C.F.R. § 63.654, Chevron shall include the following information on LDAR monitoring:

i.    a list of the process units monitored during the quarter;

ii.    the number of valves and pumps monitored in each process unit;

iii.    the number of valves and pumps found leaking;

iv.    the number of "difficult to monitor" pieces of equipment monitored;

v.    the projected month of the next monitoring event for that unit;

vi.    a list of all equipment currently on the "delay of repair" list and the date each component was placed on the list;

vii.    the number of repairs not completed within five (5) days pursuant to Paragraph 89;

viii.    the number of repairs not completed within thirty (30) days under Paragraph 96.b.i.; and

1          ix.      the number of repairs not completed within ninety (90) days under Paragraph

2                   96.b.ii.

3  **N.       Incorporation of Consent Decree Requirements into Federally Enforceable Permits.**

4          98.     **Obtaining Permit Limits for Consent Decree Emission Limits That Are**

5  **Effective Upon Entry.**

6          a.      Except as set forth below in Paragraph 98.b., by no later than fifteen days after the

7  Date of Entry of this Consent Decree, Chevron shall submit applications to the appropriate Plaintiff-

8  Intervenor to incorporate the emission limits and standards required by the Consent Decree that are

9  effective as of the Date of Entry of the Consent Decree into federally enforceable minor or major new

10  source review permits or other permits (other than Title V permits) which are federally enforceable.

11  Following submission of the permit application, Chevron shall cooperate with the appropriate

12  Plaintiff-Intervenor by promptly submitting to the appropriate Plaintiff-Intervenor all information that

13  the appropriate Plaintiff-Intervenor seeks following its receipt of the permit application.  Upon

14  issuance of such permits or in conjunction with such permitting, Chevron shall file any applications

15  necessary to incorporate the requirements of those permits into the Title V permit for the relevant

16  Chevron Refinery.

17          b.      For the Richmond FCCU only, Chevron shall not be required to submit a permit

18  application for NOx emission limits for that unit until such time as it is required to submit a permit

19  application for SO2 emission limits for that unit pursuant to Paragraph 99.a., below.

20          99.     **Obtaining Permit Limits For Consent Decree Emission Limits That Become**

21  **Effective After Date of Entry.**

22          a.      Except as set forth below in Paragraph 99.b., as soon as practicable, but in no event

23  later than the later of ninety (90) days after the effective date or establishment of any emission limits

24  and standards under Section V of this Consent Decree or fifteen (15) days after the Date of Entry of

25  this Consent Decree, Chevron shall submit applications to the appropriate Plaintiff-Intervenor to

26  incorporate those emission limits and standards into federally enforceable minor or major new source

27  review permits or other permits (other than Title V permits) which are federally enforceable.

28  Following submission of the permit application,

1   Chevron shall cooperate with the appropriate Plaintiff-Intervenor by promptly submitting to the

2   appropriate Plaintiff-Intervenor all information that the appropriate Plaintiff-Intervenor seeks

3   following its receipt of the permit application.  Upon issuance of such permit or in conjunction

4   with such permitting, Chevron shall file any applications necessary to incorporate the

5   requirements of that permit into the Title V permit of the appropriate Chevron Refinery.

6         b.      For the El Segundo FCCU only, Chevron shall not be required to submit a

7   permit application for $SO_2$ emission limits for that unit until the earlier of (i) sixty (60) days

8   after Chevron's final determination not to discontinue use of the CO Boiler at the El Segundo

9   FCCU, or (ii) ninety (90) days after the establishment of a final $SO_2$ emission limit pursuant to

10   Paragraph 19.e.

11         100.     **Mechanism for Title V Incorporation.**  The Parties agree that the

12   incorporation of any emission limits or other standards into the Title V permits for the Chevron

13   Refineries as required by Paragraphs 98 and 99 shall be in accordance with the applicable state

14   or local Title V rules.

15         101.     [omitted]

16         102.     **Construction Permits.**  Chevron agrees to use best efforts to obtain all

17   required, federally enforceable permits for the construction of the pollution control technology

18   and/or the installation of equipment necessary to implement the affirmative relief and

19   environmental projects set forth in this Section V and in Section VIII.  To the extent that

20   Chevron must submit permit applications for this construction or installation to the appropriate

21   Plaintiff-Intervenors, Chevron shall cooperate with the appropriate Plaintiff-Intervenor by

22   promptly submitting to the appropriate Plaintiff-Intervenor all information that the appropriate

23   Plaintiff-Intervenor seeks following its receipt of the permit application.  This Paragraph 102 is

24   not intended to prevent Chevron from applying to the appropriate Plaintiff-Intervenor for or

25   otherwise using an available pollution control project exemption.

26   **O.**     **RISK MANAGEMENT PLAN FOR EL SEGUNDO REFINERY**

27         102A.    Pursuant to 40 C.F.R. § 68.190, Chevron must review, update, and submit the

28   Risk Management Plan ("RMP") for the El Segundo Refinery.  The RMP must include an

1  Emergency Response Plan ("ERP") prepared in accordance with 40 C.F.R. § 68.95.  Chevron

2  shall, by February 1, 2004, submit a complete draft of the ERP portion of the RMP for the El

3  Segundo Refinery, to

4                          Mary Wesling (SFD-9A)
                          EPCRA/RMP Enforcement Coordinator
5                          U.S. Environmental Protection Agency, Region IX
                          75 Hawthorne St.
6                          San Francisco, CA 94105

7  ("EPCRA/RMP Enforcement Coordinator").  This draft ERP shall be consistent with 40 C.F.R.

8  Part 68 and any amendments thereto approved by February 1, 2004.  (See, e.g., Accidental

9  Release Prevention Requirements: Risk Management Program Requirements Under Clean Air

10  Act Section 112(r)(7); Amendments to the Submission Schedule and Data Requirements;

11  Proposed Rule, 68 Fed. Reg. 45123, 45123 - 45132 (July 31, 2003)).

12          102B.    In the event that EPA Region IX, at least seventy-five (75) days prior to the

13  due date for submittal of an updated RMP pursuant to 40 C.F.R. Part 68 and any amendments

14  thereto, provides Chevron any written comments on the draft ERP submittal described in the

15  previous paragraph, Chevron shall, within sixty (60) days of receiving such comments, submit to

16  the EPCRA/RMP Enforcement Coordinator a written response to each comment, documenting

17  changes made in response to comments or explaining why Chevron has not made any changes

18  requested by EPA Region IX.

19          102C.    On the date that Chevron submits its updated ERP pursuant to 40 C.F.R. §

20  68.190, Chevron shall also submit a copy of the same to the EPCRA/RMP Enforcement

21  Coordinator.

22

23                    **VI.  EMISSION CREDIT GENERATION**

24          **Summary**.  The intent of this Section generally is to prohibit Chevron from using the

25  emissions reductions that will result from the installation and operation of the controls

26  required by this Consent Decree ("CD Emissions Reductions") for the purpose of

27  emissions netting or emissions offsets, while still allowing Chevron to use a fraction of

28  the CD Emissions Reductions if: (1) the emissions units for which Chevron seeks to use

1  the CD Emissions Reductions are modified or constructed for purposes of compliance

2  with Tier II gasoline or low sulfur diesel requirements; and (2) the emissions from those

3  modified or newly-constructed units are below the levels outlined in Paragraph 105

4  prior to the commencement of operation of the emissions units for which Chevron seeks

5  to use the CD Emissions Reductions.

6  103.    **General Prohibition.**   Chevron shall not generate or use any NOx, $SO_2$, PM,

7  VOC, or CO emissions reductions that result from any projects conducted or controls  utilized to

8  comply with this Consent Decree as netting reductions or emissions offsets in any PSD, major

9  non-attainment and/or minor New Source Review ("NSR") permit or permit proceeding.

10  104.    **Conditions Precedent to Utilizing Exception to General Prohibition.**

11  Utilization of the exception set forth in Paragraph 105 to the general prohibition against the

12  generation or utilization of CD Emissions Reductions set forth in Paragraph 103 is subject to the

13  following conditions:

14  a.    Under no circumstances shall Chevron use CD Emissions Reductions for

15  netting and/or offsets prior to the time that actual CD Emissions Reductions have occurred;

16  b.    CD Emissions Reductions may be used only at the Refinery that generated

17  them;

18  c.    The CD Emissions Reductions provisions of this Consent Decree are for

19  purposes of this Consent Decree only and neither Chevron, nor any other entity may use CD

20  Emissions Reductions for any purpose, including in any subsequent permitting or enforcement

21  proceeding, except as provided herein; and

22  d.    Chevron still shall be subject to all federal, state, and local regulations

23  applicable to the PSD, major non-attainment and/or minor NSR permitting process.

24  105.    **Exception to General Prohibition**.  Notwithstanding the general prohibition

25  set forth in Paragraph 103, Chevron may use 80 tons per year of NOx and 15 tons per year of

26  PM, and 55 tons per year of $SO_2$ from the CD Emissions Reductions as credits or offsets in any

27  PSD, major non-attainment and/or minor NSR permit or permit proceeding occurring after the

28  Date of Lodging of the Consent Decree with respect to any of its Refineries other than the

Richmond Refinery, provided that the new or modified emissions units at which credits are being used: (1) is being constructed or modified for purposes of compliance with Tier 2 gasoline or low sulfur diesel requirements; and (2) has a federally enforceable, non-Title V Permit that reflects the following requirements that are applicable to the pollutants for which credits are being used:

      a.      For heaters and boilers, a limit of 0.020 lbs NOx per million BTU or less on a 3-hour rolling average basis.  Notwithstanding the foregoing, Chevron may utilize emissions reductions generated at the Salt Lake City Refinery as offsets or credits for the planned hydrotreater furnace and the hydrogen plant (whether constructed and operated by Chevron or a third party), provided such burners are designed to achieve an emission rate of 0.020 lbs NOx per million BTU (even if the burners do not achieve that emission rate in practice and a less stringent emission limit is therefore warranted);

      b.      For heaters and boilers, a limit of 0.10 grains of hydrogen sulfide per dry standard cubic foot of fuel gas or 20 ppmvd $SO_2$ corrected to 0% $O_2$ both on a 3-hour rolling average;

      c.      For heaters and boilers, no liquid or solid fuel firing authorization

      d.      For FCCUs, a limit of 20 ppmvd NOx corrected to 0% $O_2$ or less on a 365-day rolling average basis;

      e.      For FCCUs, a limit of 25 ppmvd $SO_2$ corrected to 0% $O_2$ or less on a 365-day rolling average basis;

      f.      For FCCUs, a limit of 0.5 pounds of PM per 1000 pounds of coke burned on a 3-hour average basis; and

      g.      For SRPs, NSPS Subpart J emission limits.

      106.      **Outside the Scope of the General Prohibition.**  Nothing in this Section VI is intended to prohibit Chevron from seeking to: (1) utilize or generate emissions credits from refinery units that are covered by this Consent Decree to the extent that the proposed credits or reductions represent the difference between the emissions limitations set forth in this Consent Decree for these refinery units and the more stringent emissions limitations that Chevron may

1   elect to accept for these refinery units in a permitting process; or (2) utilize or generate emissions

2   credits or reductions on refinery units that are not subject to an emission limitation pursuant to

3   this Consent Decree; or (3) utilize or generate emissions credits or reductions from heaters and

4   boilers on which Qualifying Controls, as defined in Paragraph 32, have been installed, provided

5   that such reductions are not included in Chevron's demonstration of compliance with the

6   requirements of Paragraphs 33 and 36 of this Consent Decree.

7

8                    **VII.  MODIFICATIONS TO IMPLEMENTATION SCHEDULES**

9           107.    **Securing Permits.**  For any work under Sections V or VIII of this Consent

10  Decree that requires a federal, state and/or local permit or approval, Chevron shall be responsible

11  for submitting in a timely fashion applications for federal, state and local permits and approvals

12  for work and activities required so that permit or approval decisions can be made in a timely

13  fashion.   Chevron shall use its best efforts to: (i) submit permit applications (i.e., applications

14  for permits to construct, operate, or their equivalent) that comply with all applicable

15  requirements; and (ii) secure permits after filing the applications, including timely provision of

16  additional information, if requested.  If it appears that the failure of a governmental entity to act

17  upon a timely-submitted permit application may delay Chevron's performance of  work

18  according to an applicable implementation schedule, Chevron shall notify EPA and the

19  appropriate Plaintiff-Intervenor of any such delays as soon as Chevron reasonably concludes that

20  the delay could affect its ability to comply with the implementation schedule set forth in this

21  Consent Decree.  Chevron shall propose for approval by EPA a modification to the applicable

22  schedule of implementation.  EPA, in consultation with the appropriate Plaintiff-Intervenor, shall

23  not unreasonably withhold its consent to requests for modifications of schedules of

24  implementation if the requirements of this Paragraph are met.  All modifications to any dates

25  initially set forth in this Decree or in any approved schedule of implementation shall be signed in

26  writing by EPA and Chevron and shall be subject to the requirements of Paragraph 234

27  (Modification).  Stipulated penalties shall not accrue nor be due and owing during any period

28  between a scheduled

1   implementation date and an EPA agreed-upon modification to such date; provided however, that

2   EPA and the appropriate Plaintiff-Intervenor shall retain the right to seek stipulated penalties if

3   EPA does not agree to a modification to a date or dates.  The failure of a governmental entity to

4   act upon a timely-submitted permit application shall not constitute a force majeure event

5   triggering the requirements of Section XIV; this Paragraph shall apply.

6        108.    **Commercial Unavailability of Control Equipment and/or Additives**.

7   Chevron shall be solely responsible for compliance with any deadline or the performance of any

8   work described in Sections V and VIII of this Consent Decree that requires the acquisition and

9   installation of control equipment, including NOx-reducing and SO2-reducing catalyst additives.

10  If it appears that the commercial unavailability of any control equipment may delay Chevron's

11  performance of work according to an applicable implementation schedule, Chevron shall notify

12  EPA and the appropriate Plaintiff-Intervenor of any such delays as soon as Chevron reasonably

13  concludes that the delay could affect its/their ability to comply with the implementation schedule

14  set forth in this Consent Decree.

15       Chevron shall propose for approval by EPA, after consultation with the appropriate

16  Plaintiff-Intervenor, a modification to the applicable schedule of implementation.  Prior to the

17  notice required by this Paragraph, Chevron must have contacted a reasonable number of vendors

18  of such equipment or additive and obtained a written representation (or equivalent

19  communication to EPA) from the vendor that the equipment or additive is commercially

20  unavailable.  In the notice, Chevron shall reference this Paragraph 108 of this Consent Decree,

21  identify the milestone date(s) it/they contend it/they will not be able to meet, provide the EPA

22  and the appropriate Plaintiff-Intervenor with written correspondence to the vendor identifying

23  efforts made to secure the control equipment, and describe the specific efforts Chevron has taken

24  and will continue to take to find such equipment or additive.  Chevron may propose a modified

25  schedule or modification of other requirements of this Consent Decree to address such

26  commercial unavailability.  Section XV ("Retention of Jurisdiction/Dispute Resolution") shall

27  govern the resolution of any claim of commercial unavailability.  EPA, in consultation with the

28  appropriate Plaintiff-Intervenor, shall not unreasonably withhold its consent to requests for

1    modifications of schedules of implementation if the requirements of this Paragraph are met.  All

2    modifications to any dates initially set forth in this Consent Decree or in any approved schedule

3    of implementation shall be signed in writing by EPA and Chevron and shall be subject to the

4    requirements of Paragraph 234 (Modification).  Stipulated penalties shall not accrue nor be due

5    and owing during any period between an originally-scheduled implementation date and an EPA

6    agreed-upon modification to such date; provided however, that EPA and the appropriate

7    Plaintiff-Intervenor shall retain the right to seek stipulated penalties if EPA does not agree to a

8    modification to a date or dates.  The failure by Chevron to secure control equipment shall not

9    constitute a <u>force majeure</u> event triggering the requirements of Section XIV; this Paragraph shall

10   apply.

11

12                          **VIII.  <u>SUPPLEMENTAL ENVIRONMENTAL PROJECTS</u>**

13        109.     In accordance with the requirements set forth in this Section VIII, and with the

14   schedules set forth in this Section VIII and/or the applicable Appendices, Chevron shall spend no

15   less than $4,550,000 to implement the Supplemental Environmental Projects ("SEPs") described

16   in Paragraphs 109A and 110 below.  Chevron may carry out its responsibilities for the SEPs

17   identified below directly or through contractors selected by Chevron.

18        109A.    **<u>Diesel Emissions Reduction SEPs</u>:**  Chevron shall spend a total of no less

19   than $1,500,000 to implement SEPs designed to reduce diesel emissions from in-service fleet

20   vehicles, including enhancement of the availability of ultra low-sulfur diesel fuel ("ULSD") for

21   such fleets, in accordance with the requirements of this Paragraph 109A.  The above amount

22   shall be allocated as follows:

23        a.       <u>Federal Diesel Emissions Reduction SEPs</u>:  Chevron shall spend $600,000 for

24   Federal diesel emissions reduction SEPs in accordance with the criteria, terms, and procedures

25   specified in Appendix L.

26        b.       <u>State Diesel Emissions Reduction SEPs</u>:

27        i.       Chevron shall spend $200,000 on State diesel emissions reduction SEPs to be

28                 implemented in the general area where Chevron's Salt Lake City Refinery is

1          located.  These projects are to be determined jointly by Chevron and the State

2          of Utah, in consultation with EPA.

3     ii.   Chevron shall spend $200,000 on State diesel emissions reduction SEPs to be

4          implemented in the general area where Chevron's Richmond Refinery is

5          located.  These projects are to be determined jointly by Chevron and the

6          BAAMQD, in consultation with EPA.

7    iii.   Chevron shall spend $500,000 on State diesel emissions reduction SEPs to be

8          implemented in the general area where Chevron's Hawaii Refinery is located.

9          These projects are to be determined jointly by Chevron and the State of

10         Hawaii, in consultation with EPA.

11    iv.   Within one year of the Date of Entry of the Consent Decree, Chevron shall

12         submit a Statement of Work ("SOW") for each State diesel emissions

13         reduction SEP that it proposes to perform, including a schedule for

14         development and implementation, and an estimated cost.  Each SOW shall be

15         subject to approval by the appropriate Plaintiff-Intervenor.  Chevron shall

16         complete implementation of the approved SOWs by no later than three years

17         from the Date of Entry.

18    v.    If Chevron demonstrates to the appropriate Plaintiff-Intervenor and to EPA

19         prior to or upon submission of its SOW(s) that it cannot identify appropriate

20         State diesel emissions reduction SEPs in the amount required by this Paragraph

21         109A.b., Chevron may seek approval from the appropriate Plaintiff-Intervenor,

22         in consultation with EPA, to submit one or more SOWs for alternative SEPs

23         that will achieve equivalent or greater environmental benefits in the area

24         around the relevant Refinery.  Each alternative SOW shall be subject to

25         approval by the appropriate Plaintiff-Intervenor, and Chevron shall complete

26         implementation of the approved alternative SOW(s) by no later than three

27         years from the Date of Entry.

28

110. **Facility- and Community-Specific SEPs**

a.      Chevron shall also perform the four additional facility- or community-specific SEPs described in Appendix M to this Consent Decree, in accordance with the individual project schedules and descriptions set forth in Appendix M, and at a cost of no less than $3,050,000.

b.      If at any time prior to the completion of the projects identified in Paragraph 110/Appendix M, Chevron becomes required to perform any of those projects pursuant to federal, state, or local statute, regulation, or permit, then Chevron shall not receive SEP credit for the amounts expended on that project.  Within 120 days of the event that invalidates a specific SEP, Chevron shall propose for EPA approval an additional SEP of equal or greater value to be performed at the same facility or in the same community as the invalidated SEP.

111.      Chevron is responsible for the satisfactory completion of the SEPs required under this Consent Decree in accordance with this Section VIII, Appendices L and M, as applicable, and any SOWs developed thereunder.  Upon completion of a specific SEP, Chevron shall submit to EPA and the appropriate Plaintiff-Intervenor a cost report certified as accurate under penalty of perjury by a responsible corporate official.  If Chevron does not expend the entire projected cost of the applicable SEP as set forth in this Section VIII, the relevant Appendix, or a subsequent Statement of Work, Chevron shall pay a stipulated penalty equal to the difference between the amount expended as demonstrated in the certified cost report(s) and the projected cost.  The stipulated penalty shall be paid as provided in Paragraph 177 (Payment of Stipulated Penalties) of the Consent Decree.  As an alternative to payment of the above penalty, Chevron may request approval from EPA and the appropriate Plaintiff-Intervenor to use unexpended SEP monies to supplement one or more diesel reduction SEPs that have been previously approved pursuant to this Consent Decree.

112.      By signing this Consent Decree, Chevron certifies that it is not required, and has no liability under any federal, state or local law or regulation or pursuant to any agreements or orders of any court, to perform or develop any of the projects identified in Paragraph 109A or 110.  Chevron further certifies that it has not applied for or received, and will not in the future apply for or receive: (1) credit as a Supplemental Environmental Project or other penalty offset

1   in any other enforcement action for the projects set forth in Paragraph 109A or 110; (2) credit for

2   any emissions reductions resulting from the projects set forth in Paragraph 109A or 110 in any

3   federal, state or local emissions trading or early reduction program; or (3) a deduction from any

4   federal, state, or local tax based on its participation in, performance of, or incurrence of costs

5   related to the projects set forth in Paragraph 109A or 110.

6           113.    Chevron shall include in each Report required by Paragraph 115 a progress

7   report for each SEP being performed under this Section VIII of this Consent Decree.  In addition,

8   the Report required by Paragraph 115 of this Consent Decree for the period in which each

9   project identified in Paragraph 109 is completed shall contain the following information with

10  respect to such projects:

11          a.      A detailed description of each project as implemented;

12          b.      A brief description of any significant operating problems encountered,

13          including

14   any that had an impact on the environment, and the solutions for each problem;

15          c.      Certification that each project has been fully implemented pursuant to the

16   provisions of this Consent Decree; and

17          d.      A description of the environmental and public health benefits resulting from

18  implementation of each project (including quantification of the benefits and pollutant reductions,

19  if feasible).

20          114.    Chevron agrees that in any public statements regarding these SEPs, Chevron

21  must clearly indicate that these projects are being undertaken as part of the settlement of an

22  enforcement action for alleged violations of the Clean Air Act and corollary state statutes.

23

24              **IX.  REPORTING AND RECORD KEEPING**

25          115.    Beginning with the first full calendar quarter after the Date of Entry of the

26  Consent Decree, Chevron shall submit to EPA and the appropriate Plaintiff-Intervenors within

27  thirty (30) days after the end of each calendar quarter through 2004, and semi-annually thereafter

28  until termination of this Consent Decree a progress report for each of the Chevron Refineries.

Each report shall contain, for the relevant Chevron Refinery, the following: progress report on the implementation of the requirements of Section V (Affirmative Relief/Environmental Projects) at the relevant Refinery; a summary of the emissions data for the relevant Refinery that is specifically required by the reporting requirements of Section V of this Consent Decree for the period covered by the report; a description of any problems anticipated with respect to meeting the requirements of Section V of this Consent Decree at the relevant Refinery; a description of the status of all SEPs being conducted at the relevant Refinery in accordance with Paragraph 109 of the Consent Decree; and any such additional matters as Chevron believes should be brought to the attention of EPA and the appropriate Plaintiff-Intervenor. The report shall be certified by either the person responsible for environmental management at the appropriate Chevron Refinery or by a person responsible for overseeing implementation of this Decree across Chevron as follows:

> I certify under penalty of law that this information was prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my directions and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.

## X. CIVIL PENALTY

116. In satisfaction of the civil claims asserted by the United States and the Plaintiff-Intervenors in the complaint filed in this matter, within thirty (30) days of the Date of Entry of the Consent Decree, Chevron shall pay a civil penalty of $3.5 million as follows: (1) $2.3 million to the United States (including $800,000 to resolve the United States' claims as set forth in Paragraph 216.b); (2) $400,000 to Plaintiff-Intervenor BAAQMD; (3) $500,000 to Plaintiff-Intervenor the Mississippi Commission on Environmental Quality; and (4) $300,000 to Plaintiff-Intervenor the State of Utah.

a. Payment of monies to the United States shall be made as follows:

i. Payment of $1,630,000 shall be made to the United States by Electronic Funds Transfer ("EFT") to the United States Department of Justice, in accordance

1       with current EFT procedures, referencing USAO File Number 2003v00868,

2       DOJ Case Number 90-5-2-1-07629, and the civil action case name and case

3       number of this action in the Northern District of California.  The costs of such

4       EFT shall be the responsibility of Chevron.  Payment shall be made in

5       accordance with instructions provided to Chevron by the Financial Litigation

6       Unit of the U.S. Attorney's Office for the Northern District of California.  Any

7       funds received after 11:00 a.m. (EST) shall be credited on the next business

8       day.  Chevron shall provide notice of payment, referencing USAO File

9       Number  2003v00868, DOJ Case Number 90-5-2-1-07629, and the civil action

10      case name and case number to the Department of Justice and to EPA, as

11      provided in Paragraph 231 (Notice).

12  ii.   A separate payment of $670,000 shall be made by Chevron for deposit in the

13      EPA Hazardous Substance Superfund.  Payment of this amount shall be made

14      by Electronic Funds Transfer ("EFT") to the United States Department of

15      Justice, in accordance with current EFT procedures, referencing USAO File

16      Number 2003v00868, DOJ Case Number 90-5-2-1-07629, and the civil action

17      case name and case number of this action in the Northern District of

18      California.  The costs of such EFT shall be the responsibility of Chevron.

19      Payment shall be made in accordance with instructions provided to Chevron by

20      the Financial Litigation Unit of the U.S. Attorney's Office for the Northern

21      District of California.  Any funds received after 11:00 a.m. (EST) shall be

22      credited on the next business day.  Chevron shall provide notice of payment,

23      referencing USAO File Number 2003v00868, DOJ Case Number 90-5-2-1-

24      07629, and the civil action case name and case number to the Department of

25      Justice as provided in Paragraph 231 (Notice), and to the EPA EPCRA/RMP

26      Enforcement Coordinator identified in Paragraph 102A. of this Consent

27      Decree.

28  b.   Payment of the civil penalty owed to BAAQMD under this Paragraph shall be

made by certified or corporate check made payable to the Bay Area Air Quality Management

District and sent to the following address:

> Attn:  Brian C. Bunger
>   Shirley R. Edwards
> Office of District Counsel
> Bay Area Air Quality Management District
> 939 Ellis Street
> San Francisco, CA  94109

      c.      Payment of the civil penalty owed to the State of Mississippi under this

Paragraph shall be made by certified or corporate check made payable to the Mississippi

Department of Environmental Quality and sent to the following address:

> Mississippi Department of Environmental Quality
> Office of Pollution Control
> P.O. Box 10385
> Jackson, MS 39289

      d.      Payment of the civil penalty owed to the State of Utah under this Paragraph

shall be made by certified or corporate check made payable to the Utah Division of Air Quality

and sent to the following address:

> Utah Division of Air Quality
> Office of the Executive Director
> 168 North 1950 West
> Salt Lake City, UT 84114-4810

      117.      The civil penalty set forth herein is a penalty within the meaning of Section

162(f) of the Internal Revenue Code, 26 U.S.C. § 162(f), and, therefore, Chevron shall not treat

these penalty payments as tax deductible for purposes of federal, state, or local law.

      118.      Upon the Date of Entry of the Consent Decree, the Consent Decree shall

constitute an enforceable judgment for purposes of post-judgment collection in accordance with

Federal Rule of Civil Procedure 69, the Federal Debt Collection Procedure Act, 28 U.S.C. §§

3001-3308, and other applicable federal authority.  The United States and the Plaintiff-

Intervenors shall be deemed judgment creditors for purposes of collecting any unpaid amounts of

the civil and stipulated penalties and interest.

# XI.  STIPULATED PENALTIES

Chevron shall pay stipulated penalties to the United States and to the appropriate Plaintiff-Intervenor for each failure by Chevron to comply with the terms of this Consent Decree as provided herein.  Stipulated penalties shall be calculated in the amounts specified in Paragraphs 119 through 176.  Stipulated penalties under Paragraphs 120, 124, 127 and 129 shall not start to accrue until there is noncompliance with the concentration-based, rolling average emission limits identified in those Paragraphs for five percent (5%) or more of the applicable unit's operating time during any calendar quarter.  For those provisions where a stipulated penalty of either a fixed amount or 1.2 times the economic benefit of delayed compliance is available, the decision of which alternative to seek shall rest exclusively within the discretion of the United States or the appropriate Plaintiff-Intervenor.

A.      **Non-Compliance with Requirements for NOx Emission Reductions from FCCUs.**

119.     For failure to comply with any requirements of the Low NOx Combustion Promoter and NOx-reducing catalyst additive protocol, as set forth in Paragraph 12 and Appendix A, including submission of the optimization study results and the NOx Additive Demonstration Reports, per unit, per day:

| Period of Delay or Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $1,000 |
| 31st through 60th day after deadline | $1,500 |
| Beyond 60th day after deadline | $2,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater |

120.     For failure to meet any emissions limit for NOx set forth in Paragraph 11, or any emissions limit proposed by Chevron or established by EPA (final or interim) for NOx pursuant to Paragraph 13, per day, per unit:  $750 for each calendar day in a calendar quarter on which the short-term rolling average exceeds the applicable limit; and $2,500 for each calendar

1  day in a calendar quarter on which the specified 365-day rolling average exceeds the applicable

2  limit.

3       121.    For failure to prepare and/or submit written deliverables required by

4  Paragraphs 12-15, per day (except where deliverables are specifically identified in Paragraph

5  119, this Paragraph 121 shall apply in lieu of Paragraph 119 where both provisions are

6  potentially applicable):

| Period of Delay | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $200 |
| 31st through 60th day after deadline | $500 |
| Beyond 60th day after deadline | $1000 |

11       122.    For failure to install, certify, calibrate, maintain, and/or operate a NOx CEMS

12  as required by Paragraph 15, per unit per day:

| Period of Delay | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

**B.**    **Non-Compliance with Requirements for SO$_2$ Emission Reductions from FCCUs.**

21       123.    For failure to comply with any requirement of the SO2-reducing catalyst

22  additives protocol, as set forth in Paragraph 17 and Appendix A, including submission of the

23  optimization study results and the SO2 Additive Demonstration Reports, per unit, per day:

| Period of Delay or Non-Compliance | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $1,000 |
| 31st through 60th day after deadline | $1,500 |
| Beyond 60th day after deadline | $2,000, or an amount equal to 1.2 times the economic benefit of the delayed |

1                                                compliance whichever is greater

2          123A.    For failure to comply with any requirements of the protocol for the El Segundo

3    FCCU, as set forth in Paragraph 19, including submission of a Demonstration Assessment

4    Report, per day:

5          Period of Delay or Non-Compliance          Penalty per day

6          1st through 30th day after deadline          $1,000

7          31st through 60th day after deadline          $1,500

8          Beyond 60th day after deadline               $2,000, or an amount equal to 1.2 times the

9                                                 economic benefit of the delayed

10                                                compliance whichever is greater

11         124.    For each failure to meet $SO_2$ emission limits (final or interim) set forth in

12   Paragraph 16, or SO2 emissions limits proposed by Chevron or established by EPA (final or

13   interim) pursuant to Paragraphs 18 or 19, per unit, per day: $750 for each calendar day in a

14   calendar quarter on which the specified 7-day rolling average exceeds the applicable limit;

15   $2,500 for each calendar day in a calendar quarter on which the specified 365-day rolling

16   average exceeds the applicable limit.

17         125.    For failure to prepare and/or submit written deliverables required by

18   Paragraphs 17-20, per day (except where deliverables are specifically identified in Paragraph

19   123 or 123A, this Paragraph 125 shall apply in lieu of Paragraphs 123 or 123A where both

20   provisions are potentially applicable):

21         Period of Delay                          Penalty per day

22         1st through 30th day after deadline          $200

23         31st through 60th day after deadline          $500

24         Beyond 60th day after deadline               $1,000

25         126.    For failure to install, certify, calibrate, maintain, and/or operate a $SO_2$ CEMS

26   as required by Paragraph 20, per unit, per day:

27         Period of Delay                          Penalty per day

28         1st through 30th day after deadline          $500

| | |
|---|---|
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

126A.    For failure to comply with the plan required by Paragraph 21 for operating the FCCUs in the event of a Hydrotreater Outage, per unit, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $250 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

**C.**        **Non-Compliance with Requirements for PM Emissions from FCCUs.**

127.    For each failure to meet applicable PM emission limits for the Chevron FCCUs as set forth in Paragraphs 22 or 23, or as later accepted by Chevron pursuant to Paragraph 202, per day, per unit: $3000 for each calendar day in a calendar quarter on which the Refinery exceeds the emission limit.

128.    For failure to install, certify, calibrate, maintain, and/or operate a COMS to monitor Opacity as required by Paragraph 25, per unit, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000, or, an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

**D.**        **Non-Compliance with Requirements for CO Emissions from FCCUs.**

129.    For each failure to meet the applicable CO emission limits for the Chevron FCCUs as set forth in Paragraphs 26 or 27, or as later accepted by Chevron pursuant to

Paragraph 203: $750 for each calendar day in a calendar quarter on which the specified 1-hour rolling average exceeds the applicable limit; and $2,500 for each calendar day in a calendar quarter on which the specified 365-day rolling average exceeds the applicable limit.

130.    For failure to install, certify, calibrate, maintain, and/or operate a CO CEMS as required by Paragraph 29, per unit, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000, or, an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

**E.      Non-Compliance with Requirements for NOx Emission Reductions from Heaters and Boilers.**

131.    For failure to install Qualifying Controls on heaters and boilers and/or to submit permit applications sufficient to comply with the requirements of Paragraphs 33 and 36, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $2,500 |
| 31st through 60th day after deadline | $6,000 |
| Beyond 60th day after deadline | $10,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

131A.    For failure to install Qualifying Controls on heaters and boilers as required by Paragraphs 37 and 37A. by the dates set forth in those Paragraphs, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $2,500 |
| 31st through 60th day after deadline | $6,000 |

| | |
|---|---|
| Beyond 60th day after deadline | $10,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

132.     For failure to comply with the applicable monitoring requirements as set forth in Paragraphs 38 and 39, per unit, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day after deadline | $2,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

133.     For failure to submit any written deliverable required by Paragraphs 32-42, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $200 |
| 31st through 60th day after deadline | $500 |
| Beyond 60th day | $1,000 |

134.     For each failure to meet NOx emission limits proposed by Chevron pursuant to Paragraph 33, per day, per unit:  $500 for each calendar day in a calendar quarter on which the emissions exceed the applicable limit.

**F.**     **Non-Compliance with Requirements for SO$_2$ Emission Reductions from Heaters and Boilers.**

135.     For burning any fuel gas that contains H2S in excess of the applicable requirements of NSPS Subparts A and J in one or more heaters or boilers or other identified equipment listed in Appendix E after the date set forth in this Decree on which the respective unit becomes an "affected facility" subject to NSPS Subparts A & J, per event, per day in a calendar quarter:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $2,500 |
| Beyond 31st day | $5,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

136.     For burning Fuel Oil in a manner inconsistent with the requirements of Paragraph 44, per unit, per day:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,750 |
| Beyond 31st day | $5,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

**G.     Non-Compliance with Requirements for NSPS Applicability to Sulfur Recovery Plants**.

137.     For failure to route all sulfur pit emissions in accordance with the requirements of Paragraph 46, per unit, per day:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| 31st through 60th day | $1,750 |
| Beyond 60th day | $4,000 or an amount equal to 1.2 times the economic benefit of delayed compliance whichever is greater. |

138.     For failure to comply with the NSPS Subpart J emission limits at the Richmond, El Segundo or Pascagoula 4, 5, and 6 SRPs, per unit, per day in a calendar quarter:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| 31st through 60th day | $2,000 |

| Over 60 days | $3,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

138A.    For failure to comply with the monitoring requirements of Paragraphs 47.b., 48.a., and 49.b.ii., per unit, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day after deadline | $1,500 |
| Beyond 60th day after deadline | $2,000 |

138B.    For failure to comply with the emissions limits for the Salt Lake City SRP as set forth in Paragraph 48.

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| 31st through 60th day | $2,000 |
| Over 60 days | $3,000 |

138C.    For failure to comply with the requirements of Paragraph 48.f. in the event that the sulfur input to the Salt Lake City SRP exceeds 20 long tons in any calendar day, including installation of a Tail Gas Unit, per day:

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |
| 31st through 60th day | $2,000 |
| Over 60 days | $3,000 or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater. |

138D.    For failure to comply with emissions limits developed pursuant to Paragraph 49.b.v. with respect to the Pascagoula SRU 2/3.

| Period of Non-Compliance | Penalty per day |
|---|---|
| 1st through 30th day | $1,000 |

31st through 60th day                  $2,000

Over 60 days                          $3,000 or an amount equal to 1.2 times the

economic benefit of delayed compliance, whichever

is greater.

138E.    For failure to complete an optimization study, as applicable, at the Salt Lake City SRP and/or the Pascagoula SRU 2/3, per unit, per day:

| Period of Delay | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $500 |
| 31st through 60th day | $1,500 |
| Over 60 days | $2,000 |

139.    For failure to develop and comply with the Preventive Maintenance and Operation Plan as specified in Paragraph 51, per Refinery, per day:

| Period of Delay or Non-Compliance | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $500 |
| 31st through 60th day | $1,500 |
| Over 60 days | $2,000 |

140.    For failure to provide any written deliverable required by Section V.H., other than the Optimization Studies and the PMO Plans, per deliverable, per day (except as specified in this Paragraph 140, this Paragraph 140 shall apply in lieu of any other potentially applicable stipulated penalties for late deliverables required by Section V.H.):

| Period of Delay | Penalty per day |
| --- | --- |
| 1st through 30th day after deadline | $200 |
| 31st through 60th day | $500 |
| Over 60 days | $1,000 |

**H.      Non-Compliance with Requirements for NSPS Applicability of Flaring Devices.**

141.    For failure to comply with NSPS Subpart J at the flares listed on Appendix F after the date on which Chevron has accepted NSPS applicability for the relevant flare as set

forth in Paragraph 54:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day | $1,500 |
| Over 60 days | $2,000 |

142.    For failure to submit the NSPS J Subpart J compliance report required by Paragraph 54.a.i:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $500 |
| 31st through 60th day | $1,500 |
| Over 60 days | $2,000 |

I.    **Non-Compliance with Requirements for Control of Acid Gas Flaring Incidents and Tail Gas Incidents.**

143.    For AG Flaring Incidents and/or Tail Gas Incidents for which Section V.J makes Chevron liable for stipulated penalties:

under Section V.J.

| Tons Emitted in Acid Gas Flaring Incident or Tail Gas Incident | Length of Time from Commencement of Flaring within the Acid Gas Flaring Incident to Termination of Flaring within the Acid Gas Flaring Incident is 3 hours or less; Length of Time of the Tail Gas Incident is 3 hours or less | Length of Time from Commencement of Flaring within the Acid Gas Flaring Incident to Termination of Flaring within the Acid Gas Flaring Incident is greater than 3 hours but less than or equal to 24 hours; Length of Time of the Tail Gas Incident is greater than 3 hours but less than or equal to 24 hours | Length of Time of Flaring within the Acid Gas Flaring Incident is greater than 24 hours; Length of Time of the Tail Gas Incident is greater than 24 hours |
|---|---|---|---|
| 5 Tons or less | $500 per Ton | $750 per Ton | $1,000 per Ton |

| Greater than 5 Tons, but less than or equal to 15 Tons | $1,200 per Ton | $1,800 per Ton | $2,300 per Ton, up to, but not exceeding, $27,500 in any one calendar day |
| Greater than 15 Tons | $1,800 per Ton, up to, but not exceeding, $27,500 in any one calendar day | $2,300 per Ton, up to, but not exceeding, $27,500 in any one calendar day | $27,500 per calendar day for each calendar day over which the Acid Gas Flaring Incident or Tail Gas Incident lasts |

For purposes of calculating stipulated penalties pursuant to this Paragraph 143, only one cell within the matrix shall apply.  Thus, for example, for a Flaring Incident in which the Flaring starts at 1:00 p.m. and ends at 3:00 p.m., and for which 14.5 tons of sulfur dioxide are emitted, the penalty would be $17,400 (14.5 x $1,200); the penalty would not be $13,900 [(5 x $500) + (9.5 x $1,200)].  For purposes of determining which column in the table set forth in this Paragraph applies under circumstances in which Flaring occurs intermittently during a Flaring Incident, the Flaring shall be deemed to commence at the time that the Flaring that triggers the initiation of a Flaring Incident commences, and shall be deemed to terminate at the time of the termination of the last episode of Flaring within the Flaring Incident.  Thus, for example, for Flaring within a Flaring Incident that (i) starts at 1:00 p.m. on Day 1 and ends at 1:30 p.m. on Day 1; (ii) recommences at 4:00 p.m. on Day 1 and ends at 4:30 p.m. on Day 1; (iii) recommences at 1:00 a.m. on Day 2 and ends at 1:30 a.m. on Day 2; and (iv) no further Flaring occurs within the Flaring Incident, the Flaring within the Flaring Incident shall be deemed to last 12.5 hours --  not 1.5 hours --  and the column for Flaring of "greater than 3 hours but less than or equal to 24 hours" shall apply.

144.    For failure to timely submit any report required by Sections V.J. or V.K, or for submitting any report that does not substantially conform to its requirements

| Period of Delay | Penalty per day |
| Days 1-30 | $750 |
| Days 31-60 | $1,500 |
| Over 60 days | $3,000 |

145.     For those corrective action(s) with respect to Acid Gas Flaring, Tail Gas Incidents, or Hydrocarbon Flaring which Chevron: (i) agrees to undertake following receipt of an objection by EPA pursuant to Paragraph 58.c; or (ii) is required to undertake following dispute resolution, then, from the date of EPA's receipt of Chevron's report under Paragraph 57 of this Consent Decree until the date that either: (i) a final agreement is reached between EPA and Chevron regarding the corrective action; or (ii) a court order regarding the corrective action is entered, Chevron shall be liable for stipulated penalties as follows:

a.     | Period of Delay | Penalty per day |
| --- | --- |
| Days 1-120 | $50 |
| Days 121-180 | $100 |
| Days 181 - 365 | $300 |
| Over 365 Days | $3,000 |
| | or |

b.     1.2 times the economic benefit resulting from Chevron's failure to implement the corrective action(s).

146.     For failure to complete any corrective action with respect to Acid Gas Flaring, Tail Gas Incidents, or Hydrocarbon Flaring under Paragraph 58 of this Decree in accordance with the schedule for such corrective action agreed to by Chevron or imposed on Chevron pursuant to the dispute resolution provisions of this Decree (with any such extensions thereto as to which EPA and Chevron may agree in writing):

| Period of Delay | Penalty per day |
| --- | --- |
| Days 1-30 | $1,000 |
| Days 31-60 | $2,000 |
| Over 60 | $5,000 |

**J.     Non-Compliance with Requirements for Control of Hydrocarbon Flaring Incidents.**

147.     For each failure to perform a root cause analysis or submit a written report or perform corrective actions as required by Paragraph 67 for a Hydrocarbon Flaring Incident:

| Period of Delay or Non-Compliance | Penalty per day per Incident |
|---|---|
| 1st through 30th day | $500 |
| 31st through 60th day | $1,500 |
| Beyond 60th day | $3,000 |

**K.      Non-Compliance with Requirements for Benzene Waste NESHAP Program Enhancements.**

148.    For failure to complete the BWON Compliance Review and Verification Reports as required by Paragraph 70:

$7,500 per month, per refinery.

149.    For failure to submit a plan that provides for actions necessary to correct non-compliance as required by Paragraph 71.b., or for failure to implement the actions necessary to correct non-compliance and to certify compliance as required by Paragraph 71.e., per refinery:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $1,250 |
| 31st through 60th day after deadline | $3,000 |
| Beyond 60th day | $5,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater |

149A.    For failure to submit a compliance plan for the Salt Lake City Refinery as required by Paragraph 71.c., or for failure to implement the compliance plan and/or to certify compliance as required by Paragraph 71.c. and e.

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $1,250 |
| 31st through 60th day after deadline | $3,000 |
| Beyond 60th day | $5,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater |

149B.    For failure to comply with the requirements set forth in Paragraph 72 for use,

1    monitoring and replacement of carbon canisters, $1,000 per incident of non-compliance, per day.

2         150.    For failure to submit or maintain any records or materials required by

3    Paragraph 72 of this Consent Decree, $2,000 per record or submission.

4         150A.    For failure to establish an annual review program to identify new benzene

5    waste streams as required by Paragraph 73, $2,500 per month, per refinery.

6         150B.    For failure to perform laboratory audits as required by Paragraph 74, $5,000

7    per month, per audit.

8         151.    For failure to implement the training requirements as set forth in Paragraph 76,

9    $10,000 per quarter, per refinery.

10        152.    For failure to install controls on waste management units handling organic

11   wastes as required by Paragraph 77.b., $10,000 per month per waste management unit.

12        153.    For failure to submit any plans or other deliverables required by Paragraphs 78

13   or 79, $10,000 per month, per refinery.

14        154.    For failure to conduct sampling in accordance with the sampling plans required

15   by Paragraphs 78-79 - $5,000 per week, per stream, or $30,000 per quarter, per stream,

16   whichever is greater, but not to exceed $150,000 per quarter, per refinery.

17        155.    For failure to conduct monthly visual inspections of all Subpart FF water traps

18   as required by Paragraph 80.b: $500 per drain not inspected.

19        156.    For failure to identify/mark segregated stormwater drains as required in

20   Paragraph 80.c: $1,000 per week, per drain.

21        157.    For failure to monitor Subpart FF conservation vents as required by Paragraph

22   80.d: $500 per vent not monitored.

23        157A.    For failure to conduct monitoring of oil-water separators as required by

24   Paragraph 80.e: $1,000 per month, per unit.

25        158.    For failure to submit the written deliverables required by Paragraph 82 -

26   $1,000 per week, per deliverable.

27        159.    If it is determined through federal, state, or local investigation that any

28   Chevron Refinery has failed to include all benzene waste streams in its TAB calculation

submitted pursuant to Paragraphs 70, Chevron shall pay the following, per waste stream:

| Waste Stream | Penalty |
|---|---|
| for waste streams < 0.03 Mg/yr | $250 |
| for waste streams between 0.03 and 0.1 Mg/yr | $1,000 |
| for waste streams between 0.1 and 0.5 Mg/yr | $5,000 |
| for waste streams > 0.5 Mg/yr | $10,000 |

**L.      Non-Compliance with Requirements for Leak Detection and Repair Program Enhancements.**

160.      For failure to develop an LDAR Program as required by Paragraph 83: $3,500 per week, per refinery.

160A.      For failure to implement the training programs specified in Paragraph 84 - $10,000 per month, per program, per refinery.

161.      For failure to conduct any of the audits required by Paragraph 85 - $5,000 per month, per audit.

162.      For failure to implement any actions necessary to correct non-compliance as required by Paragraph 86:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $1,250 |
| 31st through 60th day after deadline | $3,000 |
| Beyond 60th day | $5,000, or an amount equal to 1.2 times the economic benefit of delayed compliance, whichever is greater |

163.      For failure to perform monitoring utilizing the lower internal leak rate definitions as specified in Paragraph 87 - $100 per component, but not greater than $10,000 per month, per process unit.

163A.      For failure to repair and re-monitor leaks, as required by Paragraph 88.b, in excess of the lower leak definitions specified in Paragraph 87 - $100 per component, but not greater than $10,000 per month, per refinery (except that Paragraph 164 shall apply in lieu of this

Paragraph 163A. where both paragraphs are potentially applicable).

164.     For failure to implement the "initial attempt" repair program in Paragraph 89 – $100 per valve, but not greater than $10,000 per month, per refinery

164A.    For failure to implement the quarterly QA/QC procedures described in Paragraph 92 - $10,000 per month, per refinery.

165.     For failure to implement and comply with the LDAR monitoring program as required by Paragraph 90 - $100 per component, but not greater than $10,000 per month, per unit.

166.     For failure to use dataloggers or maintain electronic data as required by Paragraph 91 - $5,000 per month, per refinery.

167.     For failure to designate and/or maintain an individual as accountable for LDAR performance as required in Paragraph 93, or for failure to implement the maintenance tracking program in Paragraph 94: - $3,750 per week, per refinery.

168.     For failure to conduct the calibration drift assessments or remonitor valves and pumps based on calibration drift assessments in Paragraph 95 - $100 per missed event, per refinery.

169.     For failure to comply with the requirements for repair set forth at Paragraph 96 - $5,000 per valve or pump, per incident of non-compliance.

170.     For failure to submit any written deliverables required by Paragraph 97 - $1,000 per week, per report.

171.     If it is determined through a federal, state, or local investigation that Chevron has failed to include all valves and pumps in its LDAR program, Chevron shall pay $175 per component that it failed to include.

**M.       Non-Compliance with Requirements for Risk Management Plan for the El Segundo Refinery.**

172.     For each failure to comply with the requirements of Section V.O. of this Consent Decree:

| Period of Delay | Penalty per day |
|---|---|
| Days 1-30 | $500 |
| Over 30 Days | $1,500 |

173.     **Non-Compliance with Requirements Related to Supplemental Environmental Projects.**   For failure to satisfactorily complete implementation of the SEPs required under Section VIII, per project, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $1,000 |
| 31st through 60th day after deadline | $1,500 |
| Beyond 60th day | $2,500 |

174.     **Non-Compliance with Requirements for Reporting and Recordkeeping**. For failure to submit reports as required by Section IX, per report, per day:

| Period of Delay | Penalty per day |
|---|---|
| 1st through 30th day after deadline | $300 |
| 31st through 60th day after deadline | $1,000 |
| Beyond 60th day | $2,000 |

175.     **Non-Compliance with Requirements for Payment of Civil Penalties.**  For Chevron's failure to pay the civil penalties as specified in Section X of this Consent Decree, Chevron shall be liable for $15,000 per day plus interest on the amount overdue at the rate specified in 28 U.S.C. § 1961(a).

176.     **Non-Compliance with Requirement to Pay Stipulated Penalties.**  For failure to pay stipulated penalties as required by Paragraph 177 of this Consent Decree, Chevron shall be liable for $2,500 per day, and interest on the amount overdue at the rate specified in 28 U.S.C. § 1961(a).

177.     **Payment of Stipulated Penalties.**  Chevron shall pay stipulated penalties upon written demand by the United States, or the appropriate Plaintiff-Intervenor, no later than sixty (60) days after Chevron receives such demand. Demand from one agency shall be deemed a demand from all applicable agencies, but the agencies shall consult with each other prior to

making a demand.  Stipulated penalties owed by Chevron shall be paid 50% to the United States and 50% to the appropriate Plaintiff-Intervenor.  Stipulated penalties shall be paid to the United States and appropriate Plaintiff-Intervenors in the manner set forth in Section X (Civil Penalty) of this Consent Decree.  A demand for the payment of stipulated penalties will identify the particular violation(s) to which the stipulated penalty relates, the stipulated penalty amount that EPA or the appropriate Plaintiff-Intervenor is demanding for each violation (as can be best estimated), the calculation method underlying the demand, and the grounds upon which the demand is based.  After consultation with each other, the United States and the appropriate Plaintiff-Intervenor may, in their unreviewable discretion, waive payment of any portion of stipulated penalties that may accrue under this Consent Decree.

178.   **Stipulated Penalties Dispute.**  Should Chevron dispute the United States' and/or a Plaintiff-Intervenor's demand for all or part of a stipulated penalty, it may avoid the imposition of a stipulated penalty for failure to pay a stipulated penalty under Paragraph 176 by placing the disputed amount demanded in a commercial escrow account pending resolution of the matter and by invoking the dispute resolution provisions of Section XV within the time provided in Paragraph 177 for payment of stipulated penalties.  If the dispute is thereafter resolved in Chevron's favor, the escrowed amount plus accrued interest shall be returned to Chevron; otherwise, EPA and the appropriate Plaintiff-Intervenor shall be entitled to the amount that was determined to be due by the Court, plus the interest that has accrued in the escrow account on such amount.  The United States and the Plaintiff-Intervenors reserve the right to pursue any other non-monetary remedies to which they are legally entitled, including but not limited to, injunctive relief for Chevron's violations of this Consent Decree.

179.   [Omitted]

## XII.  INTEREST

180.   Chevron shall be liable for interest on the unpaid balance of the civil penalty specified in Section X, and for interest on any unpaid balance of stipulated penalties to be paid in accordance with Section XI.  All such interest shall accrue at the rate established pursuant to 28

1   U.S.C. § 1961(a) -- i.e., a rate equal to the coupon issue yield equivalent (as determined by the

2   Secretary of Treasury) of the average accepted auction price for the last auction of 52-week U.S.

3   Treasury bills settled prior to the Date of Lodging of the Consent Decree.  Interest shall be

4   computed daily and compounded annually.  Interest shall be calculated from the date payment is

5   due under the Consent Decree through the date of actual payment.  For purposes of this

6   Paragraph 180, interest pursuant to this Paragraph will cease to accrue on the amount of any

7   stipulated penalty payment made into an interest bearing escrow account as contemplated by

8   Paragraph 178 of the Consent Decree.  Monies timely paid into escrow shall not be considered to

9   be an unpaid balance under this Section.

10

11                          **XIII.  RIGHT OF ENTRY**

12          181.     Any authorized representative of EPA or the applicable Plantiff-Intervenor,

13   including independent contractors, upon presentation of credentials, shall have a right of entry

14   upon the premises of the facilities of the Chevron Refineries at any reasonable time for the

15   purpose of monitoring compliance with the provisions of this Consent Decree, including

16   inspecting plant equipment and systems, and inspecting and copying all records maintained by

17   Chevron required by this Consent Decree or deemed necessary by EPA or the applicable

18   Plaintiff-Intervenor to verify compliance with this Consent Decree.  Chevron shall retain such

19   records for the period of the Consent Decree.  Nothing in this Consent Decree shall limit the

20   authority of EPA or the applicable Plaintiff-Intervenor to conduct tests, inspections, or other

21   activities under any statutory or regulatory provision.

22

23                          **XIV.  FORCE MAJEURE**

24          182.     If any event occurs or fails to occur which causes or may cause a delay or

25   impediment to performance in complying with any provision of this Consent Decree, Chevron

26   shall notify EPA and the appropriate Plaintiff-Intervenor in writing as soon as practicable, but in

27   any event within ten (10) business days of the date when Chevron first knew of the event or

28   should have known of the event by the exercise of due diligence.  In this notice, Chevron shall

specifically reference this Paragraph 182 of this Consent Decree and describe the anticipated length of time the delay may persist, the cause or causes of the delay, and the measures taken or to be taken by Chevron  to prevent or minimize the delay and the schedule by which those measures shall be implemented.  Chevron shall take all reasonable steps to avoid or minimize such delays.  The notice required by this Section shall be effective upon the mailing of the same by certified mail, return receipt requested, to the Applicable EPA Regional Office as specified in Paragraph 231 (Notice).

183.    Failure by Chevron to substantially comply with the notice requirements of Paragraph 182 as specified above shall render this Section XIV (Force Majeure) voidable by the United States, in consultation with the appropriate Plaintiff-Intervenor, as to the specific event for which Chevron has failed to comply with such notice requirement, and, if voided, is of no effect as to the particular event involved.

184.    The United States, after consultation with the appropriate Plaintiff-Intervenor, shall notify Chevron in writing regarding its claim of a delay or impediment to performance within thirty (30) days of receipt of the force majeure notice provided under Paragraph 182.

185.    If the United States, after consultation with the appropriate Plaintiff-Intervenor, agrees that the delay or impediment to performance has been or will be caused by circumstances beyond the control of Chevron including any entity controlled by Chevron and that Chevron could not have prevented the delay by the exercise of due diligence, the appropriate Parties shall stipulate in writing to an extension of the required deadline(s) for all requirement(s) affected by the delay by a period equivalent to the delay actually caused by such circumstances. Such stipulation shall be treated as a non-material modification to the Consent Decree pursuant to the modification procedures established in this Consent Decree.  Chevron shall not be liable for stipulated penalties for the period of any such delay.

186.    If the United States, after consultation with the appropriate Plaintiff-Intervenor, does not accept Chevron's claim of a delay or impediment to performance, Chevron must submit the matter to the Court for resolution to avoid payment of stipulated penalties, by filing a petition for determination with the Court.  Once Chevron has submitted this matter to the

Court, the United States and the appropriate Plaintiff-Intervenor shall have twenty (20) business days to file their responses to the petition.  If the Court determines that the delay or impediment to performance has been or will be caused by circumstances beyond the control of Chevron including any entity controlled by Chevron and that the delay could not have been prevented by Chevron by the exercise of due diligence, Chevron shall be excused as to that event(s) and delay (including stipulated penalties), for a period of time equivalent to the delay caused by such circumstances.

187.    Chevron shall bear the burden of proving that any delay of any requirement(s) of this Consent Decree was caused by or will be caused by circumstances beyond its/their control, including any entity controlled by it, and that it could not have prevented the delay by the exercise of due diligence.  Chevron shall also bear the burden of proving the duration and extent of any delay(s) attributable to such circumstances.  An extension of one compliance date based on a particular event may, but will not necessarily result in an extension of a subsequent compliance date or dates.

188.    Unanticipated or increased costs or expenses associated with the performance of Chevron's obligations under this Consent Decree shall not constitute circumstances beyond its control, or serve as the basis for an extension of time under this Section XIV.

189.    Notwithstanding any other provision of this Consent Decree, this Court shall not draw any inferences nor establish any presumptions adverse to any Party as a result of Chevron serving a force majeure notice or the Parties' inability to reach agreement.

190.    As part of the resolution of any matter submitted to this Court under this Section XIV, the appropriate Parties by agreement, or the Court, by order, may in appropriate circumstances extend or modify the schedule for completion of work under the Consent Decree to account for the delay in the work that occurred as a result of any delay or impediment to performance agreed to by the United States or approved by this Court.  Chevron shall be liable for stipulated penalties for their failure thereafter to complete the work in accordance with the extended or modified schedule.

## XV.  **RETENTION OF JURISDICTION/DISPUTE RESOLUTION**

191.     This Court shall retain jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of the Consent Decree and for the purpose of adjudicating all disputes (including, but not limited to, determinations under Section V (Affirmative Relief/Environmental Projects) of the Consent Decree) between the United States and the Plaintiff-Intervenors and Chevron that may arise under the provisions of the Consent Decree, until the Consent Decree terminates in accordance with Section XVIII of this Consent Decree (Termination).

192.     The dispute resolution procedure set forth in this Section XV shall be available to resolve any and all disputes arising under this Consent Decree, including assertion of commercial unavailability under Paragraph 108 of this Consent Decree, provided that the Party making such application has made a good faith attempt to resolve the matter with the other Party.

193.     The dispute resolution procedure required herein shall be invoked upon the giving of written notice by one of the Parties to this Consent Decree to another advising the other appropriate Party(ies) of a dispute pursuant to this Section XV.  The notice shall describe the nature of the dispute, and shall state the noticing Party's position with regard to such dispute.

194.     Disputes submitted to dispute resolution shall, in the first instance, be the subject of informal negotiations between the Parties.  Such period of informal negotiations shall not extend beyond ninety (90) calendar days from the date of the first meeting between representatives of the Parties, unless it is agreed that this period should be extended.

195.     In the event that the Parties are unable to reach agreement during such informal negotiation period, the United States or the appropriate Plaintiff-Intervenor, as applicable, shall provide Chevron with a written summary of its position regarding the dispute. The position advanced by the United States or the appropriate Plaintiff-Intervenor, as applicable, shall be considered binding unless, within forty-five (45) calendar days of Chevron's receipt of the written summary of the United States' or the appropriate Plaintiff-Intervenor's position, Chevron files with the Court a petition which describes the nature of the dispute.  The United States or the appropriate Plaintiff-Intervenor shall respond to the petition within forty-five (45)

1    calendar days of filing.  In resolving the dispute between the parties, the position of the United

2    States and the appropriate Plaintiff-Intervenor shall be upheld if supported by substantial

3    evidence in the administrative record.

4         196.    In the event that the United States and the appropriate Plaintiff-Intervenor

5    make differing determinations or take differing actions that affect Chevron's rights or obligations

6    under this Consent Decree, the final decisions of the United States shall take precedence.

7         197.    Where the nature of the dispute is such that a more timely resolution of the

8    issue is required, the time periods set forth in this Section XV may be shortened upon motion of

9    one of the Parties to the dispute.

10        198.    The Parties do not intend that the invocation of this Section XV by a Party

11   cause the Court to draw any inferences nor establish any presumptions adverse to either Party as

12   a result of invocation of this Section.

13        199.    As part of the resolution of any dispute submitted to dispute resolution, the

14   Parties, by agreement, or this Court, by order, may, in appropriate circumstances, extend or

15   modify the schedule for completion of work under this Consent Decree to account for the delay

16   in the work that occurred as a result of dispute resolution.  Chevron shall be liable for stipulated

17   penalties for their failure thereafter to complete the work in accordance with the extended or

18   modified schedule.

19

20                    **XVI.  EFFECT OF SETTLEMENT**

21        200.    **Definitions**.  For purposes of Section XVI (Effect of Settlement), the

22   following definitions apply:

23        a.       Applicable NSR/PSD Requirements" shall mean:  PSD requirements at Part C

24   of Subchapter I of the Act, 42 U.S.C. § 7475, and the regulations promulgated thereunder at 40

25   C.F.R. §§ 52.21 and 51.166; the portions of the applicable SIPs and related rules adopted as

26   required by 40 C.F.R. §§ 51.165 and 51.166; "Plan Requirements for Non-Attainment Areas" at

27   Part D of Subchapter I of the Act, 42 U.S.C. §§ 7502-7503, and the regulations promulgated

28   thereunder at 40 C.F.R. §§ 51.165 (a) and (b), 40 C.F.R. Part 51, Appendix S, and 40 C.F.R. §

1  52.24, and any Title V regulations that implement, adopt or incorporate the specific regulatory

2  requirements identified above; any applicable, federally-enforceable state or local regulations

3  that implement, adopt, or incorporate the specific federal regulatory requirements identified

4  above, and any Title V permit provisions that implement, adopt or incorporate the specific

5  regulatory requirements identified above; and any applicable state or local regulations

6  enforceable by Plaintiff-Intervenors that implement, adopt, or incorporate the specific federal

7  regulatory requirements identified above.

8      b.      "Applicable NSPS Subparts A and J Requirements" shall mean the standards,

9  monitoring, testing, reporting and recordkeeping requirements, found at 40 C.F.R. §§ 60.100

10  through 60.109 (Subpart J), relating to a particular pollutant and a particular affected facility, and

11  the corollary general requirements found at 40 C.F.R. §§ 60.1 through 60.19 (Subpart A) that are

12  applicable to any affected facility covered by Subpart J.

13      c.      "Post-Lodging Compliance Dates" shall mean any dates in this Section XVI

14  (Effect of Settlement) after the Date of Lodging.  Post-Lodging Compliance Dates include dates

15  certain (e.g., "December 31, 2004"), dates after Lodging represented in terms of "months after

16  Lodging" (e.g., "Twelve Months after the Date of Lodging"), and dates after Lodging

17  represented by actions taken (e.g., "Date of Certification").  The Post-Lodging Compliance

18  Dates represent the dates by which work is required to be completed or an emission limit is

19  required to be met under the applicable provisions of this Consent Decree.

20      201.   **Resolution of Liability Regarding the Applicable NSR/PSD Requirements.**

21  With respect to emissions of the following pollutants from the following units, entry of this

22  Consent Decree shall resolve all civil liability of Chevron to the United States and the Plaintiff-

23  Intervenors for violations of the Applicable NSR/PSD Requirements resulting from pre-Lodging

24  construction or modification.

| Refinery/Unit | Pollutant | Date |
|---|---|---|
| Richmond FCCU | NOx | Date of Lodging |
| | SO2 | May 31, 2008 |
| | CO | Date of Lodging |

| | | |
|---|---|---|
| El Segundo FCCU | NOx | December 31, 2008 |
| | SO2 | December 31, 2005 |
| | PM | Date of Lodging |
| Pascagoula FCCU | NOx | November 30, 2008 |
| | SO2 | September 30, 2007 |
| Salt Lake City FCCU | NOx | May 31, 2009 (w/hydro) |
| | | November 30, 2010 (w/o hydro) |
| | SO2 | December 31, 2008 (w/hydro) |
| | | December 31, 2010 (w/o hydro) |
| Hawaii FCCU | NOx | August 31, 2011 |
| | SO2 | August 31, 2011 |

**All Facilities**

| | | |
|---|---|---|
| Heaters and boilers on which Qualifying Controls are installed and which are used to satisfy the requirements of ¶ 33 | NOx | Later of Date of Lodging or date of installation of Qualifying Controls |
| All other heaters and boilers | NOx | Date of Lodging |
| All heaters and boilers | SO2 | Date of Lodging or dates set forth in Appendix D if other than Date of Lodging |
| Other specific equipment (listed on Appendix E) | SO2 | Dates set forth in Appendix E |

202.    **Resolution of Liability for PM Emissions Under the Applicable NSR/PSD Requirements.**  With respect to emissions of PM from the FCCUs at the Richmond, Pascagoula, Salt Lake City and Hawaii Refineries, if and when Chevron accepts an emission limit of 0.5 pound PM per 1000 pounds of coke burned on a 3-hour average basis and demonstrates compliance by conducting a 3-hour performance test representative of normal operating

1    conditions for PM emissions at a particular Refinery, and, for the Richmond FCCU, Chevron

2    also demonstrates compliance with all applicable BAAQMD requirements including, but not

3    limited to, Permit Condition 11066 and Regulation 6, then all civil liability of Chevron to the

4    United States and the Plaintiff-Intervenors shall be resolved for violations of the Applicable

5    NSR/PSD Requirements relating to PM emissions at the relevant Refinery resulting from pre-

6    Lodging construction or modification of the FCCU for that Refinery.

7            203.    **Resolution of Liability for CO Emissions Under the Applicable NSR/PSD**

8    **Requirements.**  With respect to emissions of CO from the FCCUs at the El Segundo,

9    Pascagoula, Salt Lake City and Hawaii Refineries, if and when Chevron accepts an emission

10   limit of 100 ppmvd of CO at 0% $O_2$ on a 365-day rolling average basis and demonstrates

11   compliance using CEMS at the relevant Refinery, then all civil liability of Chevron to the United

12   States and the Plaintiff-Intervenors shall be resolved for violations of the Applicable NSR/PSD

13   Requirements relating to CO emissions at the relevant Refinery resulting from pre-Lodging

14   construction or modification of the FCCU for that Refinery.

15           204.    **Reservation of Rights Regarding Applicable NSR/PSD Requirements:**

16   **Release for Violations Continuing After the Date of Lodging Can Be Rendered Void.**

17   Notwithstanding the resolution of liability in Paragraphs 201-203, the releases of liability by the

18   United States and the Plaintiff-Intervenors to Chevron for violations of the Applicable NSR/PSD

19   Requirements during the period between the Date of Lodging of the Consent Decree and the

20   Post-Lodging Compliance Dates shall be rendered void if Chevron materially fails to comply

21   with any of the obligations and requirements of Section V.A. to V.D. (relating to FCCUs) or

22   Sections V.F. and V.G. (relating to heaters and boilers) of this Consent Decree; provided,

23   however, that the releases in Paragraphs 201-203 shall not be rendered void if Chevron remedies

24   such material failure and pays any stipulated penalties due as a result of such material failure.

25           205.    **Exclusions from Release Coverage Regarding Applicable NSR/PSD**

26   **Requirements:  Construction and/or Modification Not Covered by Paragraphs 201-203.**

27   Notwithstanding the resolution of liability in Paragraphs 201-203, nothing in this Consent

28   Decree precludes the United States and/or the Plaintiff-Intervenors from seeking from Chevron

1   injunctive relief, penalties, or other appropriate relief for violations by Chevron of the

2   Applicable NSR/PSD Requirements resulting from: (1) construction or modification that

3   commenced prior to the Date of Lodging of the Consent Decree, if the resulting violations relate

4   to pollutants or units not covered by the Consent Decree; or (2) any construction or modification

5   that commences after the Date of Lodging of the Consent Decree.

6       206.    **Evaluation of Applicable PSD/NSR Requirements Must Occur**.  Increases

7   in emissions from units covered by this Consent Decree, where the increases result from the

8   Post-Lodging construction or modification of any units within the Chevron Refineries, are

9   beyond the scope of the release in Paragraphs 201-203, and Chevron must evaluate any such

10  increases in accordance with the Applicable PSD/NSR Requirements.

11      207-209. [Omitted]

12      210.    **Resolution of Liability Regarding Applicable NSPS Subparts A and J**

13  **Requirements**.  With respect to emissions of the following pollutants from the following units,

14  entry of this Consent Decree shall resolve all civil liability of Chevron to the United States and

15  the Plaintiff-Intervenors for violations of the Applicable NSPS Subparts A and J Requirements

16  from the date that the claims of the United States and the Plaintiff-Intervenors accrued up to the

17  following dates:

| Unit | Pollutant | Date |
|------|-----------|------|
| Richmond FCCU | $SO_2$, PM, CO, Opacity | Date of Lodging |
| El Segundo FCCU | SO2 and PM | June 30, 2004 |
| | CO and Opacity | April 10, 2005 |
| | | |
| Pascagoula FCCU | $SO_2$, PM, CO, and Opacity | April 10, 2005 |
| Salt Lake City FCCU | SO2 | June 30, 2006   (w/hydro) |
| | | April 10, 2005 (w/o hydro) |
| | PM, CO, Opacity | April 10, 2005 |
| Hawaii FCCU | PM, CO and Opacity | April 10, 2005 |
| | SO2 | December 31, 2005 |

| Richmond SRP | SO2 | June 30, 2004 |
| El Segundo SRP | SO2 | June 30, 2004 |
| Salt Lake City SRP | SO2 | December 31, 2004 |
| Pascagoula SRUs 4, 5, 6 | SO2 | Date of Lodging |
| Pascagoula SRUs 2, 3 | SO2 | Earlier of date on which units achieve compliance with NSPS Subpart J or July 31, 2007 |

**All Refineries**

| All heaters and boilers | $SO_2$ | Date of Lodging or Dates set forth in Appendix D if other than Date of Lodging |
| Other specified equipment (listed in Appendix E) | SO2 | Dates set forth in Appendix E |
| All Flaring Devices | SO2 | Date on which Chevron certifies compliance with NSPS Subpart J for the relevant flaring device pursuant to Paragraph 54 |

211.     **Reservation of Rights Regarding Applicable NSPS Subparts A and J Requirements:  Release for NSPS Violations Occurring After the Date of Lodging Can Be Rendered Void.**  Notwithstanding the resolution of liability in Paragraph 210, the release of liability by the United States and the Plaintiff-Intervenors to Chevron for violations of any Applicable NSPS Subparts A and J Requirements that occurred between the Date of Lodging and the Post-Lodging Compliance Dates shall be rendered void if Chevron materially fails to comply with the obligations and requirements of Sections V.G. through V.I. of this Consent Decree; provided, however, that the release in Paragraph 210 shall not be rendered void if Chevron remedies such material failure and pays any stipulated penalties due as a result of such material failure.

212. **Prior NSPS Applicability Determinations**.  Nothing in this Consent Decree shall affect the status of any FCCU, heater or boiler, fuel gas combustion device, or sulfur recovery plant currently subject to NSPS as previously determined by any federal, state, or local authority or any applicable permit.

213. **Reservation of Rights Under NSPS Subpart H.**  Nothing in this Consent Decree shall affect, and the United States and Plaintiff-Intervenor Hawaii expressly reserve, the right of the United States and Plaintiff-Intervenor Hawaii to bring an enforcement action against Chevron for violations of NSPS, 40 C.F.R. Part 60, Subpart H (Sulfuric Acid Plants), and/or Hawaii statutes and regulations with respect to the sulfuric acid plant at Chevron's Hawaii Refinery.

214. **Resolution of Liability Regarding Benzene Waste NESHAP Requirements.**

    a.    Entry of this Consent Decree shall resolve all civil liability of Chevron to the United States and the Plaintiff-Intervenors for violations of the statutory and regulatory requirements set forth below in subparagraphs a.i. through a.iii. (the "BWON Requirements") that (1) commenced and ceased prior to the Date of Entry of the Consent Decree; and (2) commenced prior to the Date of Entry of the Consent Decree and/or continued past the Date of Entry, provided that the events giving rise to such post-Entry violations are identified by Chevron in its BWON Compliance Review and Verification Report(s) submitted pursuant to Paragraph 70 and corrected by Chevron as required under Paragraph 71:

    i.    Benzene Waste NESHAP.  The National Emission Standard for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF, promulgated pursuant to Section 112(e) of the Act, 42 U.S.C. § 7412(e), including any federal regulation that adopts or incorporates the requirements of Subpart FF by express reference, but only to the extent of such adoption or incorporation; and

    ii.    Any applicable, federally-enforceable state or local regulations that implement, adopt, or incorporate the specific federal regulatory requirements identified in Paragraph 214.a.

iii.     Any applicable state or local regulations enforceable by the Plaintiff-Intervenors that implement, adopt, or incorporate the specific federal regulatory requirements identified in Paragraph 214.a.

b.     <u>Salt Lake City Refinery</u>.

i.     With respect to Chevron's Salt Lake City Refinery, entry of this Consent Decree shall also resolve any and all civil liability to the United States and the Plaintiff-Intervenors for any violations of the BWON Requirements applicable to petroleum refineries with Total Annual Benzene (TAB) quantities above ten (10) metric tons per year from the date that the claims accrued up to the date that Chevron is required to comply with its EPA-approved compliance plan for the Salt Lake City Refinery pursuant to Paragraph 71.c.

ii.     The release of liability in Paragraph 214.b.i. shall be rendered void if Chevron materially fails to comply with the obligations and requirements of Paragraph 71.c. of this Consent Decree; provided, however, that the release in Paragraph 214.b.i. shall not be rendered void if Chevron remedies such material failure and pays any stipulated penalties due as a result of such material failure.

214A.     **Resolution of Liability Regarding LDAR Requirements.**  Entry of this Consent Decree shall resolve all civil liability of Chevron to the United States and the Plaintiff-Intervenors for violations of the statutory and regulatory requirements set forth below in subparagraphs a. and b. that (1) commenced and ceased prior to the Date of Entry of the Consent Decree; and (2) commenced prior to the Date of Entry of the Consent Decree and continued past the Date of Entry, provided that the events giving rise to such post-Entry violations are identified by Chevron in its Initial Third-Party Audit Report(s) submitted pursuant to paragraph 85.a. and corrected by Chevron as required under Paragraph 86:

a.     <u>LDAR Requirements</u>.  For all equipment in light liquid service and gas and/or vapor service, the LDAR requirements promulgated by EPA pursuant to Sections 111 and 112 of the Clean Air Act, and codified at 40 C.F.R. Part 60, Subparts VV and GGG; 40 C.F.R. Part 61, Subparts J and V; and 40 C.F.R. Part 63, Subparts F, H, and CC;

b.        Any applicable state or local regulations, State Implementation Plan requirements, or permits that implement, adopt, or incorporate the regulatory requirements identified in Paragraph 214A.a. or set similar standards and that are enforceable by the United States or a Plaintiff-Intervenor.

215.        **Reservation of Rights Regarding Benzene NESHAP and LDAR Requirements**.  Notwithstanding the resolution of liability in Paragraphs 214-214A, nothing in this Consent Decree precludes the United States and/or the Plaintiff-Intervenors from seeking from Chevron injunctive and/or other equitable relief or civil penalties for violations by Chevron of Benzene Waste NESHAP and/or LDAR requirements that (1) commenced prior to the Date of Entry of this Consent Decree and continued after the Date of Entry if Chevron fails to identify and address such violations as required by Paragraphs 70-71 and Paragraphs 85.a. and 86 of this Consent Decree; or (B) commenced after the Date of Entry of the Consent Decree.

215A.        **Reservation of Rights Regarding BAAQMD NOVs.**  Notwithstanding the resolution of liability in Paragraphs 201-203, 210, and 214-214A, nothing in this Consent Decree precludes BAAQMD from seeking from Chevron injunctive and/or other equitable relief or civil penalties for violations by Chevron that are identified by BAAQMD prior to the Date of Lodging of this Consent Decree and incorporated in Notices of Violations ("NOVs") issued by BAAQMD to Chevron.

216.        **Other.**  Entry of this Consent Decree shall resolve all civil liability of Chevron to the United States and the Plaintiff-Intervenors for the following:

a.        Salt Lake City BWON.  All potential violations of 40 C.F.R. Part 61, Subpart FF, and of applicable NSPS Subpart J requirements with respect to the SRP at the Salt Lake City Refinery, arising from the information disclosed by Chevron during EPA's August 30 – September 2, 1999 inspection and related investigation of the Salt Lake City Refinery, including the specific violations that are the subject of a litigation referral from EPA to the Department of

1    Justice.

2         b.        El Segundo EPCRA, CERCLA, and RMP.  All potential violations of Section

3    103(a) of CERCLA, Section 304 of EPCRA, and Section 112(r) of the Clean Air Act at the El

4    Segundo Refinery relating to the information disclosed by Chevron during EPA's November 14-

5    17, 2001 inspection and EPA's related investigation of the El Segundo Refinery, including the

6    specific violations that are the subject of a litigation referral from EPA to the Department of

7    Justice.

8         c.        El Segundo BWON.  All potential violations of 40 C.F.R. Part 61, Subpart FF,

9    at the El Segundo Refinery arising from information disclosed by Chevron during EPA's

10   September 1999 inspection and EPA's related investigation of the El Segundo Refinery.

11        217.  **Resolution of Liability Regarding CERCLA/EPCRA Reporting**

12   **Requirements for Pre-Lodging Flaring Events.**  Upon receipt by EPA of Chevron's

13   CERCLA/EPCRA Compliance Review Report submitted pursuant to Paragraph 59A, this

14   Consent Decree shall resolve all civil liability of Chevron to the United States and the Plaintiff-

15   Intervenors for violations of Section 103(a) of CERCLA, 42 U.S.C. § 9603(a), and Section 304

16   of EPCRA, 42 U.S.C. § 11004, for all flaring events and associated violations of Section 103(a)

17   of CERCLA and Section 304 of EPCRA that Chevron has identified in its CERCLA/EPCRA

18   Compliance Review Report and corrected as set forth in Paragraph 59A.

19        218.  [omitted]

20        219.  **Audit Policy.**  Nothing in this Consent Decree is intended to limit or

21   disqualify Chevron, on the grounds that information was not discovered and supplied

22   voluntarily, from seeking to apply EPA's Audit Policy or any state or local audit policy to any

23   violations or non-compliance that Chevron discovers during the course of any investigation,

24   audit, or enhanced monitoring that Chevron is required to undertake pursuant to this Consent

25   Decree.

26        220.  **Claim/Issue Preclusion.**  In any subsequent administrative or judicial

27   proceeding initiated by the United States or the Plaintiff-Intervenors for injunctive relief,

28   penalties, or other appropriate relief relating to Chevron for violations of the PSD/NSR, NSPS,

1    NESHAP, and/or LDAR requirements, not identified in Section XVI (Effect of Settlement) of

2    the Consent Decree and/or the Complaint:

3         a.      Chevron shall not assert, and may not maintain, any defense or claim based

4    upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, or claim-

5    splitting.  Nor may Chevron assert, or maintain, any other defenses based upon any contention

6    that the claims raised by the United States or the Plaintiff-Intervenors in the subsequent

7    proceeding were or should have been brought in the instant case.  Nothing in the preceding

8    sentences is intended to affect the ability of Chevron to assert that the claims are deemed

9    resolved by virtue of Section XVI of the Consent Decree.

10        b.      Except as set forth in Paragraph 220.a., above, the United States and the

11   Plaintiff-Intervenors may not assert or maintain that this Consent Decree constitutes a waiver or

12   determination of, or otherwise obviates, any claim or defense whatsoever, or that this Consent

13   Decree constitutes acceptance by Chevron of any interpretation or guidance issued by EPA

14   related to the matters addressed in this Consent Decree.

15        221.    **Imminent and Substantial Endangerment.**  Nothing in this Consent Decree

16   shall be construed to limit the authority of the United States and the Plaintiff-Intervenors to

17   undertake any action against any person, including Chevron, to abate or correct conditions which

18   may present an imminent and substantial endangerment to the public health, welfare, or the

19   environment.

20        222.    [Omitted]

21

22                        **XVII.  GENERAL PROVISIONS**

23        223.    **Other Laws**.  Except as specifically provided by this Consent Decree, nothing

24   in this Consent Decree shall relieve Chevron of its obligations to comply with all applicable

25   federal, state, and local laws and regulations, including but not limited to more stringent

26   standards.  In addition, nothing in this Consent Decree shall prohibit or prevent the United States

27   or Plaintiff-Intervenors from developing, implementing, and enforcing more stringent standards

28   subsequent to the Date of Lodging of this Consent Decree through rulemaking, the permit

1    process, or as otherwise authorized or required under federal, state, or local laws and regulations.

2    Subject to Section XVI (Effect of Settlement) and Paragraph 224 of this Consent Decree, nothing

3    contained in this Consent Decree shall be construed to prevent or limit the rights of the United

4    States or the Plaintiff-Intervenors to seek or obtain other remedies or sanctions available under

5    other federal, state, or local statutes or regulations, by virtue of Chevron's violation of the

6    Consent Decree or of the statutes and regulations upon which the Consent Decree is based, or for

7    Chevron's violations of any applicable provision of law.  This shall include the right of the

8    United States or the Plaintiff-Intervenors to invoke the authority of the Court to order Chevron's

9    compliance with this Consent Decree in a subsequent contempt action.  The requirements of this

10   Consent Decree do not exempt Chevron from complying with any and all new or modified

11   federal, state, and/or local statutory or regulatory requirements that may require technology,

12   equipment, monitoring, or other upgrades after the Date of Lodging of this Consent Decree.

13         224.    **Post-Permit Violations**.  Nothing in this Consent Decree shall be construed to

14   prevent or limit the right of the United States or the Plaintiff-Intervenors to seek injunctive or

15   monetary relief for violations of limits that have been incorporated into permits pursuant to this

16   Consent Decree; provided, however, that with respect to monetary relief, the United States and

17   the Plaintiff-Intervenors must elect between filing a new action for such monetary relief or

18   seeking stipulated penalties under this Consent Decree, if stipulated penalties also are available

19   for the alleged violation(s).

20         225.    **Failure of Compliance.**  The United States and the Plaintiff-Intervenors do

21   not, by their consent to the entry of Consent Decree, warrant or aver in any manner that

22   Chevron's complete compliance with the Consent Decree will result in compliance with the

23   provisions of the CAA or the state statutes and regulations identified in Paragraph 9, or the

24   provisions of CERCLA or EPCRA.  Notwithstanding the review or approval by EPA or the

25   Plaintiff-Intervenors of any plans, reports, policies or procedures formulated pursuant to the

26   Consent Decree, Chevron shall remain solely responsible for compliance with the terms of the

27   Consent Decree, except as provided in Section XIV (Force Majeure), all applicable permits, and

28   all applicable federal, state, and local laws and regulations.

226.    **Service of Process.**  Chevron hereby agrees to accept service of process by mail with respect to all matters arising under or relating to the Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including but not limited to, service of a summons.  The persons identified by Chevron at Paragraph 231 (Notice) are authorized to accept service of process with respect to all matters arising under or relating to the Consent Decree.

227.    **Post-Lodging/Pre-Entry Obligations**.  Obligations of Chevron under this Consent Decree to perform duties scheduled to occur after the Date of Lodging of the Consent Decree, but prior to the Date of Entry of the Consent Decree, shall be legally enforceable only on and after the Date of Entry of the Consent Decree.  Liability for stipulated penalties, if applicable, shall accrue for violation of such obligations and payment of such stipulated penalties may be demanded by the United States or the Plaintiff-Intervenors as provided in this Consent Decree, provided that the stipulated penalties that may have accrued between the Date of Lodging of the Consent Decree and the Date of Entry of the Consent Decree may not be collected unless and until this Consent Decree is entered by the Court.

228.    **Costs.**  Each Party to this action shall bear its own costs and attorneys' fees.

229.    **Public Documents**.  All information and documents submitted by Chevron to EPA and the appropriate Plaintiff-Intervenors pursuant to this Consent Decree shall be subject to public inspection in accordance with the respective statutes and regulations that are applicable to EPA and the Plaintiff-Intervenors, unless subject to legal privileges or protection or identified and supported as trade secrets or business confidential in accordance with the respective state or federal statutes or regulations.

230.    **Public Notice and Comment.**  The Parties agree to the Consent Decree and agree that the Consent Decree may be entered upon compliance with the public notice procedures set forth at 28 C.F.R. § 50.7, and upon notice to this Court from the United States Department of Justice requesting entry of the Consent Decree.  The United States reserves the right to withdraw or withhold its consent to the Consent Decree if public comments disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or

1    inadequate.

2         231.   **Notice.**  Unless otherwise provided herein, notifications to or communications

3    between the Parties shall be deemed submitted on the date they are postmarked and sent by U.S.

4    Mail, postage pre-paid, except for notices under Section XIV (<u>Force Majeure</u>) and Section XV

5    (Retention Jurisdiction/Dispute Resolution) which shall be sent by overnight mail or by certified

6    or registered mail, return receipt requested.  Each report, study, notification or other

7    communication of Chevron shall be submitted as specified in this Consent Decree, with copies to

8    EPA Headquarters and the Applicable EPA Region and the applicable Plaintiff-Intervenor.  If

9    the date for submission of a report, study, notification or other communication falls on a

10   Saturday, Sunday or legal holiday, the report, study, notification or other communication will be

11   deemed timely if it is submitted the next business day.  Except as otherwise provided herein, all

12   reports, notifications, certifications, or other communications required or allowed under this

13   Consent Decree to be submitted or delivered to the United States, EPA, the Plaintiff-Intervenors,

14   and Chevron shall be addressed as follows:

15        **As to the United States:**
          Chief
16        Environmental Enforcement Section
          Environment and Natural Resources Division
17        U.S. Department of Justice
          P.O. Box 7611, Ben Franklin Station
18        Washington, DC 20044-7611
          Reference Case No. 90-5-2-1-07629
19
          **As to EPA**:
20        Director, Air Enforcement Division
          Office of Regulatory Enforcement
21        U.S. Environmental Protection Agency
          Mail Code 2242-A
22        1200 Pennsylvania Avenue, N.W.
          Washington, DC 20460-0001
23
          with a hard copy to
24
          Director, Air Enforcement Division
25        Office of Regulatory Enforcement
          c/o Matrix Environmental & Geotechnical Services
26        120 Eagle Rock Avenue
          Suite 207
27        East Hanover, NJ 07936
          Attn:  Norma Eichlin
28

1  and an electronic copy to

2  neichlin@matrixegs.com
   Jackson.james@epa.gov
3  foley.patrick@epa.gov

4  **EPA Regions:**

5       <u>Region 4</u>:
   Chief
6  Air Enforcement & EPCR Branch
   Mail Code 4APTMD-AEEB
   USEPA Region 4
7  61 Forsyth Street, S.W.
   Atlanta, GA 30303
8
        <u>Region 8</u>:
9  Air Director
   Technical Enforcement Program
10 Mail Code 8 ENF-T
   Office of Enforcement, Compliance & Environmental Justice
11 USEPA Region 8
   999 18th Street, Suite 300
12 Denver, CO 80202

13      <u>Region 9</u>:
   Director
14 Air Division
   Mail Code AIR-1
   USEPA Region 9
15 75 Hawthorne Street
   San Francisco, CA 94105
16
17 **Plaintiff-Intervenors:**

18 Bay Area Air Quality Management District
   Executive Officer/Air Pollution Control Officer
   39 Ellis Street
19 San Francisco, CA 94109

20 Clean Air Branch
   Environmental Management Division
21 Hawaii Department of Health
   P. O. Box 3378
22 Honolulu, HI  96801-3378

23 Mississippi Department of Environmental Quality
   Chief, Environmental Compliance & Enforcement Division
   Office of Pollution Control
24 P.O. Box 10385
   Jackson, MS  39289
25
   Christian C. Stephens
26 Assistant Attorney General
   Department of Environmental Quality
27 150 North 1950 West
   P.O. Box 144820
28 Salt Lake City, UT 84114-4820

**As to Chevron:**

All communications to Chevron shall be addressed to:

> NSR Project Manager
> Chevron Products Company, Global Refining
> Chevron Richmond Refinery
> Technical Center, 3rd Floor
> 841 Chevron Way
> Richmond, CA 94801

With a copy to each affected Refinery:

> Manager, Health/Environmental/Safety
> Chevron Products Company
> Chevron El Segundo Refinery
> 324 West El Segundo Blvd.
> El Segundo, CA 90245

> Resources Superintendent
> Chevron Products Company
> Chevron Hawaii Refinery
> 91480 Malakole Street
> Kapolei, HI 96707

> Manager, Safety/Environmental/Health Services
> Chevron Products Company
> Chevron Pascagoula Refinery
> 250 Industrial Road
> Pascagoula, MS 39581-3201

> Health, Environment, and Safety Manager
> Chevron Products Company
> Chevron Richmond Refinery
> Technical Center
> 841 Chevron Way
> Richmond, CA  94801

> Technical Manager
> Chevron Products Company
> Chevron Salt Lake City Refinery
> 2351 N. 1100 West
> Salt Lake City, UT 84116

Any party may change either the notice recipient or the address for providing notices to it by serving all other parties with a notice setting forth such new notice recipient or address.  In addition, the nature and frequency of reports required by the Consent Decree may be modified by mutual consent of the Parties.  The consent of the United States to such modification must be in the form of a written notification from EPA, but need not be filed with the Court to be

1   effective.

2           232.     **Approvals**.  All EPA approvals or comments required under this Decree shall come from

3   EPA, Office of Regulatory Enforcement, Air Enforcement Division, at the address listed in Paragraph 231

4   (Notice).  All Plaintiff-Intervenor approvals shall be sent from the offices identified in Paragraph 231.

5           233.     **Paperwork Reduction Act.**  The information required to be maintained or submitted

6   pursuant to this Consent Decree is not subject to the Paperwork Reduction Act of 1980, 44 U.S.C. §§ 3501 <u>et</u>

7   <u>seq</u>.

8           234.     **Modification**.  The Consent Decree contains the entire agreement of the Parties and shall

9   not be modified by any prior oral or written agreement, representation or understanding.  Prior drafts of the

10  Consent Decree shall not be used in any action involving the interpretation or enforcement of the Consent

11  Decree.  Non-material modifications to this Consent Decree shall be in writing and signed by the Parties.  The

12  United States will file non-material modifications with the Court on a periodic basis.  For purposes of this

13  Paragraph 234, non-material modifications shall include, but not be limited to, schedule modifications that do

14  not extend the date for compliance with emission limitations following the installation of control equipment,

15  schedule modifications that do not extend the date for completion of a catalyst additive program (as specified

16  in Paragraphs 12.g. or 17.e. of this Consent Decree), and modifications to frequency of reporting obligations,

17  provided that such changes are agreed upon in writing by EPA and Chevron.  Material modifications to this

18  Consent Decree shall be in writing, signed by the Parties, and shall be effective upon approval by the Court.

19  Specific provisions in this Consent Decree that govern specific types of modifications shall be effective as set

20  forth in the specific provision governing the modification.

21

22                                   **XVIII.  TERMINATION**

23          235.     This Consent Decree shall be subject to termination upon motion by the United States or

24  Chevron under the conditions identified in Paragraph 237, below.  Prior to seeking termination, Chevron must

25  have completed and satisfied all of the following requirements of this Consent Decree:

26          a.       installation of control technology systems as specified in this Consent Decree;

27          b.       compliance with all provisions contained in this Consent Decree, which compliance may

28  be established for specific parts of the Consent Decree in accordance with

1    Paragraph 236, below;

2          c.        payment of all penalties and other monetary obligations due under the terms of

3    the Consent Decree; no penalties or other monetary obligations due hereunder can be

4    outstanding or owed to the United States or the Plaintiff-Intervenors;

5          d.        completion of the Supplemental Environmental Projects as set forth in Section

6    VIII;

7          e.        application for and receipt of permits incorporating the surviving emission

8    limits and standards established under Section V; and

9          f.        operation for at least one year of each unit in compliance with the emission

10   limits established herein, and certification of such compliance for each unit within the first

11   progress report following the conclusion of the compliance period, provided, however, that

12   limits established for the Hawaii Refinery pursuant to Paragraphs 12.g., 13, 17.e., and 18 are not

13   subject to the requirement in this Paragraph 235.f. if Chevron has applied for and received the

14   required permits for such limits.

15         236.    **Certification of Completion**.

16         a.        Prior to moving for termination, Chevron may certify completion for each

17   Chevron Refinery of one or more of the following parts of the Consent Decree, provided that all

18   of the related requirements for that Refinery have been satisfied:

19         i.        Section V.A. - Fluid Catalytic Cracking Unit (including operation of the unit

20                   for one year after completion in compliance with the emission limit set

21                   pursuant to the Consent Decree with the exception of the Hawaii Refinery as

22                   set forth in Paragraph 235.f.);

23         ii.       Sections V.B. through V.E. - Fluid Catalytic Cracking Unit (including

24                   operation of the unit for one year after completion in compliance with the

25                   emission limits set pursuant to the Consent Decree with the exception of the

26                   Hawaii Refinery as set forth in Paragraph 235.f.);

27         iii.      Sections V.F. and V.G. – Heaters and Boilers (including operation of the

28                   relevant units for one year after completion in compliance with the emission

1      limit set pursuant to the Consent Decree);

2          iv.     Section VIII – Supplemental Environmental Projects

3          b.      Within 90 days after Chevron concludes that any of the parts of the Consent

4  Decree identified in Paragraph 236.a.i. - iv. have been completed for any one of the Chevron

5  Refineries, Chevron may submit a written report to EPA and the appropriate Plaintiff-Intervenor

6  describing the activities undertaken and certifying that the applicable Sections have been

7  completed in full satisfaction of the requirements of this Consent Decree, and that Chevron is in

8  substantial and material compliance with all of the other requirements of the Consent Decree.

9  The report shall contain the following statement, signed by a responsible corporate official of

10  Chevron:

11              To the best of my knowledge, after thorough investigation, I
               certify that the information contained in or accompanying
12              this submission is true, accurate and complete.  I am aware
               that there are significant penalties for submitting false
13              information, including the possibility of fine and
               imprisonment for knowing violations.

14          c.      Upon receipt of Chevron's certification, EPA, after reasonable opportunity for

15  review and comment by the Plaintiff-Intervenors, shall notify Chevron whether the requirements

16  set forth in the applicable Paragraphs have been completed in accordance with this Consent

17  Decree.  The parties recognize that ongoing obligations under such Paragraphs remain and

18  necessarily continue (*e.g.,* reporting, record keeping, training, auditing requirements), and that

19  Chevron's certification is that it is in current compliance with all such obligations.

20          i.      If EPA concludes that the requirements have not been fully complied with,

21              EPA shall notify Chevron as to the activities that must be undertaken to

22              complete the applicable Paragraphs of the Consent Decree.  Chevron shall

23              perform all activities described in the notice, subject to its right to invoke the

24              dispute resolution procedures set forth in Section XV (Dispute Resolution).

25          ii.     If EPA concludes that the requirements of the applicable Paragraphs have been

26              completed in accordance with this Consent Decree, EPA will so certify in

27              writing to Chevron.  This certification shall constitute the certification of

28

1    completion of the applicable Paragraphs for purposes of this Consent Decree.

2        d.       Nothing in this Paragraph 236 shall preclude the United States or the Plaintiff-

3    Intervenors from seeking stipulated penalties for a violation of any of the requirements of the

4    Consent Decree regardless of whether a Certification of Completion has been issued under this

5    Paragraph 236 of the Consent Decree.  In addition, nothing in this Paragraph 236 shall permit

6    Chevron to fail to implement any ongoing obligations under the Consent decree regardless of

7    whether a Certification of Completion has been issued with respect to this Paragraph 236 of the

8    Consent Decree.

9        237.     At such time as Chevron believes that it has satisfied the requirements for

10   termination set forth in Paragraph 235.a. - f., Chevron shall certify such compliance and

11   completion to the United States and the Plaintiff-Intervenors in writing.  Unless, within 120 days

12   of receipt of Chevron's certification under this Paragraph 237, either the United States or any

13   Plaintiff-Intervenor objects in writing with specific reasons, the Court may upon motion by

14   Chevron order that this Consent Decree be terminated.  If either the United States or any

15   Plaintiff-Intervenor objects to the certification by Chevron then the matter shall be submitted to

16   the Court for resolution under Section XV (Retention of Jurisdiction/Dispute Resolution) of this

17   Consent Decree.  In such case, Chevron shall bear the burden of proving that this Consent

18   Decree should be terminated.

19

20                        **XIX.  SIGNATORIES**

21       238.     Each of the undersigned representatives certify that they are fully authorized to

22   enter into the Consent Decree on behalf of such Parties, and to execute and to bind such Parties

23   to the Consent Decree.

24

25       Dated and entered this __27th__ day of __June__, 200_5_ .

26

27       _____

28       UNITED STATES DI...

APPROVED

Charles R. Breyer

1

2   WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Chevron</u>
<u>U.S.A. Inc.</u>, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

3

4                                          FOR PLAINTIFF THE UNITED STATES OF
                                           AMERICA:

5

6   Date:_____9.25.03_____

7                                          THOMAS L. SANSONETTI
                                           Assistant Attorney General

8                                          Environment and Natural Resources Division
                                           United States Department of Justice

9

10  Date:____10-14-03____

11                                         A. KENT MAYO
                                           Trial Attorney

12                                         Environmental Enforcement Section
                                           Environment and Natural Resources

13                                         Division
                                           United States Department of Justice

14                                         P.O. Box 7611
                                           Ben Franklin Station

15                                         Washington, D.C.  20044-7611

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT  DECREE

WE HEREBY CONSENT to the entry of the Consent Decree in United States et al. v. Chevron U.S.A. Inc., subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR PLAINTIFF THE UNITED STATES OF AMERICA:

KEVIN V. RYAN
United States Attorney
Northern District of California

Date: 10/15/03

CHARLES M. O'CONNOR
Assistant United States Attorney
Northern District of California
450 Golden Gate Ave., Box 36055
San Francisco, CA 94102

1   WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Chevron</u>
    <u>U.S.A. Inc.</u>, subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

2

3                                              FOR THE UNITED STATES
                                               ENVIRONMENTAL PROTECTION AGENCY:

4

5   Date:   9/29/03

6                                              JOHN PETER SUAREZ
                                               Assistant Administrator for

7                                              Enforcement and Compliance Assurance
                                               United States Environmental

8                                              Protection Agency
                                               Washington, D.C.  20460

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2        WE HEREBY CONSENT to the entry of the Consent Decree in United States et al. v.

3   Chevron U.S.A. Inc., subject to the public notice and comment requirements of 28 C.F.R. §
    50.7.

4

5                                        FOR THE UNITED STATES
                                         ENVIRONMENTAL PROTECTION AGENCY,
6                                        REGION IX:

7

8   Date: 09  OCTOBER  03

                                         WAYNE NASTRI
9                                        Regional Administrator
                                         United States Environmental Protection Agency
                                         Region IX
10                                       75 Hawthorne Street
                                         San Francisco, CA 94105-3901
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States et al. v. Chevron U.S.A. Inc.</u>

FOR PLAINTIFF-INTERVENOR
THE STATE OF HAWAII

Date: 10/8/03

*for* LAURENCE K. LAU
Deputy Director
Environmental Health Administration

Date: 10-8-03

WILLIAM COOPER
Deputy Attorney General
Department of the Attorney General

WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States, et al. v. Chevron U.S.A. Inc.</u>

FOR PLAINTIFF-INTERVENOR
THE MISSISSIPPI COMMISSION ON
ENVIRONMENTAL QUALITY

Date: _9/24/03_

CHARLES H. CHISHOLM
Executive Director
Mississippi Department of
Environmental Quality

1

2       WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States, et al. v.</u>
3   <u>Chevron U.S.A. Inc.</u>

4

5                                                   FOR PLAINTIFF-INTERVENOR
                                                    THE STATE OF UTAH
6

7

8   Date: 9/25/03                                   _____
                                                    RICHARD SPROTT
9                                                   Executive Secretary
                                                    Division of Air Quality
10

11

12

13  Date: 9/25/03                                   _____
                                                    LENORE EPSTEIN
14                                                  Assistant Attorney General
                                                    State of Utah
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2        WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States, et</u>

3   <u>al. v. Chevron U.S.A. Inc.</u>

4                                              FOR PLAINTIFF-INTERVENOR
                                             BAY AREA AIR QUALITY
5                                            MANAGEMENT DISTRICT

6

7   Date: *October 2, 2003*

8                                            WILLIAM C. NORTON
                                             Executive Officer,
9                                            Air Pollution Control Officer
                                             Bay Area Air Quality Management District
10                                           939 Ellis Street
                                             San Francisco, California 94109
11

12

13                                           APPROVED AS TO FORM:

14                                           BRIAN C. BUNGER
                                             District Counsel
15                                           Bay Area Air Quality Management District
                                             939 Ellis Street
16                                           San Francisco, California 94109

17

18   Date: *October 1, 2003*        By:
                                             SHIRLEY R. EDWARDS
19                                           Assistant Counsel
                                             Bay Area Air Quality Management District
20

21

22

23

24

25

26

1        WE HEREBY CONSENT to the entry of the Consent Decree in <u>United States,</u>
2    <u>et al. v. Chevron U.S.A. Inc.</u>

3

4                                    FOR DEFENDANT CHEVRON U.S.A. INC.

5    Date: *Oct. 10, 2003*

6                                    WALKER C. TAYLOR
                                     Vice President
7                                    Chevron U.S.A. Inc.

8

9

10

11

12   Date: *October 10, 2003*

13                                   KENNETH L. WAGGONER
                                     Vice President and General Counsel
14                                   Chevron Products Company

15

16

17

18

19

20

21

22

23

24

25

26

27

28